# LIEPOSITION OF MARIAN DEBORAH MILER
## NOVEMBER 20, 2003

### 49

```
 1  interviewed you?
 2      A    Mr. Michael Mahoney.
 3      Q    What was his position with Edward Jones?
 4      A    He was a broker.
 5      Q    What's the term that Edward Jones uses for
 6  that position?
 7      A    I don't recall.
 8      Q    Investment Representative, does that sound
 9  right?
10      A    I don't recall.
11      Q    Did any --
12      A    All firms use different terms for that. At
13  Smith Barney they don't refer to them as an
14  Investment representative, refer to it as something
15  else. So I don't recall what Edward zones uses. The
16  term they use, I don't recall that term.
17      Q    Who else was involved in the hiring process
18  at Edward Jones?
19      A    A lady called me on the telephone from
20  St. Louis and she Interviewed me over the telephone.
21      Q    Do you remember who that was?
22      A    I cannot recall her name.
23      Q    How long did that interview last?
24      A    Approximately 45 minutes.
```

### 50

```
 1      Q    And did that person hire you?
 2      A    Can you rephrase that question?
 3      Q    What is It that sounds confusing to you?
 4      A    3ust asking you to rephrase the question.
 5      Q    What was your understanding about why this
 6  person from St. Louis called and interviewed you?
 7   A    She was a person that represented the
 8  company in the Human Relations Department, I suppose.
 9           Q And –
10           A And to the best of my recollection, I
11           believe her name was Amy, but I'm not certain.
12           Q Okay. And then you were ultimately hired,
13  right?
14      A    Yes.
15      Q    Was it this person -- were you informed
16  by -- how were you informed that you were hired?
17      A    Mr. Mahoney called me on the telephone to
18  tell me I was hired.
19      Q    When did he call and tell you that?
20      A    That night.
21      Q    And what did -- what did he tell you: just
22  that you were hired, or
23      A    Yes.
24      Q    When did you actually start work, then, for
```

### 51

```
 1 Edward Jones?
 2      A    I believe it was on the 7th.
 3           (Whereupon, a document entitled
 4  "Sexual Harassment Policy was marked Defendant's
 5  Exhibit No. 12 for identification.)
 6  BY MR. RICKS:
 7      Q    I'm handing you what's been marked as
 8   Exhibit 12. This Is labeled on the first page
 9   "Sexual Harassment Policy" for Edward Jones. And on
10  the second page it continues and there is a signature
11  line. Is that your signature?
12      A   Yes.
13      Q    And is that your handwriting where it shows
14  the date?
15      A    Yes.
16      Q    And what is the date you signed this?
17      A    3uly 18th, 2001.
18      Q    You Indicated you were hired as a Branch
19  Office Administrator. Is it fair to refer to that as
20  a BOA position?
21      A    Yes. As long as my attorney understands
         22  that.
23           MR. SPITZER: Yes.
24
```

### 52

```
 1 BY MR. RICKS:
 2      Q Okay. What were your job duties as a BOA?
 3      A As a BOA I was an office administrator. It
 4  meant handling telephone calls; it meant scheduling
 5  the broker for meetings.
 6      Q    Is that primarily meetings with customers
 7  or clients?
 8      A    Correct. And it also meant, that for the
 9  first six months of my fob, that I was to train
10  online on the computer for the position. I was to
11  meet and greet clients. I was responsible for
12  advertising any seminars that were held in the
13  office, responsible for mailings, responsible for
14  contacting -
15      Q These are mailings to customers?
16      A Yes. Customers and perspective customers.
17           -- responsible for understanding new
18  products that were -- the firm was selling,
19  responsible for filling out new applications for new
20  clients. Not applications, but just the paperwork
21  for new clients.
22  Q To open up accounts and that sort of thing?
23      A    Yes. Responsible for networking him any
24  way I possibly could.
```

DEPOSITION OF MARIAN DEBORAH MILLER
NOVEMBER 20, 2003

## Page 89

1  or four weeks in, right?
2   A   That's correct. That does not discount the
3  fact that Mr. Mahoney wanted answers to questions
4  very quickly. And that was almost from the -- you
5  know, almost from the very beginning. It was
6  probably -- I noticed that probably into the second
7  week. It was at that point where I said, you know, I
8  have not been trained properly, and maybe we could
9  get some help in here to get me a little organized,
10 so I would be able to give him -- you know,
11 facilitate his answers.
12  Q   You say he became enraged. What does that
13 mean?
14  A   He started to yell.
15  Q   What would he yell?
16  A   "I need an answer to this right now. You
17 better get me an answer **to this right now. You're**
18 supposed to be my BOA. You know, I would be a better
19 BOA than you would. I'm going to call St. Louis."
20          He would call St. Louis. He would
21 also -- you know, you call St. Louis; you get put on
22 hold for awhile. So he would make lewd gestures
23 while he was waiting to speak with them, towards the
24 company.

## Page 90

1  Q   He had a separate office from you, though,
2  right?
3  A   Yes, he did. I didn't have an office.
4  Q   You didn't have an office?
5  A   I had a reception area. I did not have an
6  office.
7  Q   Well, there was a reception area where you
8  worked and then he had a separate office?
13  A   Correct.
14  Q   Was there also a conference room in the --
15  A   Yes, there was.
16  Q   So was the office basically a reception
17 area, his office, and a conference room?
18 A Right. And then there was also a room
    where the server was for the computer.
19  Q   Was there a restroom in the office as well?
    Was there a storage room?
20  A   Sort of a storage room?
21  Q   That was out in the common area, or what?
22  A   Yes.
23  Q   Where the branch office was located, was
24 that an office building? a strip mall? what?

## Page 91

1  A   It was a small -- I wouldn't call it a
2  strip mall. I would call it a -- just businesses in
3  a strip area. You know, there was not any shopping
4  per se. There were offices there.
5  Q   But there were common hallways and common
6  restrooms, and that sort of thing?
7  A   Yes.
12  Q   So when you say -- when you were saying Mr.
13 Mahoney would become enraged if you didn't get a quick
14 answer for him, by that, my understanding is, that he would yell
15 and say the things that you just mentioned?
16  A   Um-hum. Yes, he would.
17  Q   Anything else that you meant when you said
18 he would become enraged?
19  A   He would just, right there and then, pick
20
21 up the phone and call St. Louis.
22  Q   He never hit you or threatened to hit you
23 or anything like that, though, did he?
24  A   No.
    Q   Okay.
    A   No. He hit me with paper.
    Q   What does that mean?
    A   It means he would crumple up a piece of

## Page 92

1  paper --
2  Q   Right.
3  A   -- and throw it at me. If that means
4  hitting, then, yes, he hit me.
5  Q   From where would he throw this?
6  A   From behind his desk.
7  Q   How far was that?
21  A   Approximately where you're sitting to where
22 I'm sitting. Or perhaps I was standing there.
23  Q   So it was, what, a distance of ten feet or
24 so?

   A   Would you say this was ten feet?
       MR. SPITZER: I would say it was four
feet.
   A   I would say it was less than ten feet.
   Q   , His office desk was only four feet from -
   A   I would be in his office.
   Q   Oh, I see. So you would be standing across
the desk from him or sitting across -
   A   Or sitting, right.
   Q   Sitting across the desk. I misunderstood
what you were saying.
           And so he might at some point take a
piece of paper and crumple it up and toss it across

DEPOSITION OF MARIAN DEBORAH MILER
NOVEMBER 20, 2003

## 93

```
 1  the desk at you?
 2      A    That's not what I said.
 3      Q    You tell me then.
 4      A    I said he would throw it at me.
 5      Q    Okay. And what would you do? Would you
 6  catch it, or what?
 7      A    No.
 8      Q    And then what would happen next?
 9      A    When he threw paper at me?
10      Q    Right.
11      A    I asked him not to do that and to treat me
12  with respect.
13      Q    And?
14      A    And I would walk out of the office.
15      Q    Okay.
16      A    Out of his office.
17      Q    Right.
18      A    I returned to my desk.
19      Q    Now, we were, then -- at this point we
20  were -- we talked about sort of a third set of
21  conversations you had with Lynn Vassal. I'm not sure
22  that you were finished yet with -- I thought you said
23  there was something else that you -- you remembered
24  some other conversations with Ms. Vassal; is that
```

## 94

```
 1  true?
 2      A  I remember subsequent conversations with
 3  Ms. Vassal that were not during the third
 4  conversation.
 5      Q    Okay.
 6      A    I remember subsequent conversations.
 7      Q    Right. Okay. When was this?
 8      A    Perhaps on the fifth or sixth conversation.
 9      Q    Okay. When?
10      A    I don't recall.
11      Q    Are we now into, for example, October of
12  2001?
13      A    I don't recall.
14      Q    Okay.
15      A    These telephone calls were going on quite
16  often. I needed to get --
17      Q    So what do you --
18      A    -- fast answers for Mr. Mahoney.
19      Q    What do you remember about the next
20  conversations with Lynn Vassal?
21      A    The following conversations were -- again,
22  my primary reason for calling them were to ask
23  questions regarding systems. And she would ask, "How
24  are things going over there? Are you able to handle
```

## 95

```
 1  him?"
 2      Q    And?
 3      A    And I said, "It's getting exceedingly more
 4  difficult."
 5      Q  What did you tell her -- other than more
 6  difficult, what else did you say, if anything?
 7      A    Well, I told her that he was very abusive,
 8  I told her that he was requiring a lot of time from
 9  me to do personal work for his condominium
10  association. I indicated to her that he did -- am I
11  going too fast for you?
12      Q    No. Go ahead.
13      A    Would you like me to -
14      Q    You said he was abusive, that he was
15  requiring you to do some personal business. What
16  else?
17      A    Yes, personal business for him. He also
18  asked me to ask my son to do some work on his
19  computer for him for a seminar that he was having,
20  and that he would pay him to do that, which he did
21  not pay him to do. Having me stay late and stuff
22  envelopes and clock out. Told me he did not want -
23  I told her that he did not want me to stay late. I
24  mean that -- pardon me -- he wanted me to stay late
```

## 96

```
 1  because he wanted me to do mailings for him, and he
 2  would start me on those mailings at five o'clock and
 3  that I should go and clock out. I told her about
 4  that.
 5           I also mentioned that I needed to get
 6  home to my son and that he was preventing me from
 7  doing that. He also -- at that point he -- well,
 8  actually, after -- I have to say after the second or
 9  third conversation -- I have to backtrack a little
10  bit, if you don't mind. Is that all right?
11      Q  Go ahead.
12      A  After the second or third conversation that
13  I had with Lynn and with Kristin -- because Kristin
14  was privy to the Information that -- or to the
15  conversation. I believe they had It on speakerphone
16  and I was speaking to both of them. They reported
17  this. They reported what I was saying to Michael
18  Cummins. Michael Cummins, in turn, called
19  Mr. Mahoney.
20      Q  Now, I don't know what -- when are you
21  talking about then?
22      A  This was after the third conversation.
23      Q    So after the third -- this would be, like,
24  the fourth conversation then?
```

DEPOSITION OF MARIAN DEBORAH MILLER
NOVEMBER 20, 2003

### 97

1  A    No. This was after the third conversation
2  that I had with them. So this is not a fourth
3  conversation; this was after the third conversation
4  that I had had with Lynn Vassal and Kristin
5  Commander.
6  Q    Okay.
7  A    There was a telephone call that was made by
8  Michael Cummins to Michael Mahoney.
9  Q    How do you know that?
10 A    Because Mr. Mahoney told me about it.
11 Q    Okay. Do you know what that conversation
12 was about?
13 A    The conversation was that he was told to
14 behave -- quotes behave himself, and that I was the
15 last BOA he was going to be given by the company.
16 And that he was asking me to do things that I was
17 not -- that were not part of my job description, and
18 that he was also --
19 Q    Mahoney told you all this?
20 A    Yes.
21 Q    Okay.
22 A    And he said to me, "If you had a problem
23 with me, why didn't you just come to me?"
24 Q    Okay.

### 98

1  A    And I replied to him, "I have spoken to you
2  about this, but it didn't seem to make much of a
3  difference to you, so I discussed it with your
4  regional leader" -- or their office. I discussed it
5  with their office.
6  Q    You discussed with the BOAS?
7  A    Correct.
8  Q    You never talked about it with Cummins
9  himself, did you?
10 A    I did speak to Mr. Cummins, yes, I did.
11 Q    Oh, you did?
12 A    Yes, I did.
13 Q    When did you talk with Mr. Cummins?
14 A    Mr. Cummins called me one day. He asked
15 me -- because this is after having, you know,
16 conversations with Kristin Commander and Lynn Vassal
17 that Mr. Mahoney was not, quote, behaving himself.
18 Q    When was this?
19 A    I don't recall the exact date, but it was
20 after the third conversation. I believe it was after
21 the third conversation that we had had. And we were
22 probably -- I mean, I'm just going to make it, you
23 know, an educated guess and say that it was somewhere
24 around four weeks after -- or -- I was working there,

### 99

1  about four weeks after I was working there.
2  Q    So perhaps late August -
3  A    Somewhere -
4  Q    -- 2001?
5  A    Perhaps it was somewhere around there.
6  Could have been mid August. You know, like I said,
7  this is just a guesstimation on my part.
8  Q    Okay. So mid to late August 2001?
9  A    Yeah.
10 Q    All right. Tell me about that.
11 A    He called me and asked me, you know, again,
12 you know, "How are things going over there?" And I
13 indicated that there was -- you know, there was a
14 problem with Mr. Mahoney. It was very demanding,
15 very condescending, and he was also keeping me
16 overtime, and he was also asking me for a number of
17 personal favors, that he was -- I told him that he
18 made a couple of wisecracks, if you will, and that I
19 was feeling that I was not in a professional
20 atmosphere.
21 Q    Okay. Anything else that you told
22 Mr. Cummins?
23 A    I told him that I had known that he had
24 already spoken to him, and I said that - I told him

### 100

1  that didn't seem to make much of a difference. He
2  was on good behavior for a couple days, but then went
3  right back to the way he was.
4       Now, I also recall, after the
5  conversation that he had had with Mr. Cummins, the
6  following day Mr. Mahoney brought me flowers to
7  apologize.
8  Q    All right. Anything else that you recall?
9  A    Nothing that I can recall at this
10 particular time.
11 Q    Okay. So you've told me everything that
12 you remember telling Michael Cummins -
13 A    Correct.
14 Q    -- during that telephone conversation?
15 A    Correct.
16 Q    And that was the only time you talked
17 directly with Michael Cummins, right?
18 A    I had spoken to him before whenever -- if I
19 had called their office, if he had happened to have
20 answered the telephone.
21 Q    Other than to say hello and -
22 A    "Hi, how are you? Is Lynn there" or "Is
23 Kristin there?" And he had asked -- he always asked
24 me how things were going, and my answers were not

DEPOSITION OF MARIAN DEBORAH MILLER
NOVEMBER 20, 2003

### Page 129

1  I said there were dozens.    You've asked -- you've
2  asked me that before, Mr. Ricks.
3      Q    Let me clarify. How many conversations
4  were there where you were talking specifically about
5  Mr. Cummins? You said there were dozens --
6      A    You mean Mr. -- you're making a mistake.
7      Q    Mr. Mahoney.
8      A    Mahoney, right.
9      Q    How many were there when you were talking
10 about Mr. Mahoney's conduct with Ms. Commander?
11     A    Dozens of times.
12     Q    Okay. And can you put dates on any of
13 those or not?
14     A    I told you approximately when these
15 occurred. They occurred approximately from two weeks
16 after my employment through the end of my employment.
17 Happened on a regular basis, almost on a daily basis,
18 sometimes three times a day, sometimes six times a
19 day.
20     Q    But you -; I understood you to have said
21 that most of the conversations were brief
22 conversations about processes or procedures or
23 questions about how to do something, correct?
24     A    They started out that way. They asked me

### Page 130

1  about other things, about how things were going over
2  there.
3      Q    But that was --
4      A    At one point, it was probably around maybe
5  the twelfth phone call that I had with Ms. Commander
6  that she urged me, along with Ms. Vassal, to call
7  Human Relations. And I indicated -- I said to them,
8  "If I call Human Relations and talk to them about it,
9  I'll lose my job. They'll fire me."
10     Q    When was it they urged you to call the
11 Associate Relations or Human Relations Department in
12 St. Louis?
13     A    I said it was probably around, you know,
14 the twelfth phone call. It was probably somewhere
15 beginning of October maybe.
16     Q    Why did you -- and you said you wouldn't do
17 that because you thought you would lose your
18 employment?
19     A    Yes.
20     Q    And why did you say that?
21     A    Because when you report to Human Relations
22 to any place, you lose your employment.
23     Q    What's your basis for saying that?
24     A    I know -- I know It's happened to a number

### Page 131

1  of my -- people that I know.
2      Q    You don't know of anybody that that's
3  happened to at Edward Jones, do you?
4      A    I know of another person who was placed in
5  another position there, another office. She lost
6  her -
7      Q    Do you know of someone who contacted
8  Associate Relations and was then --
9      A    And then was transferred to another office.
10     Q    -- and then received a transfer to another
11 office?
12     A    Yes, yes.
13     Q    Who was that?
14     A    Shannon Bogus.
15     Q    Okay. And she's -- she still worked for
16 Edward Jones, though, right?
17     A    Right.
18     Q    Okay. She did not lose her employment, did
19 she?
20     A    No.
21     Q    Okay.
22     A    Okay. But then I -
23     Q    This Shannon Bogus Is -
24     A    -- I also -

### Page 132

1      Q    Shannon Bogus is a -- was a branch office
2  administrator in Mike Mahoney's office, right?
3      A    Yes.
4      Q    Okay. So she didn't -- you say she
5  contacted Associate Relations, but she didn't lose
6  her employment, right?
7      A    That's correct.
8      Q    So what was your basis, then, for saying
9  that you would lose your employment if you contacted
10 Associate Relations?
11     A    Because I -- one day I had -- I had a
12 conversation with somebody named Amy in Associate
13 Relations. Is It Associate Relations or Human
14 Relations? I don't know what -- I don't recall what
15 they call it.
16     Q    And what happened during that conversation?
17     A    Conversation went like this: Mr. Mahoney
18 was out of the office, and he was going to a district
19 meeting for brokers, district -- you know, a regional
20 meeting for brokers at the Wilton office. While he
21 was on his way there I received a phone call from my
22 son In Atlanta, where he is attending college, where
23 he was attending college at the time, and said he had
24 gotten hit by a car.

DEPOSITION OF MARIAN DEBORAH MILLER
NOVEMBER 20, 2003

### 137

1  Q   I thought you told me that she said, *if*
2  you're going to leave, make sure he knows what you're
3     doing.
4     A   No, that's not what I said.
5     Q   Okay.
6     A   I just told you what happened.
7     Q   All right.
8     A   She told me that I needed to call him, and
9  I said -- I asked her to call him for me, and she
10    refused.
11    Q   Okay. And this was just about whether or
12 not you would have time off?
13    A   To go to Atlanta to see to my!.,- to make
14 sure my son was all right.
15    Q   And she had wanted you to talk about this.
16 first with Mr. Mahoney, instead of her being involved
17 in it; is that right?
18    A   Correct.
19    Q   Okay. Was there any other --
20    A   So it was clear to me that she didn't want
21 to get Involved.
22    Q   Well, you said earlier that you didn't
23 report this to Associate Relations because you knew,
24 if you did, any problems with Mr. Mahoney, that you'd

### 138

1 be discharged or fired from employment, right?
2     A   Well, a lot of other people were discharged
3 from employment there.
4     Q   Okay. Do you --
5     A   So I -- I was actually afraid to lose my
6 job. It was after 9/ 11. There were no other jobs
7 available In the Investment Industry, and I didn't
8 really want to leave that Industry. I really like
9 it.
10    Q   Okay. Do you know any other person -- I
11 asked you if you know of any person who has ever lost ,
12 their job at Edward Jones after having contacted the
13 Associate Relations Department, and you said Shannon
14 Bogus. We talked about that.
15    A   There was another person named Judy, and I
16 don't know -- I don't remember her last name.
17    Q   What do you know about Judy?
18    A   I know that she worked for him for awhile.
19    Q   For whom?
20    A   For Mr. Mahoney.
21    Q   Okay. And what else?
22    A   You mean what other people? I mean, when
23 you say "what else," I don't what you're referring
24 to.

### 139

1     Q   Well, you brought up her name, and I'm not
2 quite sure -
3     A   I don't know her. I don't remember her
4 last name, but I was told by Shannon that Judy had a
5 lot of problems with him too.
6     Q   See, what I'm interested in is: You said,
7 "I didn't ever -- I didn't report these things to" -
8 you said that either Ms. Vassal or Ms. Cummins told
9 you to call the Associate Relations **Department,**
10    right?
11    A   Um-hum.
12    Q   And you said, "I didn't do that because
13 I" -
14    A   I was afraid of getting fired. I have two
15 kids I have to support.
16    Q   Okay. And I asked if you knew of anybody
17 who had ever been discharged for contacting -
18    A   I don't know -- I believe that Judy was
19 discharged.
20    Q   But you don't know?
21    A   I don't know for sure. I know that there
22 was a gentleman that worked there for three weeks for
23 him and he was discharged.
24    Q   For whom?

### 140

1     A   For Mr. **Mahoney.**
2     Q   Okay.
3     A   And he was discharged.
4     Q   This is a person who was working as a BOA?
5     A   Um-hum.
6     Q   A male BOA?
7         Okay.
8     A   I know that his mother worked for him for a
9   short period of time and walked out on him.
10    Q   Would you please refer back to Exhibit 11?
11    About in the middle of the page there, do you see a
12    paragraph that starts off, "Allegations of
13    discrimination"? Do you see that paragraph?
14                                               A   I see it.
15    Q   Do you see where it says:
16
17    discrimination will be fully investigated
18    and may result in corrective disciplinary
19    action up to and including termination of
20    employment. Edward Jones will not tolerate
21    retaliation or reprisal actions taken
22    against any associate who uses this
23    procedure."
24    A   Um-hum. I see it, yeah.

.EPOSITION OF MARIAN DEBORAH i. -LER
NOVEMBER 20. 2003

### 141

1  Q Okay. You had signed that, right?
2  A I signed it, yeah. There's my signature
3  right there at the bottom (indicating).
4  Q So, in fact, you knew, from having, signed
5  this and read It, that you were protected from
6  retaliation or reprisal, right?
7  A Um-hum. Did I know. it was protected? No.
8  Do I believe what I was reading here? No.
9  Q So you read it, but didn't believe it?
10 A That's correct.
11 Q Okay. And on --
12 MR. GILLESPIE: Excuse me. The record
13 should reflect that the witness just made two --
14 THE WITNESS: Parentheses.
15 MR. GILLESPIE: -- elliptical or
16 parenthetical lines around that paragraph.
17 MR. KICKS: Sort of brackets around
18 the paragraph.
19 MR. GILLESPIE: Right.
20 BY MR. KICKS:
21 Q And in the Sexual Harassment Policy,
22 Exhibit 12 -- do you have that?
23 MR. SPITZER: Yes, yes.
24 THE WITNESS: One second. I need a

### 142

1  second.
2  (Witness making notes.)
3  BY MR. KICKS:
4  Q Would you read to me what you just wrote on
5  the pad.
6  A It's something for future reference.
7  Q Okay. Would you read it for me?
8  A Yes, of course. When I did call Associate
9  Relations and reported what was going on In the
10 office and what happened in the very last day of
11 termination, It took Mr. Rarick four days to get back
12 to me.
13 Q That's what you wrote?
14 A Yes.
15 Q Okay.
16 A And there's more, but you --
17 Q All right. On Exhibit 12, would you turn
18 to the second page?
19 A I'm sorry?
20 Q Would you turn to the second page of
21 Exhibit 12?
22 A Of No. 12.
23 Q Do you see the second paragraph there that
24 says that, (reading) "Sexual harassment allegations

### 143

1  will be fully investigated," and then the last
2  sentence in that paragraph says, "Edward Jones will
3  not tolerate retaliation or reprisal actions against
4  any associate who uses this procedure"?
5  A Um-hum.
6  Q Again, you signed this document as well,
7  right?
8  A . (Witness nods.)
9  Q But as with No. 11, the Nondiscrimination
10 Policy, you just didn't believe it?
11 A No.
12 Q Okay. So we --
13 (Pause for Attorneys Ricks and
14 Gillespie to confer.)
15 BY MR. KICKS:
16 Q Are you saying that -- what -- when you
17 say, "no," what are you saying -- no, that you just
18 did not believe what the policy said, that you
19 thought you still would be subject to discharge or
20 discipline?
21 A Yes, I believe that I would be subject to
22 discharge or -- discharge.
23 Q Just for contacting the Associate Relations
24 Department and complaining about Mr. Mahoney?

### 144

1  A Yes. Yes.
2  Q So we stopped a moment ago at the point
3  where Ms. Vassal and Ms. Commander had urged you to
4  contact the Associate Relations Department, correct?
5  (Witness making notes.)
6  BY MR. KICKS: .
7  Q Ms. Miller, it's pretty hard for me to ask
8  you questions and ask for comments when you are then
9  writing things to yourself.
10 A I'll read them to you after I write them,
11 Mr. Ricks. There is no -- you know, there are no
12 secrets in here.
13 Q What have you written now?
14 A You know what, I would prefer that -- I
15 mean, you're getting a little hostile with me, and I
16 would prefer that, you know, we keep this on a very
17 professional level. Otherwise, you know, I don't
18 know what else to -- you know, that's how I'm feeling
19 right now. So I would prefer to keep this on a
20 professional level, no hostilities. And this is a
21 deposition; it's not an attack. So if you permit me
22 to give you some more information, perhaps I would
23 need to write it down. This is not a court.
24 Q What did you write?

DEPOSITION OF MARIAN DEBORAH IWLLER
NOVEMBER 20, 2003

149

1   you had with Kristin Commander about Michael Mahoney?
2       A At that point, not that I remember.
3       Q What does that mean, "at that point"?
4       A Not that I remember at that -- you know,
8   that was already towards the end.
9       Q   So we covered everything now?
10      A   I believe we have.
11      Q All right. During your employment at Edward
12  Jones, did you ever complain about your employment
13  with Edward Jones to any other person?
14      A   Complain about my -- I don't know what you
15  mean. Can you be more specific?
16      Q   Well, you have some complaints, apparently,
17  about your employment with Edward Jones.
18      A   Um-hum.
19      Q And fm saying, while you were still employed
20  with Edward Jones, you told me you talked with Kristin
21  Commander and Lynn Vassal.
22      A   You mean, did I complain to anyone else?
23      Q   Yes.
24      A   Oh, yeah. Yes, I did.
        Q   To whom?
        A   Well -
        Q   That -- you've mentioned I think it was

151

1       Her and soma of the other brokers came in, and they
2   had a regional meeting in our office, in the Stamford
3   office.
4       Q All right. And -
5       A And I met her at that point.
6       Q All right. What did you -- what did you
7   tell her. This is Barbara Mosca now, right?
8       A Well, she was haying a meeting that day. I
9   didn't tell her anything. You know, there were other
10  brokers in the -- nothing. It was just, you know, a
11  meeting.
12          I do recall calling Mrs. Mosca to
13  complain about Mr. Mahoney, and then I called her a
14  second time.
15      Q So you called -- how many times did you
16  call her?
17      A Twice.
18      Q Twice.
19          All right. Let's talk about the first

phone call. Sounds like you must have had -- am I
correct in understanding you had three contacts with
Barbara Mosca. One was in the Stamford office when
there was a meeting there that she attended. A
Um-hum.

152

1       Q   But you didn't really talk to her on that
2   occasion, right?
3       A   No. There were other people in the office.
4       Q   And then there were two phone calls. What
5   was the first phone call? First of all, when?
6       A   I don't remember. I don't remember exactly
7   when. It was probably, I would say, in October.
8       Q Okay. October 2001?
9       A Um-hum.
14      Q What occurred during that telephone
15  conversation?
16      A Trying to remember. I don't recall that
17  conversation. I recall the second conversation; I don't
18  recall that one.
19      Q   Okay. Tell me about the second call.
20      A   Second call, I had left the office.
21      Q   When was this? This was ...
22      A   It was probably -- it was about a week
23  before I left.
24      Q   Okay. So --
        A   Probably like the very end of October.
Very end of October.
        Q Your last day in the office was
November 9th, as I recall. Does that sound about

Page 149 to 152 of 26

                              150
1    Amy -
2         A    Amy.
3         Q    -- in conjunction with your son being hit
4    by an automobile.
5         A    Yeah. And there was also -
6         Q    Anybody else?
7         A    Well, there was Michael Cummins, as you
8    know; there was Kristin Commander, there was -
9         Q    You've already told me about -
10        A    Right. I was just -
11        Q    You've already told -
12             COURT REPORTER: Excuse me. You can't
13   talk at the same time.
14        A    At one point regions changed. So this
15   office was linked with the New York office, and his
16   team leader was changed to a woman named Barbara
17   Mosca.
18        Q    Okay. Did you talk with Ms. Mosca at one
19   point?
20        A    I talked to her a couple of times.
21        Q    All right. When did you talk to Ms. Mosca
22   the first time?
23        A    The first time we had a -- we had a meeting
24   in our office. That was the first time I spoke her.

DEPOSITION OF
MARIAN DEBORAH MILLER
NOVEMBER 20, 2003

154

1  right?
2
3  A    Somewhere around there.
4  Q    So about a week before that?
5  A    Yeah, it was about a week before that,
6  yeah, about, roughly.
7  Q    So very late October, early November, right
8  in that time frame?
9  A    Very late October. I called her from my cell phone in
10 tears. I had left the office. He was just getting -- gotten finished
11 badgering me. And --
12 Q    What do you mean he was badgering -
13 A    -- I explained to her --
14 Q    What had he been saying to you? "He"
15 meaning Mr. Mahoney?
16
17 A    Um-hum.
18 Q    Mr. Mahoney had badgered. What does
19 "badgered" mean?
20 A    "Badgered" means calling me an idiot, calling me
21 stupid, telling me that I couldn't do my job, telling me that -- you
22 know, he had forgotten to do a trade and the client was very very
23 upset because the money had not been transferred into their
24 money market. So he tried to write a check on it. And he blamed
   me for that.

155

1  "I'm having difficulties with him," or what?
2  A    I don't remember my exact words, Mr. Kicks.
3  Q    To the best of your recollection.
4  A    I don't remember my exact words.
5  Q    Okay.
6  A    Just very upset, crying. I said, "I can't
7  go back there." I said to her, "Associate
8  Relations -- I mean Kristin and Lynn Vassal and
9  Michael Cummins' office had told me to call Associate
10 Relations. I said, "The only thing is, I'm afraid
11 I'll lose my job, because Mr. Mahoney told me I would
12 lose my job if I did something like that."
13         So she said, "Well, I don't know
14 if you'll lose your job or not;" she said to me,
15 "but you probably should just go back to the office
16 and act like nothing happened." And that's what I
17 did.
18 Q    Okay. Did she
19 A    So I did have reason to believe, if I
20 reported him, that I was going to get fired.
21 Q    Did she, likewise, urge you to tail
22 Associate Relations?
23 A    I just told you, sir, she said, "I don't
24 know what will happen if you -- I don't know what

156

1  will happen *if* you call Associate Relations." She
2  urged me to just go back to the office and resume my
3  duties: "Just go back to the office and continue to
4  do your work." That was what -- I said, "I'm calling
5  you because I don't know what else to do." Those
6  were my exact words.
7  Q    Okay. Any other conversation that you had
8  with Barbara Mosca?
9  A    I don't recall any at this particular time.
10 Q    Okay. Now, why have you sued Barbara Mosca
11 in this lawsuit? Do you know?
12 A    I don't know. I leave these things up to
13 professionals. I don't know.
14 Q    So your contacts with Barbara Mosca were -
15 A    She was his regional leader.
16 Q    -- the three -- the meeting in Stamford,
17 then the first phone call that you don't remember any
18 details of, and then the second phone call that you
19 just told me about?
20 A    Um-hum.
21 Q    Okay. And no other -- you didn't have no
22 other contact with Barbara Mosca, right?
23 A    I don't recall -- she had called the office
24 to speak to him a few times.

Q    So what did Mr. --
A    So I told -
Q    He badgered you. And you told me "idiot,
stupid," said you continue do the job.
A    Um-hum.
Q    What else?
A    I walked out:
Q    Right.
A    And I decided to run my errands. I had to
run errands for the firm, and I had to go to the
bank, the post office to send things to headquarters,
and I had to go to do the deposit, you know, the
checks that had come in for, you know, payment of
securities.
Q    All right. So you called Ms. Mosca?
A    I called her on my cell phone.
Q    And you said that he had badgered you?
A    I said, you know, "I don't know *if you*
notice, but I'm having a lot *of* trouble with him."
And she was aware *of* his -
Q    What did she say?
A    "I know about him. I had been forewarned
about him," she told me.
Q    So what you told her is, "I'm having

Post Reporting Service (800)262-4102

Page 153 to 156 of 2E

153

:POSITION OF MARIAN DEBORAH M.-..ER
NOVEMBER 20, 2003

### 177

1  nice guy?
2  A  No. You asked me that before and I said I
3  don't remember his name.
4  Q  Okay. All right. Does John Sullivan sound
5  right?
6  A  I don't recall. I may have it in my notes
7  at home.
8  Q  So you -- when you called this person --
9  A  I specifically asked for him.
10 Q  All right. And did he ask you to write a
11 letter and write down what your complaints were?
12 A  He asked me to specifically write about the
13 events of that particular day -- "Write down and tell
14 me what happened that day" -- which I did. But then
15 I included a couple of other things In there.
16         MR. RICKS: Would you mark these as
17 separate exhibits?
18         (Whereupon, a Fax cover sheet dated
19 11/9/01 and a letter dated 11/9/01 were marked
20 Defendant's Exhibits Nos. 14 and 15 for
21 Identification.)
22 BY MR. RICKS:
23 Q  I've handed you what's been marked Exhibit
24 14 and Exhibit 15. First of all, is that your

### 178

1  handwriting on Exhibit 14, the fax cover sheet?
2  A  Um-hum.
3  Q  And did you, In fact, fax a letter to
4  Mr. Steve Rarick?
5  A  I faxed a letter, yes, to his attention.
6  Q  And was that at the request of John
7  Sullivan?
8  A  Yes.
9  Q  Is John Sullivan the person that you --
10 with whom you had spoken that you were referring to
11 as minute ago whose name you couldn't remember?
12 A  That's correct.
13 Q  Okay. Referring now to Exhibit 15, is
14 this -- this Is a letter dated November 9th, 2001
15 from you to Mr. Steve Rarick, right?
16 A  Um-hum.
17 Q  And is that your signature page on the
18 fourth page -- is that your signature on the fourth
19 page?
20 A  Yes, it is.
21 Q  And is this a letter that you wrote?
22 A  Yes, it is.
23 Q  It shows a fax number at the top, that this
24 was faxed on November 9th, at 2 p.m. from Debra

### 179

1  Stevens Enterprises. That's -
2  A  Yes.
3  Q  That's your business, right?
4  A  That was my old business. The fax still
5  had that on there.
6  Q  Was this your fax at your home?
7  A  Yes, my own personal fax.
8  Q  Okay. So In the first sentence, first
9  paragraph it indicates that Mr. Sullivan had asked
10 you to write the letter, right?
11 A  That's correct.
12 Q  In the second paragraph it says, (reading)
13 "After working with the IR, Michael Mahoney, for over
14 three months, I had to walk out of the branch this
15 morning due to the abusive and harassment -
16 abusiveness -- excuse me for misreading that -
17 abusiveness and harassment that I have incurred since
18 the inception of my position on July 11th, 2001, as a
19 BOA trainee."
20 A  Um-hum.
21         (Inaudible statement.)
22 Q  What?
23 A  Nothing.
24 Q  Now, have you previously told me about

### 180

1  everything that you -- what Is the abusiveness and
2  harassment? Is that what you already told us about,
3  or Is there something different that you haven't
4  included yet?
5  A  There -- there are other things that are
6  different that I haven't Included yet.
7  Q  Are they mentioned in this letter?
8  A  No. No. This all encompasses everything
9  that had happened, the abusiveness. I used those
10 words to encompass a lot of different things that had
11 happened in the office.
12 Q  Okay. Did Mr. Rarick, after you sent this
13 letter on the afternoon of the 9th, did Mr. Rarick
14 then contact you?
15 A  No.
16 Q  He never contacted you?
17 A  He contacted me four days later.
18 Q  But he did contact you?
19 A  Four days later.
20 Q  Okay.
21         THE WITNESS: Do you mind If I get up
22 and get a cup of coffee?
23         MR. RICKS: Go ahead. That's fine.
24         (Pause.)

OF MARIAN DEBORAH N4._,-ER
NOVEMBER 20, 2003

### 181

1  BY MR. KICKS:
2     Q  Now in regard to Exhibit 15, is it fair to
3  say that you went back and you wrote about the things
4  that you were unhappy with with your employment with
5  Edward Jones in this letter to Mr. Rarick?
6     A  Would it be fair to say that I wrote
7  everything that I unhappy with? Everything? Is that
8  what you -- I'm -- can you rephrase?
9     Q  Well, I said is it fair to say that you
10 wrote In this letter your complaints about your
11 employment with Edward Jones?
12    A  I wrote -- no. I did not write all my
13 complaints In this letter.
14    Q  Why not?
15    A  Because when I wrote the words "abusiveness
16 and harassment," it would have taken me days to, have
17 written a volume of what this man had said to me. So
18 I encompassed it with the words "abusiveness and
19 harassment."
20    Q  All right. Now, in the -- on the second
21 page near the top,`it mentions that you were unhappy
22 about Mr. Mahoney doing something with your personal
23 belongings.
24    A  That's correct.

### 182

1     Q  What is it that Mr. Mahoney was doing with
2  your personal belongings?
3     A  He was trying on my coats. He also --when
4  I went to the -- he was trying on my coats. He was
5  sachetingaround the room in my coats In a circle
6  and, you know, swirling the coat around with him. He
7  was trying on my scarves. Whenever -- there were
8  times when I went to the ladies' room when I noticed
9  that my purse had been moved from the position where
10 it was. I kept It under the desk. There were times
11 that it was not where I left it.
12    Q  Um-hum. Anything else about your personal
13 belongings?
14    A  He shuffled things around on the desk. He
15 would sit at my desk if I went to the ladies' room or
16 I went out to get something for lunch. My bag was
17 with me at that time, but he would go to my desk and
18 shuffle things around. There were no personal
19 belongings, though, on my desk. Or underneath by
20 desk I might have, like, an extra pair of shoes and a
21 bag under there. That was often times moved.
22    Q  Anything else about your personal
23 belongings?
24    A  No.

### 183

1     Q  Okay. Then you mention, in the next
2  paragraph of Exhibit 15, the personal favors that
3  Mr. Mahoney was asking you for. I think -- are those
4  the same things that you've already talked about?
5  For example, him asking you to pick up breakfast on
6  the way into the office, and that sort of thing? Or
7  what are you referring to when you say "personal
8  favors"?
9     A  Besides asking me to pick up things for him
10 in the morning, he had also asked me to do some -- he
11 belonged to a condominium association. He was the
12 president of that association. He asked me, in the
13 office during working hours -- pardon me -- to send
14 and receive faxes from the management company. He
15 had also asked me to make copies on a number of
16 occasions of things that had to do with their
17 association meetings and, you know, things of that
18 nature, that had to do with his personal work with
19 his association at his condominium.
20    Q  And you objected to that?
21    A  I did.
22    Q  Why was that?
23    A  Because I needed time to study my modules.
24    Q  Okay. Any other reasons?

### 184

1     A  As to?
2     Q  Why you objected to helping Mr. Mahoney
3  with things you considered to be -
4     A  Out of the ordinary?
5     Q  -- not directly related to the Edward Jones
6  business.
7     A  I objected to cleaning the office. I
8  objected to the fact he gave me Pledge and a rag and
9  told me to clean the office.
10    Q  To dust the office?
11    A  Yes.
12    Q  Okay.
13    A  I objected to that. That was not part of
14 my job description.
15    Q  All right. Any other personal favors that
16 you objected to?
17    A  I objected to the fact that he had asked me
18 to ask my son to do some work for him.
19    Q  Was that computer work that you were
20 talking about earlier?
21    A  Yes.
22    Q  What was that specific job?
23    A  He was having a seminar and he wanted him
24 to do sort of a graphic design for him on that -- on

POSITION OF MARIAN DEBORAH M.__ER
NOVEMBER 20, 2003

### 209

1  A  Um-hum.
2  Q  So did you tell Rarick that --
3  A  **That's what Mr. Mahoney said, yeah.**
4  Q  That's what Mr. Mahoney said.
5      Okay. "She" -- meaning you -- "said
6 that Mike is a homosexual and one time he asked her
7 about the sexual orientation of her sons."
8  A  **Correct.**
9  Q  Is that what you told him?
10 A  **Yes.**
11 Q  Next says, "She said that Mike would wrap
12 himself in one of her scarves and, quote, prance
13 around the office, end quote."
14 A  **Um-hum.**
15 Q  You told him that?
16 A  **I did.**
17 Q  Mr. Rarick next writes, "She said that he
18 upset her one time when he told her that she would
19 make a good lipsticks lesbian."
20 A  **Um-hum.**
21 Q  Did you tell him that?
22 A  **Yes.**
23 Q  Next says, "She said that Mike's comments
24 and his actions made her feel uncomfortable."

### 210

1  A  **Yes.**
2  Q  Did you say that?
3  A  **Yes.**
4  Q  Next it says, "She said that one time she
5 was very uneasy when Mike told her that he wanted to,
6 quote, meet her little boy, unquote."
7  A  **Correct.**
8  Q  Did you tell him that?
9  A  **Yes.**
10 Q  Next says, "I asked her what he meant by
11 that, and she said she did not have any idea."
12 A  **I don't want to agree with that.**
13 Q  What is it you disagree with?
14 A  **Here lit says, (as read) "I asked her what
15 she meant by that and she said 'I don't have any
16 Idea.'"**
17    **I did have an Idea.**
18 Q  Okay. Did you say --
19 A  **"I have no Idea"?**
20 Q  Did you say to Mr. Rarick on this occasion
21 that you did not have any Idea?
22 A  **No.**
23 Q  What is it you think you said to
24 Mr. Rarick?

### 211

1  A  **When he said I told -- when he says, "She
2  said that -- that one time she was very uneasy when
3  Mike told her that he wanted meet her little boy."
4  And I -- at that point I said "I don't want" -- I
5  told him, "I don't want to discuss my children with
6  you." That's what I told Mr. Rarick.**
7  Q  Okay. So that's all that you said to
8  Mr. Rarick about that?
9  A  Yes. **That's what I told Mr. Mahoney: "I
10 don't want to discuss my children with you."**
11 Q  All right. Next says that "I" -- meaning
12    Steve Rarick -- "told Debbie that a lot of this
13    information was new to me. It had not been included
14 on the faxed information, that I was going to have to
15 look into her allegations and get back to her."
16    Did he tell you that?
17 A  **No, that's not the way he phrased it.**
18 Q  How did he phrase It?
19 A  **He phrased it as, one of the three -- well,
20 no. He said he would have to -- you're right. He
21 said he would have to get back to me, correct.**
22 Q  Okay. Then, finally, in that paragraph it
23 says, in a last sentence, "I told her that in the
24 meantime I would leave her on the payroll until the

### 212

1 issue was resolved," right?
2  A  **Correct.**
3  Q  So he told you that you would be on a paid
4 administrative leave while he investigated, right?
5  A  **Correct.**
6  Q  So is this a -- sounds like you agree this
7 is an accurate -
8  A  **Not all of It.**
9  Q  -- summary of your conversation with
10    Mr. Rarick.
11 A **Not all of it. The point -- the place
12 where I told Debbie that lit -- wait a minute.
13    (Reading) "Wanted to meet her little
14 boy. I asked what she meant by that." Right here, I
15 did not say, "I have no idea." I said, "I do not
16 want to discuss it."**
17 Q  You- already corrected that.
18 A  **I also correct the date on that. It was
19 not on November 12. It was a Tuesday. Because I
20 remember having a conversation with my mom that
21 Monday, and she actually asked me, "Did they call you
22 today," and I said, "No. I can't believe this."
23    So I have to say that the date was
24 Inaccurate.**

Post Reporting Service (800)262-4102                Page 209 to 212 of 26

uEPOSITION OF MARIAN DEBORAH MILLER
NOVEMBER 20, 2003

## 245

1   Q   Okay. Go ahead.
2       (Witness reviewing Exhibit 20.)
3   A   I don't recall this letter.
4   Q   Were you informed that -- of the contents
5   of this letter?
6   A   Perhaps Huma discussed the letter with me.
7   I don't recall. Huma is an employee at -- I don't
8   remember
9   Q   Did you understand that, as it says In the
10  last paragraph of Exhibit 20, that your employment
11  with Edward Jones was being terminated because of
12  your refusal to return to work?
13  A   Did I understand --
14  Q   Right. ,
15  A   -- that my employment -- that I would be
16  terminated if I.didn't return to work?
17  Q   Yes.
18  A   No.
19  Q   So no one ever told you that?
20  A   I was told by Mr. Rarick what my options
21  were. I told him I did not want to return to work
22  with Mr. Mahoney, that I was frightened to return to
23  work with Mr. Mahoney. So I did not want -- if I
24  were to return to work for Edward Jones and work with

## 246

1   Mr. Mahoney, I would not do that.
2   Q   Okay.
3   A   I would not work with Mr. Mahoney.
4   Q   Now, but Mr. Mahoney, he had never --
5   you've already said he never struck you, he never hit
6   you, right?
7   A   He never struck me with his hands.
8   Q   And he never --
9   A   And he --
10  Q   And he never threatened you physically, did
11  he?
12      MR. SPITZER: Objection. That's not
13  what she said. You're mischaracterizing her
14  testimony.
15  BY MR. RICKS:
16  Q   He never threatened you physically, did he?
17  A   Yes, he did threaten me by his -- by his
18  hollering In my face, yes.
19  Q   That was verbal.
20  A   That's very threatening to me.
21  Q   Okay. But my question was: He never
22  threatened you physically, did he?
23  A   He threw things at me. He threw paper.
24  Q   He threw paper. You testified he crumpled

## 247

1   up a piece of paper and threw it at you.
2   A   Yes. Not that way. It happened on more
3   than one occasion.
4   Q   All right. But he never threatened you
5   physically in any other way, did he?
6   A   No. No.
7   Q   Was that "No"?
8       Okay. Some of your main claims In
9   this case for damages are for emotional distress
10  claims, right?
11  A   Correct.
12  Q   Okay. What was the name of the company
13  employee at Smith Barney named Ralph with whom you
14  had a relationship?
15  A   His name was Ralph.
16  Q   What's his last name?
17  A   Marzulla.
18  Q   Would you please spell "Marzulla"?
19  A   M-a-r-z-u-l-i-a.
20  Q   V-o-l-l-a?
21  A   Z-u-l-1-a.
22  Q   Where does Mr. Marzulla live?
23  A   In Greenwich, Connecticut.
24  Q   What was his position with Smith Barney?

## 248

1   A   He was a sales assistant.
2   Q   Was that the same position that you held?
3   A   Correct.
4   Q   Was he the person who was the partner on
5   your team?
6   A   No.
7   Q   Okay. Now, did you have -- describe your
8   relationship with Mr. Marzulla?
9   A   He trained me. He was like a senior sales
10  assistant, and he trained me In their operations.
11  Q   Did you have a relationship with him
12  outside of business?
13  A   Yes, we did.
14  Q   What was that relationship?
15  A   It was a heterosexual relationship.
16  Q   So
17  A   Two people going out, dating.
18  Q   Okay. And it was a sexual relationship as
19  well?
20  A   Yes.
21  Q   And how long did that relationship with
22  Mr. Marzulla continue?
23  A   Marzulla.
24  Q   Marzulla continue?

Post Reporting Service (800)262-4.102                 Page 245 to 248 of 26