3/11/2004                                               Marian Deborah Miller

```
                                                        Page 350
 1   exhaust everything you've already talked about, but take it
 2   you were fearful of not being able to get
 3   Mahoney's questions quickly enough; is that
 4   right?
 5   A       I was fearful of Mr. Mahoney. And you witnessed
 6           him having fits of anger? Yes, I did.
 7   Q       At one point, I think you referred to him as being almost
 8           tyrannical; that is correct? That's correct. You heard him
 9           using profanity? Yes, I did. Of the most base sort and
10           kind? What are you referring to? Well, really nasty words.
11           Yes. We're all adults, but bad stuff. Yes. He was
12           demeaning of you. At one point, he called you an idiot? Yes. And
13           at another point he called you stupid? Yes.
14   Q       I think even today you said he frequently
15           threatened to terminate you. It was a recurring theme
16   A       (called)
17   Q
18   A
```

3/11/2004'
Miller v. Edward Jones

Miller v.

Edward Jones

3/11/2004                                                                  Marian Deborah Miller

Page 351

```
 1    of his.

 2         A    Yes.

 3         Q    I take it all of these things led up to an

 4    occasion when there was an assault, when you thought

 5    you were being actually threatened; is that right?
 6         A    Yes.
 7         Q    What was that date?
 8         A    November 9th.
 9         Q    What happened -
10         A    If that indeed was the day that I left.
11         Q    It is my understanding that that is the day
12    that you left -
13         A    Yes.
14         Q    -- but that's the day you mean to indicate?
15         A    Correct.
16         Q    That was the date on which you believe he
17    assaulted you?
18         A    I believe that I was in danger of being
19    assaulted.

20         Q    Now, on November 9
                                    you went to work, and you
21    arrived at the Edward Jones Stamford office; is that
22    right?
23         A    That's correct.
24         Q    What time did you arrive that day?
25         A    8:45.
```

Brandon Smith Reporting

e9a59fa57

aae8f5da-c0e7-45c3-9174-f0f

Case 3:03-cv-00193-MRK    Document 53-3    Filed 04/30/2004    Page 3 of 16

Miller v. Edward Jones
3/11/2004                                                          Marian Deborah Miller

Page 353
```
 1    happen?
 2         A     I sat down at my desk and he said to me,
 3    "You're late."
 4               And I said, "Yes. I know. I was ill this
 5    morning."
 6               And I apologized for my being late.
 7         Q     What happened after that?
 8         A     He said to me, "If you're late, don't come to
 9    work.!'
10         Q     What did you do?
11.1             I told him I apologized for being late, but I
      i
12    was ill this morning.
13         Q     Was there any more conversation between the
14    two of you on that occasion?
15         A     Yes.
16         Q     What then transpired?
17         A     He told me I had a message on the voice mail.
18         Q     What else did he do or say?
19         A     He told me to pick up the message on the
20    voice) mail.
21Q   I take it that was the end of any other
22    communication between you that day?
23         A     No.
24         Q     What else did he do or say?
25         ;A    When I listened to the voice mail, it wasn't
```

Brandon Smith Reporting

aae8f5da-c0e7-45c3-9174-f0fe9a59fa!

Miller v. Edward Jones

3/11/2004                                                                 Marian Deborah Miller
                                                                          Page 354

```
 1            for me.                                    It was indeed
for him. I said, "This is not
 2            my message. It's your message."
 3                                                       At that point,
he walked back into his
 4            office.                                    Then he came
back out of his office, and he

 5       confronted me face to face, and all this time he was --

 6       he was hollering, he was yelling, and he was very

 7       angry, and he was -- and just a couple of inches from
 8       my face.            Yelling at me and spitting at me.
 9            Q     And was that the end of everything that
10       happened between you that day?
11            A     Other than the words that he was screaming at
12       me and yelling, I suppose that would be it.
13            Q                                                    Yes.
14            A                          I walked out. I was afraid -
15            Q                                                   Okay.
16            A                              -- of being assaulted.
17            Q     I've asked you a couple of times what he did
18       or said.     You've described it. Is there anything

19       further that you recall him doing or saying that day
20       that  you have not yet described?
21            A     I don't recall exactly if it was -- well, I

22       don't recall all the details of that -- what he was
23       saying because I was frightened.
24            Q     Sure. And it was a long time ago, wasn't it?
25            A                               Not that long ago.
```

3/11/2004                                            Marian Deborah Miller

Page 355

Miller v. Edward Jones

1  Q   Yes.
2  A   I still remember the yelling.
3      But I guess what I'm asking you is: To the
4  Q   extent of your current best recollection
5  A   Yes.
   fullest
6  Q   -- i
7  A   Yes.
8  Q   What is that?
9      The message on the machine was from a client,
       Is there anything
       further on that?
       accused me of -- she accused him of having two that
       were bounced from the firm.

   A   she accused me of causing the checks to
       and he
       checks
10
11     Q
12     A
13         Uh-'huh
14  bounce.
       Q   Was this the check concerning Dana?
       A   Yes.
       Q   Okay. So that occurred on the date, the last
15  day that you reported to the Edward Jones office in
16  Stamford?
17
18     A   That's correct.
19
20     Q   Then you left?
       A   I explained to him there was no way the
           check could be bounced. I didn't issue the
           It was issued from St. Louis.

           And we talked about Dana's two checks at the',

21
22
23
24
25
    second
    check.

       Q

Miller v. Edward Jones

3/11/2004                                                            Marian Deborah Miller
                                                                            Page 360

```
 1      A    I arrived at approximately 8:45. I went to
 2   sit down at my desk. Mr. Mahoney came out of his
 3   office and said, "You're late."
 4           I said, "I know. I wasn't feeling well. I
 5   apologize."
 6           He said, "If you're late, don't come to
 7   work."

 8           Then he started screaming and yelling that I
 9   was late and I shouldn't come to work, and he expounded
10   on that for a few minutes. Then he went back into his
11   office, and then he told me that there was a message
12   for me on the voice mail.

13           I listened to the message, and it was not for
14   me; it was for Mr. Mahoney. And it was Dana saying
15   that she had two checks that she tried to deposit into
16   her account and they both bounced. Then he started --
17   he came out of his office -- I said, "This message
18   isn't for                          me. This is for you."
19           He then came out of his office and started
20   screaming, "You stupid idiot. You idiot. These -- you
21   bounced her checks."
22           I explained to him, "I don't have the
23   capacity to bounce a check, nor would the firm bounce a
24   check if it were a check with available funds."
25           So he came over and started screaming and
```

Brandon Smith Reporting

*aae8f5da-c0e7-45c3-9174-f0f*
*e9a59fa57*

3/11/2004                                                    Marian Deborah Miller

Page 361                                                     Miller v. Edward Jones

```
 1    yelling at me, and I believe that day he said to me,
 2    "Nobody F's with me" -- he said the word -- "and gets
 3    away with it."
              I took his behavior as a threat, and I
      gathered my belongings and I left.
         Q    Okay. What time did you leave? Having
 4    arrived at 8:45, about what time did you leave?
 5       A    I don't recall. I was pretty scared. I do not
 6    remember. I did not look at my watch. I was shaking, so I
 7    don't recall.
 8
 9       Q    Do you have any sense of the duration of this
10
      episode on the morning of November 9?

         A    I don't recall.

         Q
12

13
              So you have absolutely no recollection of the
              left or the duration of this incident?
14
      time you   I don't know. I really don't know.
                 Do you recall any of Mr. Mahoney's specific
              addition to "idiot," "stupid," and "stupid
         Q
      words in
      idiot"?
                                                                 15

         A          No.
              Q    So you don't recall the time, and      other than those
      three phrases, you don't recall his specific words?
         A    Specifically, I recall him calling me an    idiot, "You
      stupid idiot."
```

Brandon Smith Reporting

3/11/2004                                                       Marian Deborah Miller

Page 362
Miller v. Edward Jones

```
        Q    I understand. What did you say to him,, if
   anything, as you left?

 2      A    Nothing.

 3           Did you call the police?

 4      Q    No.

 5      A    Did you later file a police report?

        Q    No.
        Q    Do you still believe that Jean Rostoff '(on
   sp) told you, referring to Mr. Mahoney, that, quqte, "That
        A
   guy is nuts." Do you stand by that testimony?

        A    Yes.
```

6
7

3/11/2004                                Miller v. Edward Jones
                                                                Marian Deborah Miller

```
        Q    As I understood your earlier testimony, it got
   to be rough sledding -- well, let me withdraw that. That's
   not very specific, is it?
13           As I understood your earlier testimony, you felt
   that Mahoney was way out of line in the manner of his
14   conduct toward you, starting from a point two weeks after
   you began working for him. Do I have that' about right?

        A    About right, yes, sir.
```

Page 363
```
             And it continued to accelerate until this of
 1 making a statement? November 9; is that also correct?
 2      Q    Did you find it very tough?
 3      A    Did I find what. Yes, very tough?
 4      Q    Working in that environment.
 5      A    Yes, sir, I did. Must have been very tough for you.
 6      Q    I guess like anyone, did you begin to form a
 7
   rea          Are you asking me a question or are you
 l      Q
   dis  incident
   like for
   Mr.  A
   Mahoney?
 8      A    I developed a fear of Mr. Mahoney over time.
 9      Q    How did you deal with that? What did you do
10    to
protect
```

yourself from him in that environment?

11      A    I went to my doctor, and she prescribed

12   medication for me so I could deal with the environment.

13      Q    Did you do anything else to protect yourself

14   in that environment?

15      A    No, not that I can -- not that I can think of

16   except go into work and doing what I was instructed to

17   do.

18      Q    Okay. So just using my own words, if they're

19   not too inaccurate, this was a terribly, from your

20   point of view, hostile, incriminating, fearful

21   environment that started from two weeks after you began

22   and continued to accelerate until the day you left?
23      A    That's correct.
24      Q    You started in July?
25      A    I don't recall. I believe so, yes.


Brandon Smith Reporting

Miller v. Edward Jones

3/11/2004                                                                 Marian Deborah Miller

Page 384

```
 1        A    I'm not quite sure I understand what you mean
 2   about discriminating against me. I can only you tell
 3   you what happened. You know, again you're using some
 4   legal terms and I'm not sure I understand what you
 5   mean.
 6        Q    I get it. I'll withdraw the question.
 7        A    Okay.
 8        Q    Did anyone other than Mahoney pressure or
 9   react against you because of your sexual orientation?
10        A    No.
11        Q    Did anyone other than Mahoney seek to deprive
12   you in your view of time off for the high holy days?
13        A    No.
14        Q    So Mahoney was -- I just mean this loosely in
15   a colloquial sense. Mahoney was the bad actor here,
16   wasn't he?
17        A    The incidents that happened between Mr.
18   Mahoney and I. However, there were other people who
19   were informed, and I -- I won't say kind of. I felt
20   that if I reported him to human relations, that I would
21   be fired, which is in essence what happened. I was
22   terminated when I reported him, and I knew that would
23   happen.
24        Q    But in terms of the actual things that were
25   done to you and against you that made you fearful and
```

1

Page 385

```
 1     upset and depressed and burdened, it was Mahoney who
 2     was actually doing those things in the first instance,'
 3     wasn't it?
 4          A    In what first instance?
 5          Q    It was Mahoney that was doing those things to
 6     you, right?
 7          A    Yes, that's correct.
 8          Q    Okay. Was he assisting anybody else in doing
 9     it to you, in making you nervous or upset or on edge?
10          A    Was he -- assisted by someone? Is that what'
11    you're asking?
12          Q    Was he assisting anyone else?
13          A    No, sir.
14          Q    Okay. I was looking over, as you know, your,
15     earlier deposition transcript. In terms of your
16     earlier employment, were you ever employed by a party
17     planning or event planning organization in New York
18     City?
19          A    No.
20          Q    Did you ever work for a party planning or
21     event planning organization in New York City as a
22     consultant?
23          A    In New York City, no.
24          Q    Well, you testified, I think, that you
25     started your own business, Deborah Stevens Parties ands
```

Miller v. Edward Jones

3/11/2004                                          Marian Deborah Miller
                                                          Page 402

```
 1     occasion, didn't you?
 2          A     I don't recall.
 3          Q     Did you call him at home while he was out
 4     ill?
 5          A     I called him on his cell phone, I believe.
 6          Q     Where did you think you were reaching him
 7     while he was out ill, disabled with a bad back?
 8          A     Are you asking me or is that a question?
 9          Q     I'm asking you a question. That's what we do
10     here.     I ask and you have to answer. Let me try it
11     again.
12                When he was out sick, disabled with a bad
13     back, and you called him on his cell phone, where did
14     you think                          you were reaching him?
15          A     At home. But a cell phone is -- is mobile,
16     so he could have been in a car; he could have been on
17     the way to a doctor. I remember getting him on the
18     phone on the way to his doctor one day.
19          Q     Didn't you also call the land line at his
20     parents' home where he was recuperating?
21          A     I don't recall.
22          Q     And didn't you speak with his mother on
23     several occasions?
24          A     I don't recall.
25          Q     Weren't there in fact during that ten-day or
```

3/11 /2004

Miller v. Edward Jones

Marian Deborah Miller

Page 403

```
 1    two-week period some days on which you,called him four,

 2    times or more on a single day?
 3         A    Why, yes, there was.
 4         Q    Why was that?
 5         A    Because he instructed me to do so.
 6         Q    Did he?
 7         A    Yes.
 8         Q    Why would he give you that instruction?
 9         A    Because he was out of work and I was holding)

10    down the fort as, if you will, and I was new, and I was

11    just a trainee. He instructed me to call him every

12    time I had a question regarding one of his clients or

13    if a client called. .

14         Q    And so your testimony today is each and ever

15    time you called, it was business only?
16         A    Absolutely.
17         Q    And that on some days, there may have been

18    four times that you placed a call or perhaps even more?

19         A    Could have been. All business related. He

20    was the boss.
X21        Q    Excuse me?
22         A    He wanted me to call.
23              MR. GILLESPIE: If you give me just a
24    moment, I may have concluded.
25                   (Discussion off the record.)
```

Brandon Smith Reporting

aae8f5da-c0e7-45c3-9174-f0fe9a59fa57

Miller v. Edward Jones

3/11/2004                                              Marian Deborah Miller
                                                                     Page 406

```
 1                    MR. SPITZER: No questions.

 2

 3                    REDIRECT EXAMINATION BY MR. RICKS:

 4

 5         Q     Earlier when you were referring to Mr.
 6   Mahoney, I think it was on the 9th, getting close to
 7   you and you said spitting in your face, now, he was not
 8   literally  spitting in your face, was he?
 9         A     No.
10         Q     Isn't it true that what was -- when you say
11   that, you're just saying that was as he was talking,
12   some saliva would come out during his speech. Is that
13   what  you're saying?
14         A     Yes, sir, that's what I mean.
15         Q     So he was not literally spitting on you?
16         A     No. He was close enough while he was yelling
17   at me that his saliva was spewing forth and hit me in
18   the face.
19         Q     Spewing forth means what?
20         A     It means when he was hollering at me, there
21   was saliva that was spewing forth at my face.
22         Q     Spraying a little bit?
23         A     Okay.
24         Q     Is that what you mean?
25         A     Yes, sir.
```

Brandon Smith Reporting

Miller v. Edward Jones

3/11/2004                                                                           Marian Deborah Miller

Page 407

```
 1        Q    Okay.        But you're not saying, though, for
 2   example, cleared his throat and projected -
 3        A    No, sir.
 4        Q    -- spit onto you?
 5        A    No, sir.
 6        Q    Okay.        So using the term "spitting" isn't
 7   quite correct, is it`?
 8              MR. SPITZER: Object to form. That's
 9   what she said, Mr. Ricks. I don't know what you mean
10   by correct or not correct. She explained it to you.
11              MR. RICKS:   Okay.
12        Q    There was some -- some amount of saliva that
13   was sprayed on you during the course of Mr. Mahoney's
14   speaking to you?
15        A    He wasn't speaking to me because if he was
16   speaking to me, there would not be saliva spewing forth
17   in my face. He was yelling at me.
18        Q    Okay. When you use the term "spewing forth,"
19   that connotes to me like a volcano, like things spewing
20   forth. That's not what happened, though, is it? It
21   was an occasional drop or spray of saliva, right?
22        A    No. It wasn't an occasional drop. It was --
23   I don't -- certainly would not recreate that moment for
24   you, sir. But when somebody hollers and is in a very
25   close proximity to your face, and they are in an irate
```

Brandon Smith Reporting