UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARIAN DEBORAH MILLER,

           Plaintiff,

vs.

EDWARD D. JONES & CO., L.P.,
MICHAEL MAHONEY, MICHAEL
CUMMINS, BARBARA MOSCA, and
STEVEN RARICK,

           Defendants.

CIV NO.
3:03CV 0193 (MRK)

April 29, 2004

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
FILED ON BEHALF OF DEFENDANT EDWARD D. JONES & CO., L.P.**

**I. INTRODUCTION**

This court should grant the motion of Defendant Edward D. Jones & Co., L.P., ("Edward Jones") for summary judgment on all counts. Discovery has been completed, there is no genuine issue of material fact, and Edward Jones is entitled to judgment as a matter of law.

**II. FACTS**

The facts are set forth in detail in the Local Rule 56(a)1 Statements of Edward Jones[1] and the individual Defendants, which are incorporated herein by reference. The essential facts can be summarized more briefly as follows:

Plaintiff began working for Edward Jones as a Branch Office Administrator ("BOA") in Stamford, Connecticut on July 7, 2001. Defendant Michael Mahoney ("Mahoney") was the Investment Representative ("IR") in that office (Jones Stmt. ¶1, 10).

---

[1] Hereinafter cited as "Jones Stmt."

1

Plaintiff received copies of the Edward Jones nondiscrimination and sexual harassment policies, providing that any discrimination or harassment concerns must be immediately brought to the attention of the Associate Relations Department. Although Plaintiff claims she was subjected to ongoing discrimination and harassment throughout her employment, she did not contact Associate Relations until after she had walked out, never to return. Even then, she did not initially complain about discrimination or harassment (Jones Stmt. ¶¶12-16, 80-90).

Plaintiff has articulated a variety of concerns about Mahoney's conduct unrelated to unlawful discrimination or harassment, including that he was moody, interrupted her work, required her to help with his outside activities, and do "menial" work such as office housekeeping and picking up meals for him, "yelled" at her, and made negative remarks about her intelligence and work performance (Jones Stmt. ¶¶84-90, 20-30).

Plaintiff admitted in deposition that she claims not that Mahoney discriminated against her because she is female, but that he did so because of her sexual orientation -- because she is heterosexual whereas he is homosexual. She complains that he regularly discussed "homosexual activity" and "homosexuality," and commented on her sexual orientation and that of his clients and her sons and boyfriend (Jones Stmt. ¶¶31-40).

Plaintiff also claims that Mahoney regularly used profanity, commented on her breasts a few times, tried on her coat, and sometimes moved her purse or other personal items. She claims he made a few remarks about her age. Finally, she claims he discriminated against her because of her religion by denying accommodation for several Jewish holidays, attempting to call her at home on Jewish holidays, and making jokes about Jews and Jewish names (Jones Stmt. ¶¶45-47).

2

On November 9, 2001, after working for Edward Jones about four months, Plaintiff walked out during an argument with Mahoney over a bounced check (Jones Stmt. ¶¶28, 84, 85). Defendant Steve Rarick is employed by Edward Jones in its Associate Relations Department, which has exclusive authority and responsibility over discrimination or harassment concerns under the Edward Jones discrimination and harassment policies (Jones Stmt. ¶¶4, 13-16).

Rarick became aware of trouble between Plaintiff and Mahoney only after Plaintiff had walked out, when she wrote him complaining about Mahoney's conduct. Nowhere in this letter was there any indication Plaintiff was complaining about sex discrimination, sexual harassment, sexual orientation discrimination, religious discrimination, or age discrimination (Jones Stmt. ¶¶84-90).

Although Rarick did not understand Plaintiff to be claiming Mahoney had engaged in any unlawful employment practices, he was concerned about her allegations. He therefore immediately commenced an investigation, involving conversations with Plaintiff and Mahoney, and with others who might have relevant knowledge or whom Plaintiff claimed would substantiate her allegations (Jones Stmt. ¶91).

Rarick's investigation confirmed there had been friction between Plaintiff and Mahoney. It also disclosed that Mahoney had expressed some performance concerns about Plaintiff, particularly excessive personal cell phone calls, that were corroborated by others. Plaintiff's denials of such calls were contradicted by several witnesses. Additionally, one witness not employed by Edward Jones contradicted Plaintiff's version of their conversation. These contradictions diminished Plaintiff's credibility in Rarick's eyes. Mahoney denied Plaintiff's allegations about his conduct, and informed Rarick of

inappropriate conduct by Plaintiff, including conduct of a sexual nature (Jones Stmt. ¶¶92-135).

Plaintiff demanded Mahoney's "discharge from employment as a condition of her returning to work," but Edward Jones did not believe it had been established that he had engaged in conduct warranting discharge. Instead, although Rarick's investigation was inconclusive, Mahoney was given a warning and reminder that violating Edward Jones' non-discrimination policy or sexual harassment policy could result in discipline up to and including discharge (Jones Stmt. ¶¶138, 146-151).

From November 9, 2001 through December 31, 2001, while Rarick's investigation was in progress, Plaintiff was on a paid leave of absence. Thereafter, her position was still held open and efforts were made to return her to work until she made it clear she was not interested (Jones Stmt. ¶¶136-152).

Edward Jones formally terminated Plaintiff's employment March 5, 2002, almost four months after she had walked out. By that time, she had been retained on leave, paid or unpaid, for approximately the same duration as the brief period of her active employment (July 7, 2001 – November 9, 2001). A final letter to her attorney had made clear to her that Edward Jones would view a failure to respond and continued refusal to return to work as a resignation (Jones Stmt. ¶¶145-152).

### III. ARGUMENT

A. **Edward Jones Is Entitled To Summary Judgment On Plaintiff's State and Federal Sexual Harassment and Sex, Religious, and Age Discrimination Claims (Counts One, Two, Three, Five, Eight, Nine, and Ten).**

In Counts One and Two, Plaintiff seeks to recover for sexual harassment and sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII"). In Count Three, Plaintiff seeks to recover for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §621 *et seq.* ("ADEA").

4

In Count Five, Plaintiff seeks to recover for sex, gender, religion, age, and sexual orientation discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §46a-60(a)(1). In Counts Eight, Nine and Ten, Plaintiff seeks to recover for sexual harassment in violation of the CFEPA, Conn. Gen. Stat. §§46a-60(a)(8)(A) (Count Eight), 46a-60(a)(8)(B) (Count Nine), and 46a-60(a)(8)(C) (Count Ten).[2]

Edward Jones is entitled to summary judgment on Counts One, Two, Three, Five, Eight, Nine, and Ten because no reasonable jury could find it liable. There is no evidence Plaintiff was subjected to sexual harassment or sex, gender, religious, or age discrimination. She presents evidence of isolated offensive comments regarding her religion, age, and sexual orientation, but these alleged comments are not sufficiently severe and pervasive to rise to the level of an actionable hostile work environment. Moreover, the undisputed evidence regarding Plaintiff's lack of proper and timely use of established complaint procedures and Edward Jones' response to her complaints precludes any recovery. Finally, Plaintiff cannot recover for termination of her employment under any legal theory because she resigned -- by abandoning her employment -- under circumstances not constituting a constructive discharge.

**1.    Plaintiff admits she was not subjected to sex discrimination.**

The Complaint suggests Plaintiff claims she was discriminated against on the basis of her sex (gender) (see, e.g., Complaint ¶¶ 8, 10, 15, 20, and 72). However, Plaintiff directly admitted in her deposition that she has no such claim:

> Q.    Okay. I think that in your lawsuit, as I understand it, you've said Mr. Mahoney and/or Edward Jones discriminated against you based on your gender, on your sex, right?

---

[2] In interpreting these sections of the CFEPA, the Connecticut courts "have looked for guidance to federal case law interpreting Title VII" and have viewed the CFEPA as "coextensive with" Title VII. *Brittell v. Dept. Of Correction*, 717 A.2d 1254, 1264 (Conn. 1998).There is thus no need to analyze the CFEPA claims separately.

> A. No.
>
> Q. Oh, you're not claiming that?
>
> A. It was based on my sexual orientation.
>
> Q. All right. So you're not saying that Edward Jones or Mr. Mahoney discriminated against you based on your sex, but, rather, on your sexual orientation; is that -- have I understood that correctly?
>
> \* \* \* *[question repeated twice from the record]*
>
> A. Mr. Mahoney discriminated against me for my sexual orientation.

(Miller Depo. at 298-99).

This admission alone is grounds for summary judgment in favor of Edward Jones on Plaintiff's CFEPA sex and gender discrimination claims in Counts Five and Eight. It is well established that sexual orientation discrimination is not sex or gender discrimination. *See, e.g., Simonton v. Runyon*, 232 F.3d 33, 36 (2nd Cir. 2000) (where plaintiff alleged he was discriminated against not because he was a man, but because of his sexual orientation, court stated flatly: "[s]uch a claim remains non-cognizable under Title VII," citing 1st, 4th, and 8th Circuit decisions).

2. **Plaintiff was not subjected to sexual harassment.**

   *a)  Plaintiff was not subjected to a hostile work environment.*

"The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Alfano v. Costello*, 294 F.3d 365 373-74 (2nd Cir. 2002).[3] "[I]ncidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* at 374[4] "Isolated acts, unless very

---

[3] Citing *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001), which cited *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) and *Brennan v. Metropolitan Opera Ass'n*, 192 F.3d 310, 318 (2d Cir.1999).
[4] Quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997).

6

serious, do not meet the threshold of severity or pervasiveness." *Id.*[5] "[A] plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Id.*[6]

Relevant factors in determining whether discriminatory harassment rises to the level of an actionable hostile environment include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" *Id.*[7]

Under these standards, Plaintiff's evidence fails to establish that Mahoney's alleged sexually harassing conduct was of sufficient frequency and severity to rise to the level of an actionable hostile environment. It was not "more than episodic"; it was not "sufficiently continuous and concerted . . . to be deemed pervasive." Plaintiff complains only of "isolated acts" that are not extremely serious. She says Mahoney made comments about lesbians only "perhaps four times, perhaps a dozen times." Perhaps the most offensive alleged remark is that some of the lesbian clients would like her and she should take them out for dinner. The severity of this remark is mitigated significantly by Plaintiff's admission that Mahoney never asked her to have a sexual relationship with any of his clients. (*See* Jones Stmt. ¶¶32-35,37,41.)

Plaintiff does raise more frequently occurring conduct in claiming that Mahoney asked questions and made comments about her boyfriend "almost on a daily basis," and discussed "homosexual activity" and "homosexuality" "on a daily basis" (Jones Stmt.,

---

[5] *Citing Brennan,* 192 F.3d at 318; *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (Supreme Court noting that "[w]e have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment").
[6] *Quoting Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir. 2000) (*quoting Perry,* 115 F.3d at 149).
[7] *Citing Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993).

7

¶¶36, 40). However, most of this alleged discussion is quite innocuous, everyday personal conversation that a reasonable person would not find hostile or offensive. For example, he asked her how her boyfriend was and if she was still seeing him, and talked about his friends and their social activities (e.g., "we're all going out for dinner") (Jones Stmt., ¶¶36, 40). Had Mahoney not been gay, undoubtedly Plaintiff would have viewed such conduct as nothing more than the routine chitchat that occurs in any workplace where people seek to maintain good relations with coworkers by expressing friendly interest in their lives away from work.

Plaintiff did not allege anywhere in her very detailed and lengthy Complaint that Mahoney made any verbal or physical sexual advances, requested sexual favors, engaged in any physical conduct of a sexual nature, initiated any offensive physical contact, physically threatened her, or involved any third parties in the alleged offensive comments and inquiries. Nor did she provide evidence of any such conduct in her deposition. In sum, her evidence is only that Mahoney made "mere offensive utterance[s]." This is insufficient, as a matter of law.

The standard for hostile environment sexual harassment has both "objective and subjective elements: the misconduct shown must . . . create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Alfano*, 294 F.3d at 374.[8] The above discussion pertains to the objective aspect of this analysis. As to the subjective aspect, Plaintiff's position is undermined by evidence she actively participated in -- and initiated -- discussions of a sexual nature with Mahoney (Jones Stmt., ¶¶124, 126).[9]

---

[8] Citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). See also *Brown v. Henderson*, 257 F.3d 246 (2nd Cir. 2001) (for hostile environment claim, plaintiff must prove conduct that is objectively severe or pervasive and that plaintiff subjectively perceives as hostile or abusive).
[9] See *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721 (8th Cir. 2000) ("A plaintiff must indicate by her conduct that the alleged harassment was unwelcome. . . [and] . . . cannot create a genuine

### b) *Plaintiff does not claim that she was harassed because of her sex.*

Sexual harassment is unlawful only to the extent it actually involves sex (gender) discrimination. "[I]t is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." *Id.*[10] "[W]orkplace harassment . . . is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations. 'The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).[11] Therefore, "an environment which is equally harsh for both men and women . . . does not constitute a hostile working environment under the civil rights statutes." *Brown*, 257 F.3d at 253.[12]

"Everyone can be characterized by sex, race, [or] ethnicity . . . ; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." *Alfano*, 294 F.3d at 365.[13]

Certainly Plaintiff alleges her boss, Mahoney, was "harsh, unjust, and rude" (*see, e.g.*, Jones Stmt., ¶20, 23, 24, 26, 27, 28, 36, 42). But the sexual orientation

---

issue of material fact with regard to unwelcome behavior when she engages in the conduct complained about").

[10] Citing *Brown*, 257 F.3d at 252 (2d Cir. 2001); *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. at 80 (1998) (Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at " discriminat[ion] . . . because of . . . sex). *See also Richardson v. New York State Dept. of Correctional Serv.*, 180 F.3d 426, 440 (2nd Cir. 1999) (same as to racial harassment).

[11] Quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25 (1993).

[12] Quoting *Brennan*, 192 F.3d at 318.

[13] The same analysis applies under the CFEPA. Conn. Gen. Stat. Section 46a-60(a)(8) prohibits harassment "on the basis of sex," thus clearly defining sexual harassment as a species of sex discrimination for purposes of the CFEPA, as it is under Title VII. *See also* n. __, *supra* (Connecticut courts' interpretation of CFEPA as "coextensive with" Title VII).

harassment she claims he visited upon her lacks a linkage or correlation to any of her claimed grounds of discrimination. Obviously, there is no evidence it has any relation to Plaintiff's age or religion. There is also no evidence Plaintiff was victimized because she is a woman.[14] She admits her claim is not that Mahoney discriminated against her based on her sex, but that he discriminated against her because she was a heterosexual.[15] There is no evidence, and no basis for a reasonable inference, that a heterosexual man in her position would have been treated any better. In fact, such a man may have been treated worse, as he may have been subjected not only to gay-oriented banter, but also to sexual advances, given Mahoney's admitted homosexuality (Jones Stmt., ¶123).

In relying on the sexual content of some of Mahoney's alleged comments to her as the basis for claiming sexual harassment, Plaintiff makes the same fundamental error as the plaintiff in *Brown v. Henderson*. In that case, the plaintiff's opposition to summary judgment indicated she thought "what made her tormentors' conduct 'sexual harassment' was the fact that the behavior touched on matters of sexuality, . . . and not that it was a form of sex discrimination. . . ." This error was fatal to her claim.[16] Plaintiff similarly relies on the fact Mahoney's alleged remarks involved matters of sexuality (primarily homosexuality), and expressly denies Mahoney engaged in sex discrimination. This is fatal to Plaintiff's claim, just as it was in *Brown*.

Another reason Plaintiff's claim falls short on the critical "because of sex" requirement is the undisputed fact that Mahoney was homosexual. This negates the reason male-on-female harassment involving matters of sexuality is normally assumed to occur "because of sex." The inference of discrimination is ordinarily "easy to draw in

---

[14] She does allege Mahoney commented a few times on her "nice breasts" (Jones Stmt. ¶41), but these were clearly isolated incidents, and while offensive, were much less severe or threatening coming from an admittedly gay man.
[15] See III.A.1., above.

10

most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex." *Oncale*, 523 U.S. at 80. Obviously, this analysis is inapplicable to male-female harassment involving discussion of sexual matters where the perpetrator is homosexual; it is ***not*** reasonable to assume such discussions -- and possibly more pointedly sexual conduct -- would not have been imposed on someone of the same sex.

### 3. Even if Plaintiff could establish actionable hostile environment harassment, Edward Jones would be entitled to summary judgment based on the *Faragher/Ellerth* affirmative defense.

In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), the Supreme Court held that if sexual harassment by an employee's supervisor does not result in a tangible employment action, the employer can avoid liability with a 2-pronged affirmative defense. The employer must establish that: 1) it exercised reasonable care to prevent and promptly correct harassment; and 2) the plaintiff unreasonably failed to take advantage of corrective opportunities the employer provided.

#### a) *The alleged harassment did not result in a tangible employment action.*

The *Faragher/Ellerth* affirmative defense is available to Edward Jones because the alleged harassment did not result in a tangible employment action. This is true despite her claim that Edward Jones terminated her employment for discriminatory and retaliatory reasons, including the refusal to submit to unlawful harassment.

An involuntary termination for refusal to submit to unlawful harassment would be a tangible employment action precluding use of the affirmative defense, but this did not occur. Rather, Plaintiff effectively resigned -- by abandoning her employment -- under

---

[16] *Brown*, 257 F.3d at 255-56.

11

circumstances not constituting a constructive discharge. Defendant Rarick's ultimate termination action of processing a termination form was merely a recognition of this decision made by Plaintiff, not an adverse decision by Edward Jones. Plaintiff never submitted a resignation letter, but her failure to respond to the final letter to her attorney stating she would be deemed to have resigned if she did not respond had the identical effect. Until then, Plaintiff had been free to return to work. (Jones Stmt., ¶¶141-45, 149, 151-52 .) It was Plaintiff, not Edward Jones, who ended her employment.[17]

The Second Circuit has held that a constructive discharge is not a tangible employment action precluding reliance on the *Faragher/Ellerth* affirmative defense. *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2nd Cir. 2001).[18] This issue is presently before the Supreme Court.[19] However, even if the Court were to hold that a constructive discharge is a tangible employment action precluding use of the *Faragher/Ellerth* affirmative defense, Plaintiff would not benefit. She would still be unable to establish a tangible employment action using a constructive discharge theory because she cannot establish that her resignation was a constructive discharge.

"The standard for constructive discharge is 'a demanding one." *Cioffi v. the Allen Products Co.*, 2000 WL 33180448, *14 (D.Conn. 2000).[20] "To establish a constructive discharge, a plaintiff must show that the employer deliberately [made her] working conditions so intolerable that [she was] forced into an involuntary resignation." *Id.* at *13[21] "Deliberateness exists only if the actions complained of were intended by the

---

[17] *Cf., Brunson v. Bayer Corp.*, 237 F. Supp. 2d 192 (D. Conn. 2002) (court rejected plaintiff's claim that she had been terminated, where evidence showed employer wanted her to return to work and only actually terminated her employment when it determined she had abandoned her job; court states: "On this record, no jury could conclude that [the plaintiff] was discharged from her employment").
[18] Citing *Caridad v. Metro-North Commuter Railroad*, 191 F.3d 283, 294 (2d Cir. 1999).
[19] *Pennsylvania State Police v. Souders*, No. 03-95, argued March 31, 2004.
[20] Quoting *Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2d Cir.1985).
[21] Quoting *Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360 (2d Cir.1993). *See also Leson v. ARI of Connecticut, Inc.*, 51 F.Supp.2d 135 (D. Conn. 1999).

employer as an effort to force the employee to quit." *Id.*[22] Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."[23] "Intolerability is measured by a reasonable person standard and not by the employee's subjective feelings." *Cioffi,* 2000 WL 33180448 at *13 "[A] constructive discharge cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant." *Id.* at *14.[24]

Plaintiff's evidence falls short of this "demanding" standard at every turn. There is no evidence Edward Jones did anything intended to force her to quit. To the contrary, although her walkout itself could have been treated as a quit, Edward Jones did not do so. Instead, it made considerable efforts to investigate and remedy her complaints, allowed her a lengthy leave, a significant portion of it paid, repeatedly resisted Mahoney's efforts to obtain another full-time BOA, and communicated with her attorney in an effort to return her to work (Jones Stmt., ¶¶91-135, 137, 140-52).[25]

Plaintiff's unsubstantiated claim that Edward Jones failed to properly respond to her complaints about Mahoney would be unavailing in establishing constructive discharge, even if it were true. *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 73-74 (2nd Cir. 2000) ("ineffective or even incompetent" handling of harassment

---

[22] *Quoting Leson,* 51 F.Supp.2d at 143 (D.Conn.1999).
[23] *Leson,* 51 F.Supp.2d at 143 (*quoting Chertkova v. Connecticut General Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir.1996)).
[24] *Quoting Spence v. Maryland Casualty Co.,* 995 F.2d 1147, 1156 (2d Cir.1993).
[25] *Cf., Whidbee,* 223 F.3d at 74 (in rejecting constructive discharge, court notes: "the employer demonstrated an interest in retaining the plaintiffs"); *Leson,* 51 F.Supp.2d at 144 (in rejecting constructive discharge, court notes plaintiff was asked by management time and again not to resign); *Cioffi,* 2000 WL 33180448 at * 14 (in rejecting constructive discharge, court notes that employer held plaintiff's job open for five months without requested medical documentation before terminating her employment (*citing Viera v. Olsten/Kimberly Quality Care,* 63 F.Supp.2d 413, 418 (S.D.N.Y.1999) (former employee not actually or constructively discharged where she was aware failure to accept position would be treated as voluntary resignation, and employer waited nearly two months before compelling her to decide)).

complaints did "not rise to the level of deliberate action required by [Second Circuit] precedent" to establish constructive discharge).

The working conditions described by Plaintiff are hardly so intolerable that a reasonable person would feel compelled to resign. They were perhaps "difficult or unpleasant," but that has been held insufficient. *Cioffi*, 2000 WL 33180448 at *14. Significantly, when she refused Edward Jones' final offer of return, Plaintiff was not working, so she had no working conditions at the time, let alone intolerable ones. What she had was an opportunity to return to work under working conditions characterized by a chastened Mahoney who had been expressly warned against harassment, discrimination, and retaliation (Jones Stmt., ¶¶135, 147-48). Her refusal of this opportunity was unreasonable. *Cf. Leson*, 51 F.Supp.2d at 144 ("Inasmuch as [plaintiff] did not work even for one day in her new position, it is impossible for her to prove that the working conditions were intolerable or that [the employer] deliberately set about to force her to quit. 'A reasonable person will usually explore alternative avenues thoroughly before coming to the conclusion that resignation is the only option.'"[26]

Thus, Plaintiff cannot establish the alleged harassment resulted in a tangible employment action using her claim that she was terminated, because the undisputed facts establish as a matter of law that she was not terminated, but resigned. And even if the Supreme Court concludes, contrary to present law in this Circuit, that a constructive discharge may be a tangible employment action, her resignation was not a constructive discharge.

Alternatively, the Complaint suggests Plaintiff might seek to avoid application of the *Faragher/Ellerth* affirmative defense with evidence of other "tangible employment actions." She refers to Mahoney implicitly and explicitly conditioning promotional

---

[26] Quoting *Larkin v. Town of West Hartford*, 891 F.Supp. 719, 728 (D.Conn.1995).

opportunities and bonus opportunities on her submission to his conduct, and using her refusal to submit to his conduct as the basis for unspecified unfavorable employment decisions.[27]

However, Plaintiff was not even eligible any promotions or bonuses (Jones Stmt. ¶153). As the Supreme Court made clear in *Ellerth*, the crucial distinction is between merely threatening to take action based on refusal to submit to harassment (defense available) and actually taking such action (defense not available).[28] Plaintiff claims only the former.

Therefore, because the alleged harassment did not actually result in a tangible employment action, regardless of what Mahoney may have said or implied about conditioning Plaintiff's future success on Plaintiff's submission to his conduct, Edward Jones is entitled to assert the *Faragher/Ellerth* affirmative defense.

### b) *Plaintiff unreasonably failed to make timely use of Edward Jones' discrimination and harassment complaint procedures.*

Employer policies prohibiting harassment and specifying avenues for harassment complaints often play a central role in both prongs of the *Faragher/Ellerth* affirmative defense. Edward Jones has such policies, and Plaintiff knew of them but unreasonably failed to take advantage of them. She had received copies of the Edward Jones nondiscrimination and sexual harassment policies, requiring that complaints be directed to the Associate Relations Department or to an ombudsman (Jones Stmt., ¶¶12-16).

Plaintiff claims she was subjected to ongoing discrimination and harassment throughout her employment. However, she did not talk to Associate Relations about

---

[27] Complaint ¶88.
[28] *Ellerth*, 524 U.S. at 742 (question presented was standard of liability where employee is threatened with tangible consequences if she refuses to submit to sexual harassment, but she refuses to submit and threat is not carried out; Court held absent actual tangible action affirmative defense is available).