such concerns, as required by the policies, until after she had walked out November 9, 2001, never to return (see Jones Stmt., ¶¶79, 80, 90, 95). In her initial contacts with Associate Relations, she did not specify that her concerns about Mahoney involved discrimination or sexual harassment (Jones Stmt., ¶¶84-90). Nor did she mention religious or age-based harassment or discrimination (Id.). She specifically requested that her complaints to Lyn Vasil not be communicated, and chose not to contact Associate Relations when advised to do so by Vasil (Jones Stmt., ¶70, 79). A telephone conversation with Rarick on November 12, 2001, was the first time she said she had been subjected to sexually oriented remarks (Jones Stmt., ¶¶93, 95, 96). Allegations of age and religious discrimination were raised only after her attorney came into the picture, writing a letter dated November 21, 2001. (Jones Stmt., ¶117).

Edward Jones' promulgation and distribution of nondiscrimination and sexual harassment policies establishes it exercised reasonable care to prevent harassment, part of the first prong of the *Faragher/Ellerth* affirmative defense. *See Leopold v. Baccarat, Inc*, 239 F.3d 243, 245 (2nd Cir. 2001) (existence of anti-harassment policy with complaint procedures is important consideration in determining whether employer has satisfied first prong of defense).[29] Plaintiff's failure to properly utilize the complaint procedure set forth in such policies establishes the second prong. *See Caridad*, 191 F.3d at 296 (unreasonable failure to use employer's complaint procedure normally satisfies employer's burden on second prong).[30] Edward Jones' response to Plaintiff's complaints -- once she raised issues that potentially involved unlawful discrimination or

---

[29] Citing *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (1999) (*quoting Faragher*, 118 S.Ct. at 2293). *See also Arnold v. Yale New Haven Hospital*, 213 F.Supp.2d 142, 149 (D.Conn. 2002) (that employer has anti-harassment policy and provides copy to employee is important in determining whether employer acted "reasonably" for affirmative defense).

[30] This court, among others, has found unreasonable delay in utilizing a complaint procedure sufficient to establish the second prong. *See, e.g., Arnold*, 213 F.Supp.2d at 149 (defense established where plaintiff put up with frequent harassment for several months before complaining, and once he complained, employer responded swiftly and completely).

harassment -- completes the proof of the first prong of the affirmative defense by demonstrating that Edward Jones exercise reasonable care to promptly correct harassment.

### c) *Edward Jones acted promptly and reasonably to correct any unlawful harassment and prevent its recurrence.*

Although Rarick initially did not understand Plaintiff to be claiming Mahoney had engaged in any unlawful employment practices -- as she had not articulated any such claim in her November 9, 2001 letter -- he immediately commenced an investigation.[31] He talked several times to Plaintiff and Mahoney. He also questioned other persons who might have relevant knowledge or whom Plaintiff claimed would substantiate her allegations. (Jones Stmt. ¶¶91-135.) Meanwhile, he acted reasonably to protect Plaintiff from any further harm, without prejudicing her financially, by placing her on paid leave (Jones Stmt. ¶¶96, 137).

Rarick's investigation disclosed no evidence of unlawful conduct. Several of the people Plaintiff claimed would substantiate her allegations did provide some support for her claim that Mahoney was a difficult and demanding supervisor. However, several of them also contradicted some of Plaintiff's specific factual assertions about her cell phone use and a conversation with someone in a neighboring business -- calling into question her veracity. Mahoney denied Plaintiff's allegations. He also told Rarick that Plaintiff had herself engaged in discussions of a frankly sexual nature (*i.e.*, specifics of her sex life, including reference to sexual positions) (Jones Stmt. ¶¶102, 104-108, 110-14, 120-27, 130-35.)

Rarick concluded that Mahoney may have behaved inappropriately, and that there was interpersonal friction between him and Plaintiff, but that Mahoney's conduct

---

[31] Plaintiff walked out and faxed the letter to Rarick on a Friday; Rarick began investigating the following Monday (Jones Stmt. ¶¶84, 91).

17

did not involve sexual harassment or discrimination because of sex, religion, or age. As a result of this investigation, Edward Jones warned Mahoney not to violate its non-discrimination and sexual harassment policies. It informed Mahoney of the allegations against him and warned him that any further allegations of misconduct, of a sexual nature or otherwise, could result in discipline up to and including termination, and that retaliation against Plaintiff would not be tolerated.

Clearly, Plaintiff would have preferred for Edward Jones to respond to her complaints by terminating Mahoney's employment. However, the *Faragher/Ellerth* affirmative defense does not require any particular corrective action, or the corrective action preferred by the complaining employee. It only requires actions reasonably likely to prevent further harassment. *See Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999) (defense available as long as remedial efforts reasonably likely to prevent further harassment).

Moreover, under the peculiar circumstances of this case, termination of Mahoney could readily have been construed as unlawful sexual orientation discrimination. A decision to terminate Mahoney based on Plaintiff's complaints could been interpreted as motivated by his openness about his homosexuality. Much conduct Plaintiff claims was sexual orientation discrimination against her was merely Mahoney's unwillingness to remain "in the closet." Thus, she complains that he had "flamboyant" conversations with some of his homosexual friends, discussed such friends and their social activities with her, commented that certain clients were homosexual, and said some male clients were "cute." Had he been fired, Mahoney could have claimed with some justification that Plaintiff found this conduct offensive only because of her prejudice against

18

homosexuals, and that the CFEPA required that Edward Jones not take adverse action against him based on such prejudice.[32]

In conclusion, Edward Jones had an anti-harassment policy with a complaint procedure, actively investigated and took reasonable steps to remedy the alleged harassment, and Mahoney thereafter engaged in no further conduct offensive to Plaintiff. Edward Jones has therefore met its first-prong burden of establishing that it exercised reasonable care, and is entitled to summary judgment based on the *Faragher/Ellerth* affirmative defense. See *Arnold*, 213 F.Supp.2d 142, 148 (D.Conn. 2002).[33]

### 4. Plaintiff was not subjected to religious or age discrimination.

Plaintiff's religious and age discrimination claims fail for many of the same reasons as her sexual-harassment claims, as discussed above. Specifically, her claims that Mahoney made jokes about Jews and Jewish names and holidays, attempted to call her at home on Jewish holidays, and made a few remarks regarding her age do not rise to the level of severe and pervasive religious or age-based harassment. Even if they did, as discussed above, Plaintiff's unreasonable failure to make timely complaints, and Edward Jones' prompt and reasonable response, establish the *Faragher/Ellerth* affirmative defense.

It is significant for purposes of the second prong of the *Faragher/Ellerth* affirmative defense that allegations of offensive remarks relating to Plaintiff's religion or

---

[32] Plaintiff professed to be such a strict Orthodox Jew that she was "absolutely humiliat[ed]" by receiving a telephone call on a Jewish holiday (Jones Stmt. ¶47). The Orthodox Jewish view of homosexuality is clear: sex between two men is "such a severe sin that it merits the death penalty in a Jewish court system." Rabbi Dr. Nachum Amsel, *Homosexuality In Orthodox Judaism*, available online at http://www.lookstein.org/resources/homosexuality_amsel.pdf. Plaintiff's religious views thus probably prejudiced her against homosexuals.

[33] Citing *Caridad*, 191 F.3d at 295, as example of appropriateness of summary judgment based on the affirmative defense, and contrasting *Whidbee*, 223 F.3d at 72 (2d Cir.2000) ("if harassment continues after complaints are made, reasonable jurors may disagree about whether an employer's response was adequate").

age were not brought to Edward Jones' attention until they were included in her attorney's letter dated November 21, 2001 (Jones Stmt. 117). Plaintiff claims Mahoney made a discriminatory remark about her age about halfway through her employment (Jones Stmt. 43), which would have been in early September. In 2001, Rosh Hashanah fell on September 18, and Yom Kippur the following week.[34] Thus, about two months elapsed after Mahoney allegedly made the age-discriminatory remark, made fun of Rosh Hashanah, and called her at home on a Jewish holiday (Jones Stmt. ¶¶46, 47), before she complained to Rarick about such conduct. This is an unreasonable delay, which establishes the *Faragher/Ellerth* affirmative defense if these remarks are construed as a basis for a hostile environment claim.

Plaintiff also claims Mahoney threatened her employment if she did not work on two Jewish holidays, but she admitted he allowed her to take off on both Rosh Hashanah and Yom Kippur (Jones Stmt. ¶45). Her attorney's letter complains that she was not paid for these holidays (Jones Stmt. ¶117), but she was not entitled to be paid. *Cf. Ansonia Bd. Of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986) (unpaid leave for holy day observance would generally be reasonable accommodation).

Plaintiff was not subjected to an adverse employment action because of her age or religion. As discussed above, she was not terminated, constructively discharged, or denied any promotional opportunities or bonus. Even assuming *arguendo* that the formal termination of Plaintiff's employment in response to her refusal to return to work is viewed as an adverse employment action, Edward Jones has provided evidence of a legitimate, non-discriminatory reason for its decision to take such action -- Plaintiff's refusal to return to work. Plaintiff has no evidence this was a pretext for religious or age discrimination. Mahoney's alleged discriminatory remarks are not evidence of a

---

[34] Although this date is not in the record, the court can take judicial notice of it based on a calendar.

discriminatory motive for this decision, as they were unrelated to the decision, and he was not involved in making it.

### B. Edward Jones Is Entitled To Summary Judgment On Plaintiff's State and Federal Retaliation Claims (Counts Four and Six).

In Counts Four and Six, Plaintiff seeks to recover against Edward Jones for retaliation in violation of Title VII and the CFEPA, Conn. Gen. Stat. §46a-60(a)(4), respectively. Edward Jones is entitled to summary judgment on this claim because there is no evidence from which a reasonable jury could find it liable. To prevail on a claim of retaliation in violation of Title VII, a plaintiff must show that: 1) she engaged in protected participation or opposition under Title VII; 2) the employer was aware of this activity; 3) the employer took adverse action against her, and 4) a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action. *Fitzgerald v. Henderson*, 251 F.3d 345, 358 (2nd Cir. 2001).[35] The same principles apply to retaliation claims under the CFEPA.[36] Plaintiff's evidence on each of these essential elements of a retaliation claim is fatally deficient.

#### 1. Plaintiff did not engage in protected activity of which Edward Jones was aware.

Plaintiff alleges in the Complaint that her "refusal to submit to Mahoney's unwelcomed verbal or physical conduct of a sexual nature, and her complaints regarding this treatment was used as a basis for unfavorable employment decisions affecting [her]" (Complaint ¶¶ 60, 97). She thus seeks to establish two distinct types of protected activity: refusal to submit, and complaints.

---

[35] Quoting *Sumner v. United States Postal Service*, 899 F.2d 203, 208-09 (2d Cir. 1990).
[36] See *Shaw v. Greenwich Anesthesiology Assocs., P.C.*, 137 F.Supp.2d 48 (D. Conn. 2001) (dismissing CFEPA retaliation claim for the same reasons federal retaliation claims were dismissed).

21

### a) Refusal to submit

For several reasons, Plaintiff cannot establish protected activity based on refusal to submit. First, as discussed above in connection with Plaintiff's discrimination and sexual harassment claims, there is no evidence Mahoney's conduct involved any unlawful harassment or discrimination, so she cannot have engaged in protected conduct by refusing to submit to it. Second, merely refusing to submit may not rise to the level of protected activity.[37] Third, while Plaintiff may have been subjected to unwelcome -- though not unlawfully discriminatory -- verbal or physical conduct of a sexual nature, there is no evidence she refused to submit, as claimed. To the contrary, the undisputed evidence is that she submitted to it very passively, not even mentioning it -- although she openly complained about a variety of other aspects of Mahoney's conduct -- until after she walked out. And when she walked out, this act did not entail a refusal to submit to unwelcome conduct of a sexual nature, but an attempt to escape an entirely work-related and non-sexual confrontation with Mahoney.

### b) Complaints

Plaintiff's complaints and comments about Mahoney to various Edward Jones personnel before she walked out were not protected activity because they made no mention of harassment or discrimination of any kind, dealing instead with difficulties working with Mahoney that would have been troublesome to an employee in her position without regard to sex, religion, or age.[38]

For the same reason, Plaintiff cannot establish that Edward Jones was aware that her pre-walkout complaints involved protected conduct. It is of course true that

---

[37] See Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2nd Cir. 2000). "While . . . opposition to a Title VII violation need not rise to the level of a formal complaint . . . , this notion of 'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'"

22

after Plaintiff walked out, she -- and subsequently her attorney -- did make a few complaints to Rarick about conduct that was mildly sexual in nature. Although her letter to Rarick mentioned no conduct that was at all sexual, Plaintiff did raise a few comments related to sexual orientation in a subsequent telephone conversation with Rarick, -- including an alleged one-time reference to "lipstick lesbian." Later her attorney's letter to Rarick raised a few additional similar allegations. (Jones Stmt. ¶¶90, 93, 95, 117.)

Such complaints were not protected conduct because, as discussed above, the alleged conduct was not unlawful. Nor could Plaintiff even have had a reasonable belief that it was unlawful. *Cf. Holmes v. the Long Island Rail Road Co.*, 2001 WL 797951 (E.D.N.Y. 2001) (plaintiff not protected under Title VII for internal complaint concerning two comments by physical therapist that she had nice body, one comment that he would like to see her in bathing suit, and one attempt to have her undress to waist as required for physical examination; belief she had been subjected to hostile work environment by this conduct was not objectively reasonable).[39]

2. **There was no adverse action taken against Plaintiff.**

As discussed above in connection with whether Plaintiff suffered a tangible employment action, Plaintiff was not terminated, constructively discharged, or denied any promotional opportunities or bonus. Thus, there was no adverse action.

3. **There is no causal connection between the allegedly protected activity and any adverse action.**

Even assuming *arguendo* that Plaintiff engaged in protected activity and that the formal termination of her employment in response to her refusal to return to work is

---

[38] For example, she complained to Commander that Mahoney was very demanding, and to Vasil that he was difficult, abusive, and required her to perform personal work (Jones Stmt. ¶¶61, 69).
[39] *Holmes* applied the Supreme Court's decision in *Clark County School Dist. v. Breeden*, 532 U.S. 268 (2001), which assumed, without deciding, that the retaliation protection extends not just to practices that are actually unlawful, but also to those the employee could reasonably believe were unlawful, and then held the plaintiff's opposition unprotected because no one could reasonably believe the mild verbal harassment about which she complained violated Title VII.

viewed as an adverse employment action, there is no evidence of a causal connection between the two. Plaintiff first explicitly complained of sexually oriented conduct November 12, 2001, and of age and religious discrimination November 21, 2001 (Jones Stmt. ¶¶93, 95, 117). Yet her employment was maintained in "administrative leave" status until March 5, 2002, over three months later (Jones Stmt. ¶¶96, 137, 144). Rather than moving expeditiously to terminate Plaintiff, as one would expect if Edward Jones had been acting in a retaliatory manner, Edward Jones sought Plaintiff's return to work (Jones Stmt. ¶¶141-151). These facts prove there was no retaliatory motive.

If there had been a causal connection between Plaintiff's complaints and the formal termination of her employment, the latter would have occurred much closer to the time of the complaints. *Cf. Clark County School Dist.*, 532 U.S. 268 273-74 (2001) ("cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'").[40]

Finally, Edward Jones has provided evidence of a legitimate, non-discriminatory reason for the formal termination of Plaintiff's employment -- her refusal to return to work (Jones Stmt. ¶152). Plaintiff has no evidence this was a pretext for retaliation.

### C. Edward Jones Is Entitled To Summary Judgment On Plaintiff's Aiding And Abetting Claim (Count Seven).

In Count Seven, Plaintiff seeks to recover against Edward Jones for aiding and abetting unlawful discriminatory employment practices in violation of the CFEPA, Conn. Gen. Stat. §46a-60(a)(5).[41] This claim is insufficient as a matter of law.

---

[40] *Citing Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period too long); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992) (4-month period too long).
[41] Conn. Gen. Stat. § 46a-60(a)(4) provides that it is an discriminatory employment practice to "aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so. . . ."

24

### 1. There were no unlawful discriminatory employment practices.

Edward Jones cannot be liable under for aiding and abetting unlawful discriminatory employment practices under the CFEPA because, as discussed above and in the separate motions for summary judgment of Defendants Rarick, Cummins, and Mosca, no such CFEPA violations were committed by any Defendant, including Mahoney.

### 2. Edward Jones cannot have aided and abetted itself.

Aiding and abetting inherently involves assistance to another party who commits an unlawful employment practice. Here, under the Connecticut Supreme Court's decision in *Perodeau v. City of Hartford*, 259 Conn. 729, 792 A.2d 752 (Conn. 2002), the individual supervisory Defendants cannot be personally liable under the CFEPA; their conduct can never constitute an unlawful employment practice. There is thus no other CFEPA violator for Edward Jones to have aided and abetted.

### 3. Edward Jones' response to Plaintiff's complaints is the antithesis of aiding and abetting.

As discussed above, Edward Jones responded promptly and reasonably to Plaintiff's complaints about Mahoney's conduct. It did not condone or ratify such conduct. To the contrary, even though the evidence was at best inconclusive, Edward Jones warned Mahoney not to violate its non-discrimination and sexual harassment policies" or retaliate against Plaintiff (Jones Stmt. ¶135). Such measures reasonably designed to prevent unlawful employment practices are precisely the opposite of aiding, abetting, inciting, compelling, or coercing the commission of such practices.

### D. Edward Jones Is Entitled To Summary Judgment On Plaintiff's Intentional Infliction Of Emotional Distress Claim (Count Eleven).

In Count Eleven, Plaintiff seeks to recover for intentional infliction of emotional distress. Edward Jones is entitled to summary judgment on this claim because there is no evidence from which a reasonable jury could find it liable.

Under Connecticut law, the elements of a claim for intentional infliction of emotional distress are: 1) the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of its conduct; 2) the defendant's conduct was extreme and outrageous; 3) the defendant's conduct caused the plaintiff emotional distress, and 4) the emotional distress was severe. *Brunson v. Bayer Corp.*, 237 F.Supp.2d 192, 207 (D. Conn. 2002)[42]

Assuming, *arguendo*, that if there is a genuine issue of material fact as to the third and fourth elements -- whether Plaintiff suffered extreme emotional distress caused by Defendants' conduct -- the evidence relating to this conduct fails to establish the first and second elements -- extreme and outrageous conduct intended to cause such distress or known to be likely to do so.

The conduct Plaintiff alleges falls into six categories: 1) Mahoney's demands that she perform tasks she preferred not to perform[43]; 2) his general impatience and rudeness, including some insulting comments and "yelling and screaming" directed at Plaintiff in connection with disputes over work performance[44]; 3) his remarks relating to sexuality, primarily homosexuality and his sexual orientation and that of Plaintiff, and others[45]; 4) his handling of her clothing and handbag[46]; 5) his remarks regarding her age

---

[42] Citing *Petyan v. Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986). See also *Pascal v. Storage Technology Corp.*, 152 F.Supp.2d 191, 214 (D. Conn. 2001) (*citing DeLaurentis v. City of New Haven*, 220 Conn. 225, 266-67, 597 A.2d 807 (1991)).
[43] See, e.g., Jones Stmt., ¶¶22, 68, 69, 93.
[44] See, e.g., Jones Stmt., ¶¶24, 26-28, 93.
[45] See, e.g., Jones Stmt., ¶¶32-37, 40, 41, 95.
[46] See, e.g., Jones Stmt., ¶¶42, 95.

and religion[47] and 6) the alleged failure of Edward Jones and the other Defendants to prevent or correct his conduct.

### 1. Edward Jones did not intend to inflict emotional distress or have actual or constructive knowledge it was likely.

The first element, the intention to cause emotional distress, is not satisfied by mere negligence. *Brunson,* 237 F.Supp.2d at 207. Plaintiff's evidence on this element is insufficient as a matter of law because at most it establishes only negligence.

#### a) *Mahoney*

There is no evidence whatsoever that Mahoney acted with the specific intention of causing Plaintiff to suffer severe emotional distress. The only reasonable inference from the evidence of Mahoney's alleged conduct is that he was a demanding, rude, and inconsiderate person who at times engaged in inappropriate conversations of a personal nature. The observation of an unbiased employee from another Edward Jones office that Mahoney and Plaintiff were similar personalities is undisputed.[48] This fact alone is sufficient to negate Plaintiff's implausible claim that Mahoney pursued a course of conduct for the specific purpose of causing her to suffer emotionally, rather than merely finding it difficult to get along with her.

There is also no evidence whatsoever that Mahoney knew or should have known that severe emotional distress was the likely result of his conduct. The nature of this conduct is such that ordinarily the expectation would not be for it to result in severe emotional distress. There is no evidence Mahoney was aware of any unusual emotional vulnerability which would have changed such expectation.

#### b) *Edward Jones*

Edward Jones' conduct was clearly no more than mere negligence, if that. Plaintiff's claim based on Edward Jones' conduct is simply one of nonfeasance --

---

[47] *See, e.g.,* Jones Stmt., ¶¶43-47.

27

alleged failure to actively intervene to protect her from Mahoney.[49] Such passive nonfeasance fails to meet the standard of intentional or reckless conduct. There is no evidence whatsoever of intent to cause severe emotional distress. *See Brunson*, 237 F. Supp. at 207-08 (rejecting intentional infliction claim based on employer's alleged knowledge of harasser's propensity for harassment and its handling of plaintiff's harassment complaints because while employer may have been less than helpful, there was no evidence to suggest any motivation other than negligence).

There is also no evidence Edward Jones knew or should have known Plaintiff was likely to suffer severe emotional distress. It was only aware of a personality conflict between Plaintiff and Mahoney that might make working conditions somewhat less pleasant, but would not reasonably be expected to cause severe emotional distress. As with Mahoney, there is no evidence Edward Jones was aware of any unusual emotional vulnerability that would have changed this understanding of the situation.

2.   **Plaintiff was not subjected to extreme and outrageous conduct.**

"Because the element of intent is separate from the requirement that the behavior be extreme and outrageous, the question is whether the defendants' conduct, not the motive behind such conduct, is itself extreme and outrageous."[50] This standard requires conduct that exceeds "all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind."[51] *Petyan v. Ellis*, 510 A. 2d 1337, 1342, n.5 (Conn. 1986). The conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

---

[48] Jones Stmt., ¶110.
[49] *See* Complaint ¶119.
[50] *Radesky v. First American Title Insurance Co.*, 2003 WL 22119183 *3 (D.Conn. 2003).
[51] *Petyan v. Ellis*, 510 A. 2d 1337, 1342, n.5 (Conn. 1986).

intolerable in a civilized community." *Ericson v. City of Meriden*, 113 F.Supp.2d 276, 292 (D. Conn. 2000)[52]

Adjudication of claims involving allegations of intentional infliction of emotional distress involves distinguishing "between the slight hurts which are the price of a complex society and the severe mental disturbances inflicted by intentional actions wholly lacking in social utility." *Whelan v. Whelan*, 588 A.2d 251, 253 (Conn. Super. 1991). The conduct must be "considerably more egregious than that experienced in the rough and tumble of everyday life . . . ." *Id.* at 252. It is for the court to make an initial determination of whether the specific misconduct alleged meets these threshold requirements of outrageousness. *Abate*, 130 F. Supp. 2d at 348. [53] Here, it clearly does not.

### a)     Mahoney

Plaintiff merely describes Mahoney as making offensive comments and inquiries and being a demanding and perhaps oppressive boss, and she alleges he violated federal and state employment discrimination laws. This alleged conduct falls far short of the standard of outrageousness summarized above.

The Connecticut courts have recognized the danger in allowing tort recovery for every incident of such "slight hurts" typically experienced in the "rough and tumble of everyday life." The Connecticut Superior Court has wisely observed:

> When a citizen who has been called a son of a bitch testifies that the epithet has destroyed his slumber, ruined his digestion, wrecked his nervous system, and permanently impaired his health, other citizens who on occasion have been called the same thing without catastrophic harm may have legitimate doubts that he was really so upset, or that if he were

---

[52] Citing *DeLaurentis v. City of New Haven*, 220 Conn. 225, 266-67, 597 A.2d 807 (1991); *Petyan v. Ellis*, 200 Conn. at 254 n.5. *See also Miner v. Town of Cheshire*, 126 F.Supp.2d 184, 194 (D. Conn. 2000); *Newtown v. Shell Oil Co.*, 52 F.Supp.2d 366, 375 (D. Conn. 1999); *Dobrich v. General Dynamics Corp.*, 40 F.Supp.2d 90, 104 (D. Conn. 1999).
[53] *See also Miner*, 126 F. Supp. 2d at 194; *Ericson*, 113 F. Supp. 2d at 292; *Newtown*, 52 F. Supp. 2d at 375; *Dobrich*, 40 F. Supp. 2d at 103-04.

his sufferings could possibly be so reasonable and justified under the circumstances as to be entitled to compensation.

*Whelan v. Whelan,* 588 A.2d at 252-53 (quoting W. Prosser & W. Keeton, Torts (5th Ed.1984) § 12, at 59).

This statement aptly describes the type of claim Plaintiff makes here. Plaintiff makes the dubious assertion that she suffered digestive disturbances, hair loss, depression, etc. as a result of being subjected to some veiled name-calling and relatively mild, if offensive, conversations about sexuality not involving any sexual advances, requests for sexual favors, or physical contact.

The alleged conduct is of a type routinely portrayed on network television. Obviously, in this society in which homosexuality is increasingly accepted and "out of the closet," yet still not entirely unremarkable, many citizens have been subjected to comments, inquiries, and conversations on the subject of sexual orientation (their own and that of others) "without catastrophic harm." As suggested by *Whelan*, such citizens would likely "have legitimate doubts" about Plaintiff's claim that she suffered severe emotional distress as a result of such conduct.

The same is clearly true with respect to working for a demanding boss who requires the performance of some "menial" tasks and personal favors. Surely, untold millions of American workers silently endure such working conditions "without catastrophic harm." Mahoney's alleged conduct is simply not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

In fact, applying Connecticut law, this Court has frequently rejected intentional infliction of emotional distress claims in the employment context where based on similar or more severe workplace conduct. *See Pascal v. Storage Technology Corp.*, 152 F. Supp. 2d 191, 214-215 (D. Conn. 2001) (supervisors openly expressed preference for