UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARIAN DEBORAH MILLER,

Plaintiff,

vs.

CIV NO.
3:03CV 0193 (DJS)

EDWARD D. JONES & CO., L.P.,
MICHAEL MAHONEY, MICHAEL
CUMMINS, BARBARA MOSCA, and
STEVEN RARICK,

Defendants.

April 29, 2004

LOCAL RULE 56(A)1 STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
FILED ON BEHALF OF DEFENDANT EDWARD D. JONES & CO., L.P.

COMES NOW Defendant Edward D. Jones & Co., L.P. ("Edward Jones"), and in support of its motion for summary judgment, submits the following statement of material facts as to which Defendant contends there is no genuine issue to be tried[1]:

### Background Information On The Individual Defendants

1.      Defendant Michael Mahoney was employed by Edward Jones as an investment representative ("IR") in Stamford, Connecticut from March 1999 through March 2002 (Mahoney Depo. at 6).

2.      Defendant Michael Cummins is an Edward Jones IR with an office in Old Saybrook, Connecticut (Cummins Depo. at 5-6).   He was the regional leader for the entire State of Connecticut from 1994 until about September of 2001, when Barbara Mosca ("Mosca"), regional leader for the Metropolitan New York area, took over as regional leader for Fairfield County, Connecticut (Cummins Depo. at 11-13, 52; see Miller Depo. at 57-58).

---

[1] This statement of facts is based upon evidence obtained in discovery.  Should the Motion be denied, Defendant reserves the right to present evidence at trial controverting such facts, but because the Court must now view the evidence in the light most favorable to Plaintiff, where there are significant differences between the testimony of Plaintiff and of Defendant's witnesses, Plaintiff's version is given.  By including facts in this statement, Defendant does not admit truth or materiality for all purposes.

3.    Defendant Barbara Mosca is employed by Edward Jones as an investment representative in Long Beach, New York (Mosca Depo. at 5). She is an Edward Jones regional leader for a New York metropolitan area region that was expanded in October 2001 to include Fairfield County, Connecticut, for which Cummins had previously been the regional leader (Mosca Depo. at 7-8; *see* Miller Depo. at 150).

4.    Defendant Steven Rarick is employed by Edward Jones at its home offices in St. Louis, Missouri as a as the team leader of the resolution team in the Associate Relations department. His duties include investigating and resolving allegations of inappropriate conduct by Edward Jones employees (Rarick Aff., ¶¶ 1, 3.)

5.    In hiring the individual Defendants, Edward Jones followed its standard hiring procedures, which include background and reference checks. These procedures disclosed no reason to question the individual Defendants' fitness for employment. The employment files for these individuals also contain no information or facts that would raise any question about their fitness for employment by Edward Jones. (Rarick Aff., ¶ 72).

### Background Information On Plaintiff

6.    Plaintiff has two sons (Miller Depo. at 10-11). The younger is 14 and resides with her; the older is 22 and in college (Miller Depo. at 11).

7.    In 1995, Plaintiff got divorced from her husband of 15 years because he was impotent and she wanted a sexual relationship (Miller Depo. at 10, 17-18). During the last seven years of her marriage, Plaintiff had engaged in sexual activity with another man, although he was also impotent (Miller Depo. at 18-19).

8.    Shortly before her employment with Edward Jones, Plaintiff had a social and sexual relationship with a senior coworker who was physically abusive with her and was prosecuted and convicted in connection with such abuse (Miller Depo. at 247-54).

2

## Plaintiff's Employment With Edward Jones

9.      Edward Jones branch offices are typically staffed by an Investment Representative ("IR") and a Branch Office Administrator ("BOA"). The IR functions as a retail stockbroker or salesperson, with responsibility for meeting prospective clients, establishing relationships with prospective customers, and selling investments such as stocks, bonds, and mutual funds. The BOA is responsible for office administration, customer service, and marketing support. (Rarick Aff., ¶ 5)

10.     Plaintiff began working for Edward Jones as a BOA in Stamford, Connecticut on July 7, 2001 (Miller Depo. at 48).

11.     As a BOA, Plaintiff had a variety of office duties, including answering telephone calls, greeting clients, scheduling meetings for the IR (Defendant Michael Mahoney), handling mailings to customers and prospective customers, and assisting with paperwork for new clients (Miller Depo. at 52).

## Edward Jones Discrimination and Harassment Policies

12.     At the beginning of her employment with Edward Jones, Plaintiff signed an employment at will acknowledgment form (Miller Depo. Exh. 10), an Edward Jones nondiscrimination policy (Miller Depo. Exh. 11) and an Edward Jones sexual harassment policy (Miller Depo. Exh. 12) (Miller Depo. at 46-47, 51).

13.     The Edward Jones sexual harassment policy provides that harassment concerns must be immediately brought to the attention of the Edward Jones Associate Relations Department/Human Relations, which is "the only department in the firm with the authority and responsibility for investigating sexual harassment claims" (Miller Depo. Exh. 12). The Edward Jones nondiscrimination policy contains a similar provision (Miller Depo. Exh. 11).

14.     The Edward Jones sexual harassment policy further provides that "[g]eneral principals, department leaders, team leaders, managers, investment representatives, branch staff

associates, regional leaders and associates in departments other than Associate Relations cannot investigate concerns of sexual harassment," although they have a responsibility to report information on sexual harassment to Associate Relations (Miller Depo. Exh. 12). The Edward Jones nondiscrimination policy contains a similar provision (Miller Depo. Exh. 11).

15.    The Edward Jones sexual harassment policy also provides that "[b]ranch associates who wish to discuss discrimination concerns in a confidential manner may contact the firm's ombudsman," but cautions that "the ombudsman is an informal and off-the-record resource who cannot investigate or take action upon concerns" (Miller Depo. Exh. 11). The Edward Jones nondiscrimination policy contains a similar provision (Miller Depo. Exh. 11).

16.    The Edward Jones sexual harassment policy provides that the Associate Relations staff will investigate allegations of harassment "quickly and thoroughly," that such allegations "may result in corrective or disciplinary action, up to and including termination of employment," and that "Edward Jones will not tolerate retaliation or reprisal actions taken against any associate who uses this procedure." The Edward Jones nondiscrimination policy contains a similar provision (Miller Depo. Exh. 11).

### Defendant Michael Mahoney's Alleged Conduct, In General

17.    Mahoney was not disciplined by his employer in any prior position he held (Mahoney Depo. at 17).

18.    The BOA who worked with Mahoney before Plaintiff, Shannon Bogus, had complained about his expectations with regard to tasks and duties (Mahoney Depo. at 28). Specifically, Bogus had complained about an incident in which she left early to care for a sick child and Mahoney called her at home regarding a particular task (Mahoney Depo. at 28-31).

19.    Mahoney had mood swings "where he was extremely euphoric at one point and then . . . would . . . crash and be very down soon after that" (Miller Depo. at 72).

20.    Mahoney often interrupted Plaintiff during the course of a workday, interfering with her work (Miller Depo. at 70).  Examples of this would be "asking [her] to get up and get him an envelope" (which were "maybe 4 feet away from him") or "go out and get him something to eat," and discussing people they could both see through the office window (Miller Depo. at 71-72, 121).

21.    Mahoney asked Plaintiff to do some work in the office during working hours relating to the condominium association of which he was the president (Miller Depo. at 183).

22.    Mahoney gave Plaintiff "Pledge" and a rag and told her to dust the office (Miller Depo. at 184).

23.    In early or mid-October, 2001, Mahoney asked Plaintiff to ask her son to do some computer work for him. Her son did the work, which took two to three hours, and Mahoney said he would pay him," but "it never happened" (Miller Depo. at 185).

24.    If Mahoney was put on hold while calling St. Louis, "he would make lewd gestures . . . towards the company" (Miller Depo. at 89).

25.    Mahoney asked Plaintiff to call another BOA, Lynn Cornida, to get answers on a test Plaintiff was taking online for her training. When Plaintiff asked Mahoney if he was asking her to cheat, he said "yes."  (Miller Depo. at 112).

26.    Mahoney "wanted things done very very quickly, and when he didn't have them done very quickly he became enraged" (Miller Depo. at 88).  When this occurred, he would start to "yell": "I need an answer to this right now.  You better get the answer to this right now.  You're supposed to be my BOA.  You know, I would be a better BOA than you would.  I'm going to call St. Louis" (Miller Depo. at 89).

27.    On one occasion when a client was upset because money had not been transferred into a money market account, Mahoney blamed Plaintiff for the mistake, calling her "stupid" and saying she couldn't do her job (Miller Depo. at 153).

28.   The final confrontation between Plaintiff and Mahoney occurred when a client complained about a check bouncing and Mahoney "went on a rampage," "yelling and screaming" at Plaintiff that the check had bounced, calling Plaintiff an "idiot" and "bitch" and getting "in [her] face" (Miller Depo. at 167-70).  As a result of this confrontation, Plaintiff walked out during the workday (Miller Depo. at 170-71).

29.   Plaintiff claims this final confrontation involved an assault upon her by Mahoney (Miller Depo. at 351).  However, she admitted he never hit her, threatened to hit her, or physically threatened her in any other way (Miller Depo. at 91, 246-47 ).

30.   Later, the third time she described this incident in her deposition, she added the detail that she believes that while Mahoney was "screaming and yelling" at her, he said to her "Nobody f[uck]s with me . . . and gets away with it," which she took as a threat. (Miller Depo. at 360-61)

### Mahoney's Alleged Conduct Relating To Sexual Orientation

31.   Plaintiff directly admitted she is claiming not that Mahoney discriminated against her because she is female, but that he discriminated against her because of her sexual orientation (Miller Depo. at 298-99).  Specifically, she contends he engaged in "reverse" sexual orientation discrimination, discriminating against her because she is heterosexual whereas he is homosexual (Miller Depo. at 299).

32.   Plaintiff cited the following aspects of Mahoney's conduct which she contends constituted discrimination against her because she is heterosexual: 1) he discussed "lesbianism" with her (Miller Depo. at 300); 2) he asked her to take a number of his lesbian clients out for dinner (Miller Depo. at 300, 304-05); 3) he said she "would make a good lipstick lesbian" and should go to a particular bar in New York (Miller Depo. at 300); 4) he said he had somebody who was gay who worked for him and he liked that a lot and it was too bad she

wasn't gay (Miller Depo. at 302, 304); and 5) he would put on her scarves and her coat and parade around the office (Miller Depo. at 303).

33.     Mahoney asked Plaintiff if she thought he was gay, to which she responded that she was not aware of whether or not he was gay and it didn't make any difference to her (Miller Depo. at 72).

34.     Mahoney had "flamboyant" conversations with some of his friends who were homosexuals which could be overheard by people who would enter the office (Miller Depo. at 122-23, 197-98).

35.     Mahoney asked Plaintiff whether either of her sons was gay (Miller Depo. at 124-25). However, she admitted such questions about her children had nothing to do with her sexual orientation (Miller Depo. at 301-02).

36.     Mahoney asked questions and made comments about Plaintiff's boyfriend "almost on a daily basis," including asking her how this boyfriend was and if she was still seeing him, commenting on his attractiveness, suggesting that if she was no longer seeing him perhaps he could see the boyfriend instead, which he said the boyfriend would probably enjoy better (Miller Depo. at 73-74, 186-87).

37.     Mahoney mentioned to Plaintiff that he would like her to be a lesbian, stating that she "would make a wonderful lipstick lesbian, and that [she] should frequent the . . . lipstick lesbian bars in New York and that [she] should pick up clients for him that way" (Miller Depo. at 186, 188-89, 304).  He said some of the lesbian clients would like Plaintiff and she should take them out for dinner (Miller Depo. at 186, 305).  This happened "[p]erhaps four [times], [p]erhaps a dozen times" (Miller Depo. at 188).  She admitted Mahoney never asked her to have a sexual relationship with any of his clients.  (Miller Depo. at 305-06)

38.     Plaintiff testified that her objection to entertaining Mahoney's lesbian clients changed his mood, demeanor, and behavior towards her, which she interpreted as evidence he was

"discriminating against [her] as a heterosexual female, but not only as a heterosexual female, but as a heterosexual Jewish female at the age of 48" (Miller Depo. at 304-05).

39.    Plaintiff testified that on a number of occasions Mahoney complemented her on her appearance or clothing, and asked to borrow something she was wearing (she supposed so he could wear it for Halloween) (Miller Depo. at 312, 368).

40.    Mahoney discussed "homosexual activity" and "homosexuality" "on a daily basis" (Miller Depo. at 194).  These discussions were about his homosexual friends and their social activities (e.g., "we're all going out for dinner"), sexual preference and marital status of one homosexual client, comments about heterosexual clients being "cute," and "whether he was a 'top' or a 'bottom'" (Miller Depo. at 195-96, 200).

### Mahoney's Other Alleged Conduct Relating to Plaintiff's Sexuality

41.    Mahoney "told [Plaintiff] a few times that [she] had a nice 'rack,'" which she understood to mean that she "had nice breasts" (Miller Depo. at 199).

### Mahoney's Alleged Conduct Relating To Plaintiff's Privacy and Personal Property

42.    Plaintiff testified that her invasion of privacy claim is based on the following alleged conduct of Mahoney: 1) calling her at home on the telephone during nonworking hours several times a week, asking her to pick up coffee and a bagel or muffin for his breakfast (Miller Depo. at 333-36); 2) asking her about her sexual relationship with her boyfriend (she refused to describe the specific questions for "religious reasons") (Miller Depo. at 334, 336-37); 3) discussing her children and their sexual orientation with her (Miller Depo. at 334, 337-38); 4) putting on her scarf and coat on a number of occasions and "parading around the room" (Miller Depo. at 182, 334, 338); 5) going through and moving business-related papers on her desk (Miller Depo. at 334, 338-40); and 6) moving her handbag under her desk in her absence, leaving its contents in "disarray" on at least one occasion (Miller Depo. at 182, 334, 340-43).

**Mahoney's Alleged Comments Regarding Plaintiff's Age**

43.    Mahoney told Plaintiff that "he was 12 years younger than [she] was and that he was faster than [she] was." She asked him if he was making a comment about her age, and he responded that he was (Miller Depo. at 232). Plaintiff testified this occurred about halfway through her employment (Miller Depo. at 232).

44.    Mahoney said he "could run circles around [her]" and that she was "too old for this job" (Miller Depo. at 237).

**Mahoney's Alleged Conduct Relating To Plaintiff's Religion**

45.    In her first partial day of deposition testimony, Plaintiff testified that Mahoney told her if she "didn't attend work on two separate Jewish holidays, that she was going to get fired" (Miller Depo. at 125). However, when she returned at a later date to complete the deposition, she testified she was in fact allowed to take off on both Rosh Hashanah and Yom Kippur (Miller Depo. at 314-15).

46.    In her first partial day of deposition testimony, Plaintiff testified Mahoney made fun of Rosh Hashanah, referring to it as "Rush Ahama" (Miller Depo. at 147). However, when she returned at a later date to complete the deposition, she testified he called it "rush-a-home-a" (Miller Depo. at 313).

47.    When she returned to complete her deposition, Plaintiff testified to the following additional conduct by Mahoney which she considered religious discrimination: 1) denying her request to leave early for Yom Kippur, and instead keeping her half an hour late (Miller Depo. at 314); 2) denying her request for time off for the Jewish holiday of Succoth (Miller Depo. at 314-15); 3) making jokes about Jews and Jewish names (Miller Depo. at 315-16); and 4) attempting to call her at home on Jewish holidays, when she says religious Jews are not permitted to answer the telephone -- conduct she claims was "absolutely humiliating" (Miller Depo. at 321).

**Plaintiff's Communications With Edward Jones Employees[2] Regarding Mahoney's Alleged Conduct**

48.     Plaintiff testified she reported problems about Mahoney to Kristin Commander and Lyn Vasil, Lynn Comida, Shannon Bogus, John Sullivan, and someone with the first name of Amy in the Edward Jones human relations department, as well as to Defendants Cummins, Mosca, and Rarick (Miller Depo. at 274-75).

49.     Commander and Vasil were the BOA's for Defendant Cummins' office (Miller Depo. at 59). Commander worked part-time as a BOA for Cummins, starting in 1999 (Commander Depo. at 6-7). Vasil worked for him as a full-time senior BOA (Commander Depo. at 7).

50.     Commander visited the Stamford office twice (Miller Depo. at 60, 396-97). Commander met Plaintiff at the end of the summer of 2001, when she went to Mahoney's office to explain the daily routine and to show Plaintiff how to organize office files and arrange her desk (Commander Depo. at 8-12). She went to Mahoney's office one more time several weeks later (Commander Depo. at 11-12). Altogether, she spent about nine hours at Mahoney's office (Commander Depo. at 30).

51.     The first occasion was approximately sometime in August, 2001 (Miller Depo. at 61). Plaintiff testified that at this time, Commander spent about three hours speaking with Mahoney and about 20 minutes speaking with Plaintiff (Miller Depo. at 62-63).

52.     Commander testified that while she was at Mahoney's office on these two occasions, Mahoney did not monopolize her time or detract from her ability to participate in training Plaintiff (Commander Depo. at 35).

53.     During this August, 2001, visit to the Stamford office, Commander asked Plaintiff if Mahoney was gay, telling her other people in the company had laughed and poked fun at the fact he was gay (Miller Depo. at 63, 65).

---

[2]     Plaintiff's communications with individual Defendants Mosca, and Cummins are detailed in their separate Local Rule 56(a)1 statements, which are hereby incorporated by reference.   Her communications with Rarick, which are central to Edward Jones' sexual harassment defendants, are set forth below.

54.     During this visit, Commander also told Plaintiff that a number of previous employees had problems with Mahoney and he was "on probation," advising her "not to let him get away with anything" (Miller Depo. at 63).   She told Plaintiff that if Mahoney "could not work it out with [Plaintiff] as a BOA, that he was going to get fired" (Miller Depo. at 65).

55.     Subsequently, Commander again visited the Stamford office.   This time she was there about 2 1/2 hours, spending time with Mahoney, and also helping Plaintiff with some aspects of her work (Miller Depo. at 78-80).

56.     While at Mahoney's office on these two occasions, Commander did not observe Mahoney using any profanity (Commander Depo. at 31).

57.     While at Mahoney's office on these two occasions, Commander observed Plaintiff go out to bring back lunch for Mahoney, Commander, and Plaintiff, doing so at her own suggestion and without any complaint (Commander Depo. at 32).

58.     Mahoney had instructed Plaintiff to call Cummins' office if she was not sure about a certain procedure, and when she did so Plaintiff would speak with Commander or Vasil (Miller Depo. at 82, 87-88).

59.     Similarly, although Commander and Vasil were not Plaintiff's supervisors, they had instructed Plaintiff to call them if she had any problems with anything in the office (Miller Depo. at 59).

60.     Commander had frequent telephone conversations with Plaintiff regarding office administration matters such as processing customer checks (Commander Depo. at 12, 27).

61.     Plaintiff told Commander over the phone that Mahoney was "very demanding, but she was very vague on what it was that he was being demanding for" (Commander Depo. at 14).

62.     Commander told Plaintiff that a previous employee who worked with Mahoney had conflicts with him being demanding or inpatient (Commander Depo. at 36-38).   She had no

knowledge or information that this employee's conflicts with Mahoney had to do with conduct of a sexual nature or use of inappropriate language in the office (Commander Depo. at 39).

63.    Plaintiff never said anything to Commander that would have led her to believe Mahoney was "doing anything or saying anything that was inappropriate or a violation of Edward Jones policies" (Commander Depo. at 27-28).

64.    Plaintiff never complained to Commander about Mahoney's language or demeanor, other than "just that he was demanding" (Commander Depo. at 21).

65.    Plaintiff never said anything to Commander indicating Mahoney was making any offensive statements referring to sex, religion, or age, using any language of a sexual nature, or making any inappropriate comments or statements to her (Commander Depo. at 22, 24, 25).

66.    In Vasil's second telephone conversation with Plaintiff, she snickered and asked Plaintiff how it was going and how Mahoney was behaving.  Plaintiff responded that "things are going fine," but that she "found him to be a bit odd" (Miller Depo. at 83-84).

67.    In this conversation, Vasil said: "Don't let him get the better of you, and don't do anything you're not supposed to do.  Do not take your work home with you . . . [a]nd don't do any extra work for him" (Miller Depo. at 84).

68.    In this conversation, Plaintiff told Vasil that Mahoney often sent her out to get his breakfast and lunch, and had her make his coffee and do personal work for him.  Vasil said she "was not supposed to be doing any [of] that" (Miller Depo. at 85).

69.    In later telephone conversations with Vasil, when asked by Vasil how things were going and whether she was "able to handle [Mahoney]," Plaintiff said "it's getting exceedingly more difficult" (Miller Depo. at 95).  She specifically told Vasil that Mahoney "was very abusive," was requiring her to do "personal work for his condominium association," had asked her son to do computer work for pay and failed to pay him, and had her stay late and stuff envelopes, preventing her from getting home to her son (Miller Depo. at 95-96).

70.    In a conversation with Vasil at the end of September or beginning of October, 2001, Plaintiff said "I can't take this guy anymore," referring to Mahoney (Miller Depo. at 104-05). When Vasil offered to tell Cummins to talk to Mahoney again, Plaintiff responded: "don't say anything to Mr. Cummins because . . . I got in trouble for it last time" (Miller Depo. at 105).

71.    In this conversation with Vasil at the end of September or beginning of October, 2001, Vasil told Plaintiff to "go home when you're supposed to go home, [and d]on't take any work home with you," clean the office, or get him coffee or lunch.  She also said: "This is what always happens with everybody that works there" (Miller Depo. at 106).

72.    On a number of occasions during conversations with Plaintiff, Vasil made references to Mahoney's sexual preference, finding it to be amusing (Miller Depo. at 107).

73.    Plaintiff told Vasil and Commander that Mahoney "would put [her] coat on and prance around the room and swing it about, including [her] scarf, and that [she] found that to be odd behavior" (Miller Depo. at 17).

74.    Lynn Comida was a BOA in upper state Connecticut who Plaintiff said was aware "that [Mahoney] had had problems with previous branch office administrators," with "very brash" behavior "that one would not expect in an office situation" (Miller Depo. at 275 -76).

75.    Comida told Plaintiff she knew Mahoney was "very difficult," to which Plaintiff responded: "yes, he is very difficult."  Comida then said that Plaintiff "wouldn't be the first person to say that" because Mahoney had "gone through a lot of people before [her]" (Miller Depo. at 110-11). Vasil and Commander said the same thing, Commander even "naming names of people who had been there prior to [Plaintiff]" (Miller Depo. at 111).

76.    Comida also commented that Mahoney "was a pain in the ass" because "he called her too much and she didn't have time to talk to him anymore" and he interrupted her too much (Miller Depo. at 111).

77.     Plaintiff told Vasil and Commander that Mahoney had asked her whether either of her sons was gay (Miller Depo. at 25).

78.     Plaintiff told Commander Mahoney was threatening her job.  Commander responded: "You can't get fired.  If anyone is going to get fired, it will be him" (Miller Depo. at 126).

79.     At some point, Vasil and Commander told Plaintiff to contact the Associate Relations Department in St. Louis, but she chose not to do it at that time (Miller Depo. at 145-46).

80.     Later, Plaintiff contacted the Associate Relations Department and spoke to someone named Amy, telling her that Mahoney was "almost tyrannical," that she believed he was having some "mental problems," that his mood swings were intolerable and very difficult to work with (Miller Depo. at 146).  She complained that he would not permit her to leave the office when her son was in an accident, that when she was home sick he called her into the office anyway, and that he made fun of Jewish holidays (Miller Depo. at 146-47).  Plaintiff requested that she be transferred to another office (Miller Depo. at 146).

81.     Following the confrontation with Mahoney described in paragraph 28 above, Plaintiff spoke with John Sullivan, an Edward Jones home office employee in Associate Relations, whom she characterized as a "very nice guy" (Miller Depo. at 176, 178).

82.     Plaintiff did not discuss details of Mahoney's conduct with Sullivan, but "just told him he was very abusive, . . . intrusive, . . . [and] that his conduct in the office was totally inappropriate" (Miller Depo. at 201).

83.     Sullivan said "I know about this," and asked Plaintiff to write about what happened and fax the letter to Steve Rarick, also an Edward Jones home office employee in Associate Relations (Miller Depo. at 177-78, 201-02).

## Plaintiff's Letter to Rarick

84.     As requested by John Sullivan, Plaintiff wrote a letter to Rarick and faxed it to him (Miller Depo. at 177-78).  This occurred on Friday, November 9, 2001 (Miller Depo. at 203-04).  The

fax cover sheet and letter are Exhibit 15 to Plaintiff's deposition (Miller Depo. at 177-78), and Exhibit A to Rarick's Affidavit.

85.     In this letter, Plaintiff stated that after working with Mahoney for over three months, she had to walk out that morning "due to all the abusiveness and harassment that [she had] incurred since the inception of [her] position. . . ."

86.     This letter to Rarick referred generically to "abusiveness and harassment" that Plaintiff "incurred since the inception of [her] position," said that "[f]rom the very beginning [she] found Mr. Mahoney to be very demanding and intrusive," and characterized his behavior as "erratic," "critical," verbally and emotionally "abusive," "intrusive and condescending," lacking professionalism, and involving "false accusations" and "harassment."

87.     In this letter, Plaintiff complained about a variety of specific conduct by Mahoney, including constantly interrupting her training with a BOA from another office and her study time, telling her to "cheat" on a test, interrupting her with "menial" tasks, sitting at her desk under circumstances raising suspicions regarding his handling of her personal belongings, calling her at home asking her for personal favors, being "extremely unreasonable" when she sought to leave work upon receiving an emergency call that her older son was hit by a car, interfering with her attempts to organize the office, making her work late, seeking other employment, making offensive gestures in her presence when he is on the phone with staff members in St. Louis, painting a very poor picture of Edward Jones, and blaming her for his mistakes.

88.     In this letter to Rarick, Plaintiff also told Rarick about several disputes she had with Mahoney over details of specific client transactions, including the final incident on November 9 that led her to walk out.

89.     In this letter to Rarick, Plaintiff said she "cannot continue to work directly for [Mahoney]," and adverted to some physical symptoms she attributed to "the stress that he has caused me."