90. Nowhere in this letter to Rarick was there any indication that Plaintiff was complaining about sex discrimination, sexual harassment, sexual orientation discrimination, religious discrimination, or age discrimination. Plaintiff did not say Mahoney made offensive sexually oriented remarks to or about her, wore her clothes, discussed his or her sexual orientation or that of his friends, clients, Plaintiff's sons, Plaintiff's boyfriend, or others. She also did not raise any claims of age discrimination, religious discrimination, or retaliation.

### Rarick's Investigation Into Plaintiff's Complaints About Mahoney

91. Although Rarick did not understand Plaintiff to be claiming that Mahoney had engaged in any unlawful employment practices, he was concerned about her allegations, as they suggested there was a poor working relationship between her and Mahoney that could interfere with effective operation of the branch office. He therefore immediately commenced an investigation, starting the following Monday, November 12, 2001. His investigation involved conversations with Plaintiff and Mahoney, and with persons who might have relevant knowledge or whom Plaintiff claimed would substantiate her allegations, including Cummins, Mosca, Commander, and Vasil.

92. On November 12, 2001, Rarick also spoke with Mahoney, who said Plaintiff had just gotten mad at him and walked off the job. He described her as verbally abusive and said that she yelled at him throughout her employment. (Rarick Aff., ¶¶ 16-17.)

93. Later the same day, Rarick called Plaintiff in response to the letter she had faxed to him on November 9, 2001. She complained that Mahoney was demeaning, would call her "an idiot" or "stupid," and frequently used profanity, saying "fuck" at least a dozen times a day. She also complained that he did not allow her to take a lunch break, or if he did, would make her pick up his lunch; that he had called her at home and told her to bring him breakfast; and that she had been doing all of the office cleaning. (Rarick Aff., ¶¶ 9-11; see also Miller Depo. at 203-07, 212 (claiming conversation was the following day).)

16

94.     In this conversation with Plaintiff on November 12, 2001, Rarick asked her if she ever talked to anyone else about her concerns. She said that she spoke to Kristen Commander and Lyn Vasil at Mike Cummins' office. (Rarick Aff., ¶ 14.)

95.     In their November 12, 2001 conversation, Plaintiff also told Rarick that Mahoney is a homosexual and once had asked her about the sexual orientation of her sons. She also said Mahoney would wrap himself in one of her scarves and "prance around the office"; that he upset her one time when he told her she "would make a good lipstick lesbian"; that his comments and actions made her feel uncomfortable; and that one time she was very uneasy when he told her he wanted to "meet her little boy" (but when he asked her what he meant by that, she said she didn't have any idea). (Rarick Aff., ¶ 13; see also Miller Depo. at 209-11.)

96.     Rarick concluded the conversation by telling Plaintiff that a lot of this was new to him as it had not been included in the faxed letter, that he was going to look into it and get back to her, and that while he investigated she would remain on the payroll on paid administrative leave. (Rarick Aff., ¶ 15; see also Miller Depo. at 211-12.)

97.     Subsequently on November 12, 2001, Rarick called and left a message for Price Woodward, who is the person in the IR Development Department responsible for the geographic area of the country involved. Rarick wanted Price Woodward him to know about his conversations with Mahoney and Plaintiff and make him aware of the complaints against Mr. Mahoney so Mr. Woodward would know of Rarick's investigation. (Rarick Aff., ¶ 18.)

98.     Subsequently on November 12, 2001, Rarick called Cummins, who said he had spoken to Plaintiff, and because she was talking about the working environment in the office he had referred her to Barbara Mosca. Rarick asked Cummins if either of his BOA's had spoken to Plaintiff. Cummins said that Commander had been to the office to train Plaintiff, but neither Commander nor Vasil were available at the time. Rarick asked Cummins to have them call him back. (Rarick Aff., ¶ 19.)

99. Subsequently on November 12, 2001, Rarick called and left a message for Mark Stecher. Rarick knew Stecher had been assigned to "coach" Mahoney, and wanted to find out what he knew about the situation. (Rarick Aff., ¶ 20.)

100. Subsequently on November 12, 2001, Rarick called Mahoney to talk to him again. He asked Mahoney what Mark Stecher had suggested to Mahoney about his working relationship with Plaintiff. Mahoney said Stecher had told him that raising his voice was not productive and had discussed better ways of addressing his concerns with her. Mahoney said he had not yet addressed the issues with Plaintiff. Rarick told Mahoney that Plaintiff had some concerns that he was going to be looking into and that she was going to remain on the payroll until the situation was resolved. (Rarick Aff., ¶ 21.)

101. The next day (November 13, 2001), Mark Stecher returned Rarick's call from the day before. Rarick informed Stecher that Plaintiff had walked out the previous day and asked him about his contacts with Mahoney. He said Mahoney began calling him about a month and a half ago about some performance concerns he was having with Plaintiff's work ethic and personal use of the phone. Mark said he had discussed with Mahoney the language he should be using when he addressed these concerns with Plaintiff. (Rarick Aff., ¶ 23.)

102. Subsequently on November 13, 2001, Rarick called Mahoney to discuss Mahoney's concerns about Plaintiff. One of his concerns was that her cell phone was "constantly ringing" and that this did not stop even after he addressed it with her. He said he had called BOA Recruiting to get an oncall BOA, and Rarick told him while he could use an on call (temporary replacement), he could not hire a full-time BOA until the situation with Plaintiff was resolved. Although Plaintiff had walked out in anger, and clearly had expressed some concerns with Mahoney, Rarick felt it was premature to treat this conduct as a resignation and was hopeful of a resolution whereby she would remain employed by Edward Jones. (Rarick Aff., ¶ 24-25.)

103. On November 16, 2001, Commander, along with Cummins and Vasil, participated in a telephone conversation with Rarick (Commander Depo. at 14). The conversation was initiated by Commander, and part of it also included Cummins and Vasil over a speaker phone. Commander called Rarick to inform him that she "had told [Plaintiff] to call him if there was anything further she wanted to make a complaint about" (Commander Depo. at 15, 19, 20).

104. In this telephone conversation with Rarick, Commander said the environment in Mahoney's office was "demanding," by which she meant: "That when he wanted something done, he would come out, and if she was in the middle of something, he would ask her to stop what she was doing and do it . . ." (Commander Depo. at 16-17, 26; see Rarick Aff., ¶ 28). She also told Rarick she thought Mahoney assigned Plaintiff too many projects (Rarick Aff., ¶ 28.)

105. In this telephone conversation with Rarick, Commander also described Mahoney as having "zero patience," which she viewed as a personality trait, and as sometimes speaking in a condescending tone (Commander Depo. at 17-18; see Rarick Aff., ¶ 28).

106. In this telephone conversation with Rarick, Commander said she had never known Mahoney to use profanity in the office. Commander also said Mahoney sometimes says things that could be offensive to people (Rarick Aff., ¶ 28; see Commander Depo. at 18). However, the only example Commander gave was that "he would just come up to her while she was on the phone, which is rude and offensive, and she would get all flustered and mad. . . " (Commander Depo. at 23).

107. In this telephone conversation with Rarick, Commander also said both Plaintiff and Mahoney would complain to her about each other and she finally told them to call their new regional leader (Mosca) or St. Louis (Commander Depo. at 18; see Rarick Aff., ¶29). These mutual complaints were all work related complaints about his requests that she do things she did not want to do, and her refusal to do such things (Commander Depo. at 18-21, 28).

108. In this telephone conversation with Rarick, Commander also told Rarick that when she was with Plaintiff at Mahoney's office, Plaintiff's cell phone rang more than the office phone, and from what she heard she determined they were personal calls from Plaintiff's friends (Rarick Aff., ¶ 27).

109. Commander had no other discussions with Rarick regarding Plaintiff or Mahoney, and no further discussions with Cummins or Vasil about the subject of this November 16, 2001 conversation (Commander Depo. at 19-20).

110. On November 16, 2001, Rarick also spoke to Vasil. She said she felt Mahoney may have been too demanding and would "overstep his boundaries," such as by asking Plaintiff to get his breakfast and calling her at home. When Rarick asked her who she thought was at fault for the problems at Mahoney's office, she said Plaintiff and Mahoney were both very similar personalities and she could not assign the blame. (Rarick Aff., ¶¶ 32, 33.)

111. Neither Commander nor Vasil mentioned any issues relating to harassment of or discrimination against Plaintiff based on her sex, sexual orientation, religion, or age (Rarick Aff., ¶ 34).

112. Also on November 16, 2001, Rarick called Plaintiff. He asked her about receiving personal cell phone calls at the office, and she denied her cell phone was ever even turned on at the office, including the day that Kristen Commander was there training her. (Rarick Aff., ¶ 36.)

113. Also on November 16, 2001, Rarick asked Plaintiff if anybody else witnessed the events about which she complained. She mentioned someone named Karen at the art store next to Mahoney's office. Plaintiff said Karen had called her at home and asked her if she was OK and Karen thought Mahoney may have "done something" to Plaintiff. (Rarick Aff., ¶ 37.) Thereafter, also on November 16, 2001, Rarick called and left a message for Karen at Art Directions, the business next to Mahoney's office (Rarick Aff., ¶ 38).

114. Also on November 16, 2001, Rarick called and spoke to Barbara Mosca, who informed him that while Plaintiff was at work she frequently used her cell phone to call Mahoney's former BOA, now working at another Edward Jones office (Rarick Aff., ¶ 39).

115. On November 21, 2001 and November 26, 2001, Rarick again left messages for Karen at Art Directions, as she had not yet called him back and he wanted to follow up on Plaintiff's reference to her as a possible witness (Rarick Aff., ¶ 40).

116. Rarick received a letter dated November 21, 2001 from attorney Vlad Spitzer, who said his firm represented Plaintiff. Exhibit B to the Rarick Affidavit is a true and correct copy of this letter. (Rarick Aff., ¶ 41.)

117. This November 21, 2001 letter from attorney Spitzer repeated some allegations Plaintiff had made previously, but also raised a number of others Rarick had never heard before, including that Mahoney had made "ongoing references and questions concerning [Plaintiff's] sexuality," and asked her "questions regarding [her] relationship with her boyfriend"; that he had "frequently made derogatory references to [Plaintiff's] age; that he had refused [her] the right to take off certain Jewish holidays," claiming she was forced to take off Yom Kippur and Rosh Hashanah without pay; that he had "engaged in threatening behavior"; and that she had suffered "extreme emotional distress" as a result of Mahoney's behavior (Rarick Aff., Exh. B; Rarick Aff., ¶ 42).

118. This letter was also the first time the allegations about Mahoney's conduct were phrased in terms suggesting unlawful discrimination, as the letter used the phrase "hostile work environment" (Rarick Aff., Exh. B; Rarick Aff., ¶ 43).

119. This letter claimed Plaintiff was frightened to return to work with Mahoney, had suffered "extreme emotional distress" as a result of Mahoney's behavior, and could not under any circumstances return to work with him (Rarick Aff., Exh. B).

120. On November 27, 2001, Rarick again called for Karen at Art Directions. This time she was there and he spoke to her, telling her that Plaintiff had told him she had contacted Plaintiff at home to check on her because of Mahoney's abusive behavior in the office. Karen said she did call Plaintiff at home, but that was not the reason. She said she called because she had not seen Plaintiff for several days and just wanted to make sure she was OK, and it did not have anything to do with Mahoney. (Rarick Aff., ¶ 44.)

121. Karen from Art Directions said she knew Mahoney was a difficult supervisor because he had been through several BOA's. However, she said she had never heard him yelling at anyone. (Rarick Aff., ¶ 45.)

122. Also on November 27, 2001, Rarick called Mahoney to discuss concerns raised in the November 21, 2001 letter from attorney Spitzer (Rarick Aff., ¶ 46).

123. Rarick asked Mahoney if he ever discussed his sexuality in the office, to which he responded that he is gay and Plaintiff knows that, but he did not discuss it in the office (Rarick Aff., ¶ 47).

124. Rarick asked Mahoney if he ever talked to Plaintiff in the office about her sexual preference. He said she would come in talking about specifics of her sex life with her boyfriend, one time saying that he "tried to roll her over and do a rear entry." Mahoney said that when he heard this held up his hand and said" "T.M.I" ("Too Much Information") and walked away. He said he had to do this several times. (Rarick Aff., ¶ 48.)

125. Rarick asked Mahoney about the allegation that he questioned the sexual preference of Plaintiff's son, and he denied ever saying anything like this (Rarick Aff., ¶ 49).

126. Mahoney said Plaintiff would often talk about her boyfriends and they would constantly call the office (Rarick Aff., ¶ 50).

127. Mahoney said he never yelled at Plaintiff, but mentioned a time when she "screamed" at him, and he said he felt harassed by her (Rarick Aff., ¶ 51).

128. On November 28, 2001, Rarick further discussed the situation involving Mahoney and Plaintiff with Barbara Mosca and Price Woodward (Rarick Aff., ¶ 52).

129. On November 30, 2001, Rarick spoke to Shannon Bogus, Mahoney's BOA before Plaintiff (Rarick Aff., ¶ 53).

130. Rarick asked Bogus about her experience with Mahoney. She said that he was demeaning to her, telling her she couldn't do anything right and was not capable of doing her job (Rarick Aff., ¶ 54).

131. Bogus said that Mahoney would send her out to pick up his breakfast and lunch, and that Plaintiff later called her and told her the same thing was happening to her (Rarick Aff., ¶ 55).

132. Rarick asked Bogus about Mahoney's use of profanity in the office, and she said he would only say things if they "slipped out," but it was not excessive or a problem and he never used "the F-word" in her presence (Rarick Aff., ¶ 56).

133. When Rarick asked Bogus if Mahoney ever talked about his sex life, she said he was open with her that he was gay, but he did not get into specifics (Rarick Aff., ¶ 57).

134. Bogus said Mahoney never questioned her sexuality (Rarick Aff., ¶ 58).

135. Bogus said Plaintiff told her Mahoney questioned her sexuality and the sexual preference of her son (Rarick Aff., ¶ 59).

Plaintiff demanded Mahoney's "discharge from employment as a condition of her returning to work," but Rarick concluded that while Mahoney was a difficult person with whom to work, his conduct did not constitute unlawful employment discrimination and did not violate Edward Jones' policies. He concluded Mahoney had not engaged in conduct warranting discharge. Instead, although Rarick's investigation was inconclusive, he reminded Mahoney of Edward Jones' policies prohibiting employment discrimination and sexual harassment and told him if he

violated these policies, it would result in discipline up to and including discharge (Rarick Aff., ¶ 63, 68, 70).

### Plaintiff's Employment Status and Ultimate Resignation

136. Plaintiff claims Edward Jones retaliated against her because after she reported Mahoney to the human relations department, she was terminated. She admits this reporting only occurred after she left the office on November 9, never to return. (Miller Depo. at 331-33)

137. Plaintiff was on a paid leave of absence from November 9, 2001 through December 31, 2001 (Miller Depo. at 228; see Rarick Aff., ¶ 22).

138. In her first partial day of deposition testimony, Plaintiff testified she told Rarick she would not return to work for Mahoney, but would be glad to return to work at the Stamford office if there was a new investment representative there (Miller Depo. at 229). However, when she returned at a later date to complete the deposition, she testified she did not recall saying she would not return to work in the branch office with Mahoney (Miller Depo. at 332).

139. Plaintiff claims Defendant Rarick told her she was being taken off salary and would be used on an "as-needed basis" (Miller Depo. at 227).

140. On November 16, 2001, Rarick received a call from BOA Recruiting, asking about the situation with Mahoney. He said Mahoney could use an on call, but did not have approval to hire a full-time replacement until the situation was resolved. (Rarick Aff., ¶ 35.)

141. During December, 2001 and January, 2002, it was clear to Rarick that Plaintiff was unwilling to return to work for Edward Jones working in the same office with Mahoney. It was unclear whether Edward Jones could find an open position in another branch office for Plaintiff. (Rarick Aff., ¶ 60.)

142. For this reason, on January 2, 2002, Rarick again told Mahoney that while he could use an on call BOA, he would not approve a full-time replacement BOA (Rarick Aff., ¶ 61).

143. A letter to Plaintiff's attorney dated January 18, 2002, indicates that her attorney had stated in December that Plaintiff would never return to the Stamford, Connecticut branch office. Exhibit C is a true and correct copy of this letter. (Rarick Aff., ¶ 65.)

144. A letter to Plaintiff's attorney dated February 21, 2002, states that Edward Jones still considered Plaintiff to be an employee on a leave of absence, although she was no longer being paid. It concludes by stating that if the matter has not been resolved or if there has been no response by the end of February, "Edward Jones will consider [Plaintiff's] employment terminated effective February 28, 2002 because of her voluntary resignation." Exhibit D is a true and correct copy of this letter. (Rarick Aff., ¶ 66.)

145. A letter to Plaintiff's attorney dated February 28, 2002, refers to correspondence and a telephone call the previous day with Plaintiff's attorney in which Edward Jones offered Plaintiff the opportunity to return to work in the Stamford branch office, but Plaintiff's attorney represented that Plaintiff "has elected not to return to work from her leave of absence" and "her position on this is final." Rarick received a copy of this letter, which was written and sent to Plaintiff's attorney at his direction. Rarick conducted the investigation referred to in this letter, and concurred in the conclusions in the letter. All of Rarick's communications with Plaintiff were through Plaintiff's attorney because Plaintiff refused to communicate directly with him. Exhibit E is a true and correct copy of this letter, which was sent by fax as well as by regular mail on February 28, 2002 (Rarick Aff., ¶ 67).

146. This February 28, 2002, letter also summarizes the conclusions of Rarick's investigation of Plaintiff's complaints against Mahoney, noting she did not complain of "any requests for sexual favors or requests for conduct of a sexual nature," nor did she complain "of any touching or physical contact of a sexual nature." The letter says that "[a]t most there was a complaint of some isolated comments with some mention of sexuality, primarily having to do with sexual

25

orientation," with Mahoney "making comments favorable to a gay and lesbian lifestyle" that Plaintiff found offensive. (Rarick Aff. 67, Exh. E.)

147. This February 28, 2002 letter says it was "Edward Jones position that it was inappropriate for Mr. Mahoney to make any comments of a sexual nature in the workplace" and that Edward Jones therefore warned him that any future violation of Edward Jones' policy would result in immediate discharge. The letter further states Mahoney was warned that "absolutely no retaliation against [plaintiff] would be tolerated for having complained about his conduct." (Rarick Aff. 68, Exh. E.)

148. This February 28, 2002 letter also states that despite this warning to Mahoney, Plaintiff demanded his "discharge from employment as a condition of her returning to work," but Edward Jones did not believe his conduct warranted discharge. (Rarick Aff., Exh. E.)

149. This February 28, 2002 letter also states that although Plaintiff's attorney asserted Plaintiff was "frightened to return to work" with Mahoney and feared for her safety, Edward Jones was not aware of any threats of violence or threats to her safety and therefore her refusal to return to work was unreasonable. (Rarick Aff. 67, Exh. E.)

150. This February 28, 2002 letter also states that "Edward Jones is concerned that [Plaintiff's] response to Mr. Mahoney may itself be based on sex discrimination by [Plaintiff] because of Mr. Mahoney's sexual orientation."

151. This February 28, 2002, letter concludes that "it is Edward Jones' understanding that [Plaintiff] absolutely refuses to return to work and that her decision is final." Therefore, it provides that her resignation will be effective at the close of business that day, absent any contrary communication from Plaintiff's attorney.

152. On March 5, 2002, because there had been no response to the February 28, 2002 letter giving Plaintiff a final opportunity to return to work, Rarick processed a termination form message formally terminating Plaintiff's employment due to her failure to return to work for Edward Jones. He made this

decision because Plaintiff had refused to return to work for Mahoney, Rarick had decided there was no basis for discharging Mahoney, and there was no other opening for Plaintiff in other branch offices. (Rarick Aff., ¶ 69.)

153. Edward Jones hired Plaintiff July 11, 2001. She left work November 9, 2001 and never returned. She would not have been eligible for her six month performance review until February 1, 2002. This performance review never occurred because Plaintiff never returned to work. During her employment with Edward Jones, neither Michael Mahoney nor Plaintiff were eligible for any bonuses. During her employment with Edward Jones, Plaintiff was not yet eligible for any pay increases and was never denied any pay increases. Similarly, during her employment with Edward Jones, Plaintiff was not eligible for any promotions and was never denied any promotions (Rarick Aff. ¶73).

Respectfully submitted,

DEFENDANT Edward Jones & Co., L.P.

By: _____
Michael N. LaVelle, Esq.  06170
Pullman & Comley, LLC
850 Main Street, P.O. Box 7006
Bridgeport, CT 06601-7006
(203) 330-2000
(203) 330-2288 (Facsimile)

By: _____
Fred A. Ricks, Jr., Esq.
Harris Dowell Fisher & Harris, L.C.
15400 South Outer Forty, Suite 202
St. Louis, Missouri 63017
(636) 532-0300
(636) 532-0246 (Facsimile)

27

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, postage prepaid, to the following parties:

Peter E. Gillespie, Esq.
Attorney at Law
46 Riverside Avenue
Westport, CT 06880
(203) 227-7000

Vlad Spitzer, Esq.
Spitzer & Brey, LLC
239 Main Street, 2nd Floor
Westport, CT 06880