UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARIAN DEBORAH MILLER,

    Plaintiff,

vs.

EDWARD D. JONES & CO., L.P.,
MICHAEL MAHONEY, MICHAEL
CUMMINS, BARBARA MOSCA, and
STEVEN RARICK,

    Defendants.

CIV NO.
3:03CV 0193 (DJS)

April 29, 2004

### AFFIDAVIT OF STEVEN RARICK

COMES NOW Steven Rarick, being duly sworn, and states as follows:

1.    I am presently employed by Edward D. Jones & Co., L.P. ("Edward Jones"), I have been employed as the team leader of the resolution team in the Associate Relations department since November, 2000.

2.    I have been so employed by Edward Jones since June, 1994.

3.    My job duties as team leader in the Associate Relations Department include conducting investigations into allegations, inappropriate conduct by employees of Edward Jones and resolution of those allegations and complaints. I also facilitate and supervise the investigations and resolution of allegations and complaints conducted by other members of my resolution team in the Associate Relations Department. I also have access to and control of all Edward Jones human resource files concerning all current and former Edward Jones employees.

4.    Based upon my performance of my job duties for Edward Jones, I have personal knowledge of all of the following facts relating to Plaintiff Marian Deborah Miller's claims.

5.    Edward Jones branch offices are typically staffed by an Investment Representative ("IR") and a Branch Office Administrator ("BOA"). The IR functions as a retail

stockbroker or salesperson, with responsibility for meeting prospective clients, establishing relationships with prospective customers, and selling investments such as stocks, bonds, and mutual funds. The BOA is responsible for office administration, customer service, and marketing support.

6. On Friday, November 9, 2001, I received a letter from Plaintiff by fax. The fax cover sheet and introductory paragraph of this letter indicated Plaintiff was writing me at the request of John Sullivan. Exhibit A is a true and correct copy of such letter.

7. In this four-page letter, Plaintiff complained about a variety of specific conduct by Mahoney, but nowhere was there any indication that Plaintiff was complaining about sex discrimination, sexual harassment, sexual orientation discrimination, religious discrimination, or age discrimination.

8. Although I did not understand Plaintiff to be claiming Mahoney had engaged in any unlawful employment practices, I was concerned about her allegations, as they suggested there was a poor working relationship between her and Mahoney that could interfere with effective operation of the branch office. I therefore immediately commenced an investigation, starting the following Monday, November 12, 2001. My investigation involved conversations with Plaintiff and Mahoney, and with persons who might have relevant knowledge or whom Plaintiff claimed would substantiate her allegations, including Michael Cummins, Barbara Mosca, Kristen Commander, and Lyn Vasil.

9. On November 12, 2001, I called Plaintiff in response to the letter she had faxed to me on November 9, 2001 (Exh. A), and I asked her about her concerns with the workplace.

10. Plaintiff responded that Mahoney was demeaning, would call her "an idiot" or "stupid," and frequently used profanity, saying "fuck" at least a dozen times a day.

11. Plaintiff also complained that Mahoney did not allow her to take a lunch break, or if he did, would make her pick up his lunch; that he had called her at home and told her to bring him breakfast; and that she had been doing all of the office cleaning.

12. Although Plaintiff believed Mahoney required her to perform tasks that were "menial" in nature, including office housekeeping, such tasks are required to be performed by many BOA's. In addition, an IR may request that a BOA assist with other tasks, such as support on outside, volunteer activities, so long as this does not interfere with or prevent completion of the primary BOA job duties.

13. In this conversation I had with Plaintiff on November 12, 2001, she told me Mahoney is a homosexual and one time had asked her about the sexual orientation of her sons. She also said Mahoney would wrap himself in one of her scarves and "prance around the office"; that he upset her one time when he told her she "would make a good lipstick lesbian"; that his comments and actions made her feel uncomfortable; and that one time she was very uneasy when he told her he wanted to "meet her little boy" (but when I asked her what he meant by that, she said she didn't have any idea).

14. In this conversation with Plaintiff on November 12, 2001, I asked her if she ever talked to anyone else about her concerns. She said that she spoke to Kristen Commander and Lyn Vasil at Mike Cummins' office.

15. I concluded this conversation by telling Plaintiff that a lot of this was new to me as it had not been included in the faxed letter, that I was going to look into it and get back to her, and in the meantime she would remain on the payroll until the issue was resolved.

16. Also on November 12, 2001, I received a call from Mahoney. He said Plaintiff had walked off the job the previous Friday (November 9, 2001). He said she got mad at him and left.

17. In this telephone conversation with Mahoney on November 12, 2001, he described Plaintiff as verbally abusive, and said that she yelled at him throughout her employment.

18. Subsequently on November 12, 2001, I called and left a message for Price Woodward, who was the person in the IR Development Department responsible for this

geographic area of the country. I wanted him to know about my conversations with Mahoney and Plaintiff and make Price Woodward aware of the complaints against Mr. Mahoney so Mr. Woodward would know of my investigation.

19.     Subsequently on November 12, 2001, I called Michael Cummins, who said he had spoken to Plaintiff, and because she was talking about the working environment in the office he had referred her to Barbara Mosca. From Cummins, I understood Plaintiff just did not like working with Mahoney. I asked Cummins if either of his BOA's had spoken to Plaintiff. He said that one of them, Kristen Commander, had been to the office to train Plaintiff, but neither of them were available at the time. I asked him to have them call him back.

20.     Subsequently on November 12, 2001, I called and left a message for Mark Stecher. I knew he had been assigned to "coach" Mahoney, and I wanted to find out what he knew about the situation.

21.     Subsequently on November 12, 2001, I called Mahoney to talk to him again. I asked him what Mark Stecher had suggested to Mahoney about improving his working relationship with Plaintiff. Mahoney said Stecher had told him that raising his voice was not productive and had discussed better ways of addressing his concerns with her. Mahoney said he had not yet addressed the issues with Plaintiff. I told him Plaintiff had some concerns that I was going to be looking into and that she was going to remain on the payroll until the situation was resolved.

22.     At this time, I decided to place Plaintiff on a paid leave of absence during my investigation because she was upset and did not want to return to the office to work with Mahoney.

23.     The next day (November 13, 2001), Mark Stecher returned my call from the day before. I informed Stecher that Plaintiff had walked out the previous day and asked him about his contacts with Mahoney. He said Mahoney began calling him about a month and a half ago about some performance concerns he was having with Plaintiff's work ethic and personal use of

the phone. Mark said he had discussed with Mahoney the language he should be using when he addressed these concerns with Plaintiff.

24. Subsequently on November 13, 2001, I called Mahoney to discuss Mahoney's concerns about Plaintiff. One of his concerns was that her cell phone was "constantly ringing" and that this did not stop even after he addressed it with her.

25. In this conversation, Mahoney said he had called BOA Recruiting to get an on call BOA, and I told him while he could use an on call (temporary replacement), he could not hire a full-time BOA until the situation with Plaintiff was resolved. Although Plaintiff had walked out in anger, and clearly had expressed some concerns with Mahoney, I felt it was premature to treat this conduct as a resignation and was hopeful we could achieve a resolution whereby she would remain employed by Edward Jones.

26. On November 16, 2001, I spoke to Kristen Commander, a BOA in Mike Cummins' office, about what she observed while briefly working in Mahoney's office with Mahoney and Plaintiff.

27. Commander said Plaintiff's cell phone rang more than the office phone, and from what she heard she determined they were personal calls from Plaintiff's friends.

28. Commander also said Mahoney was demanding, had "zero patience," assigned Plaintiff too many projects, could be unintentionally condescending, and sometimes said things that could be offensive to people (but she did not think he realized it).

29. Commander said Plaintiff and Mahoney called her to complain about each other, and she finally told them to call their new regional leader, Barbara Mosca, or St. Louis.

30. Commander said she had never known Mahoney to use profanity in the office.

31. On November 16, 2001, I also spoke to Lyn Vasil, another BOA in Mike Cummins' office, in Old Saybrook, Connecticut.

32.  Vasil said she felt Mahoney may have been too demanding and would "overstep his boundaries," such as by asking Plaintiff to get his breakfast, such as pick up a bagel and coffee, and calling her at home.

33.  When I asked Vasil who she thought was at fault for the problems at Mahoney's office, she said Plaintiff and Mahoney were both very similar personalities and she could not assign the blame.

34.  Neither Commander nor Vasil mentioned any issues relating to harassment of or discrimination against Plaintiff based on her sex, sexual orientation, religion, or age.

35.  Also on November 16, 2001, I received a call from BOA Recruiting, asking about the situation with Mahoney. I said Mahoney could use an oncall, but did not have approval to hire a full-time replacement until the situation was resolved.

36.  Also on November 16, 2001, I called Plaintiff. I asked her about receiving personal cell phone calls at the office, and she denied her cell phone was ever even turned on at the office, including the day that Kristen Commander was there training her.

37.  Also on November 16, 2001, I asked Plaintiff if anybody else witnessed the events about which she complained. She mentioned someone named Karen at the art store next to Mahoney's office. Plaintiff said Karen had called her at home and asked her if she was OK and Karen thought Mahoney may have "done something" to Plaintiff.

38.  Thereafter, also on November 16, 2001, I called and left a message for Karen at Art Directions, the business next to Mahoney's office.

39.  Also on November 16, 2001, I called and spoke to Barbara Mosca, who informed me that while Plaintiff was at work she frequently used her cell phone to call Mahoney's former BOA, now working at another Edward Jones office.

40.  On November 21, 2001 and November 26, 2001, I again left messages for Karen at Art Directions, as she had not yet called me back and I wanted to follow up on Plaintiff's reference to her as a possible witness.

41. I received a letter dated November 21, 2001 from attorney Vlad Spitzer, who said his firm represented Plaintiff. Exhibit B is a true and correct copy of this letter.

42. This November 21, 2001 letter from attorney Spitzer repeated some allegations Plaintiff had made previously, but also raised a number of others I had never heard before, including that Mahoney had made "ongoing references and questions concerning [Plaintiff's] sexuality," and asked her "questions regarding [her] relationship with her boyfriend," that he had "frequently made derogatory references to [Plaintiff's] age, and refused [her] the right to take off certain Jewish holidays," claiming she was forced to take off Yom Kippur and Rosh Hashanah without pay, that he had "engaged in threatening behavior," and that she had suffered "extreme emotional distress" as a result of Mahoney's behavior.

43. This letter was also the first time the allegations about Mahoney's conduct were phrased in terms suggesting unlawful discrimination, as the letter used the phrase "hostile work environment."

44. On November 27, 2001, I again called for Karen at Art Directions. This time she was there and I spoke to her, telling her that Plaintiff had told me she had contacted Plaintiff at home to check on her because of Mahoney's abusive behavior in the office. Karen said she did call Plaintiff at home, but that was not the reason. She said she called because she had not seen Plaintiff for several days and just wanted to make sure she was OK, and it did not have anything to do with Mahoney.

45. Karen from Art Directions said she knew Mahoney was a difficult supervisor because he had been through several BOA's. However, she said she had never heard him yelling at anyone.

46. Also on November 27, 2001, I called Mahoney to discuss concerns raised in the November 21, 2001 letter from attorney Spitzer.

47. I asked Mahoney if he ever discussed his sexuality in the office, to which he responded that he is gay and Plaintiff knows that, but he did not discuss it in the office.

48. I asked Mahoney if he ever talked to Plaintiff in the office about her sexual preference. He said she would come in talking about specifics of her sex life with her boyfriend, one time saying that he "tried to roll her over and do a rear entry." Mahoney said that when he heard this he held up his hand and said" "T.M.I" ("Too Much Information") and walked away. He said he had to do this several times.

49. I asked Mahoney about the allegation that he questioned the sexual preference of Plaintiff's son, and he denied ever saying anything like this.

50. Mahoney said Plaintiff would often talk about her boyfriends and they would constantly call the office.

51. Mahoney said he never yelled at Plaintiff, but mentioned a time when she "screamed" at him, and he said he felt harassed by her.

52. On November 28, 2001, I further discussed the situation involving Mahoney and Plaintiff with Barbara Mosca and Price Woodward to tell them I was continuing my investigation.

53. On November 30, 2001, I spoke to Shannon Bogus, Mahoney's BOA before Plaintiff.

54. I asked Bogus about her experience with Mahoney. She said that he was demeaning to her, telling her she couldn't do anything right and was not capable of doing her job.

55. Bogus said that Mahoney would send her out to pick up his breakfast and lunch, and that Plaintiff later called her and told her the same thing was happening to her.

56. I asked Bogus about Mahoney's use of profanity in the office, and she said he would only say things if they "slipped out," but it was not excessive or a problem and he never used "the F-word" in her presence.

57. When I asked Bogus if Mahoney ever talked about his sex life, she said he was open with her that he was gay, but he did not get into specifics.

58. Bogus said Mahoney never questioned her sexuality.

59. Bogus said Plaintiff told her Mahoney questioned her sexuality and the sexual preference of her son.

60. During December, 2001 and January, 2002, it was clear to me that Plaintiff was unwilling to return to work for Edward Jones working in the same office with Michael Mahoney. It was still unclear whether Edward Jones could find an open position in another branch office for Plaintiff.

61. For this reason, on January 2, 2002, I again told Mahoney that while he could use an on call BOA, I would not approve a full-time replacement BOA.

62. However, on February 25, 2002, because it was my understanding that Plaintiff had still not indicated any interest or willingness to return to work, but rather had communicated through her attorney that she would never return to the Stamford office, and because I had found no basis for terminating Mahoney's employment, I told BOA Recruiting that Mahoney was no longer on hold for a full-time replacement BOA, but could proceed towards hiring one.

63. Plaintiff had demanded that Edward Jones discharge Mahoney from employment. I concluded there was no basis for discharging Mahoney. After interviewing Plaintiff and all of the persons listed above, I concluded that while Mahoney was a difficult person with whom to work, his conduct did not constitute unlawful employment discrimination based on sex, sexual harassment, age, or religion and did not violate Edward Jones' internal policies. I reminded Mahoney of Edward Jones' non-discrimination policy and policy prohibiting sexual harassment. I told him that if he violated these policies, it could result in discipline up to and including discharge. I told him even though I had concluded that his treatment of Plaintiff probably had been demanding, insistent and impatient, his conduct did not constitute discrimination based on sex, sexual harassment, age or religion.

64. Mike Mahoney resigned from employment with Edward Jones on March 11, 2002.

65. Exhibit C is a true and correct copy of a letter to Plaintiff's attorney dated January 18, 2002, a copy of which I received.

66. Exhibit D is a true and correct copy of a letter to Plaintiff's attorney dated February 21, 2002, a copy of which I received.

67. Exhibit E is a true and correct copy of a letter to Plaintiff's attorney which was sent by fax as well as by regular mail on February 28, 2002, a copy of which I received. I conducted the investigation referred to in this letter, as described in paragraphs 8 through 59, above, and I concurred in the conclusions in the letter. This letter was written and sent to Plaintiff's attorney at my direction. All of my communications with Plaintiff were through Plaintiff's attorney because Plaintiff refused to communicate directly with me.

68. As indicated in this letter, as a result of my investigation Mahoney I reiterated a warning that any future violation of Edward Jones' policy would result in immediate discharge," and that "absolutely no retaliation against [Plaintiff] would be tolerated for having complained about his conduct."

69. On March 5, 2002, because there had been no response to the February 28, 2002 letter giving Plaintiff a final opportunity to return to work, I processed a termination form message formally terminating Plaintiff's employment due to her failure to return to work for Edward Jones. I made this decision because Plaintiff had refused to return to work even though I had concluded there was no basis for discharging Mahoney, and there was no other opening for Plaintiff in other branch offices.

70. Before Edward Jones hires IRs, it conducts a thorough background check. This was done before Edward Jones hired Michael Mahoney. Nothing in Michael Mahoney's background check indicated any prior record of him engaging in any unlawful employment discrimination or other inappropriate conduct.

71. Based on my investigation of Mahoney, I concluded that he could be a difficult, demanding IR but his conduct didn't rise to level of requiring discharge. Edward Jones hired a

management coach to work with Mahoney. Michael Mahoney was working with this management coach to improve his interpersonal skills. This

72. In hiring the individual Defendants Cummins, Mosca and Rarick, Edward Jones followed its standard hiring procedures, which included background and reference checks. These procedures disclosed no reason to question the individual Defendants' fitness for employment. The employment files for these individuals also contain no information or facts that would raise any question about their fitness for employment by Edward Jones.

73. Edward Jones hired Plaintiff July 11, 2001. She left work November 9, 2001 and never returned. She would not have been eligible for her six month performance review until February 1, 2002. This performance review never occurred because Plaintiff never returned to work. During her employment with Edward Jones, neither Michael Mahoney nor Plaintiff were eligible for any bonuses. During her employment with Edward Jones, Plaintiff was not yet eligible for any pay increases and was never denied any pay increases. Similarly, during her employment with Edward Jones, Plaintiff was not eligible for any promotions and was never denied any promotions.

I have read the above seventy three (73) paragraphs and state that they are true to the best of my knowledge.

_[signature]_

STATE OF MISSOURI     )
                     ) SS
COUNTY OF ST LOUIS    )

Subscribed and sworn to before me this 29th day of April, 2004.

_Vanessa Jones_
Notary Public

My Commission Expires:

_____

Vanessa C. Jones
Notary Public - Notary Seal
State of Missouri
St. Louis County
My Commission Expires Feb. 17, 2006