Miller v. Edward Jones

3/11/2004                                                   Barbara Mosca

Page 1

1                  UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF CONNECTICUT
2

3
                                            COPY
4
                                    )
5    MARIAN DEBORAH MILLER,          )
             Plaintiff,             )
6                                    )      Civil Action No.
     VS                              )      3:03CV0193-DJS
7                                    )
     EDWARD D. JONES & CO, L.P.,     )
8    MICHAEL MAHONEY, MICHAEL        )
     CUMMINS, BARBARA MOSCA, and     )
9    STEVEN RARICK,                  )
             Defendants.            )
10                                   )

11

12

13

14
              DEPOSITION OF: BARBARA MOSCA
15
              DATE:        MARCH 11, 2004
16
              HELD AT:     PULLMAN & COMLEY
17                         850 MAIN STREET
                           BRIDGEPORT, CONNECTICUT
18

19

20

21

22

23      Reporter:  JAMES A. SCALLY, RPR, CRR, LSR #80
               BRANDON SMITH REPORTING SERVICE
24                  44 Capitol Avenue
             Hartford, Connecticut 06106
25                  (860) 549-1850

Brandon Smith Reporting

8a6b4569-b11f-4b86-b884-b17e9a14e9b5

Miller v. Edward Jones

3/11/2004                                                          Barbara Mosca

Page 5

1    talk while I'm talking because the court reporter can't

2    simultaneously take us both talking at the same time,

3    and if you need a break for any reason, just ask me or

4    Mr. Ricks, and we'll be happy to stop for a few minutes

5    and let do you that.

6              Anything about what I've said so far that

7    needs clarification?

8         A    I understand.

9         Q    Okay.  Great.  Where do you presently work?

10        A    I work at Edward Jones Investments at 134

11   East Park Avenue in Long Beach.

12        Q    And how long have you been with Edward Jones?

13        A    Ten years.

14        Q    And prior to -- strike that.

15             When did you start?  What year?

16        A    April -- excuse me.  January 1994.

17        Q    Okay.  And what position did you start with

18   Edward Jones?

19        A    Investment representative.

20        Q    And were you at the same office as you are

21   now?

22        A    No.  I was three blocks down the street.

23        Q    Okay.  So still in the same location, though?

24        A    In the same town.

25        Q    Okay.  And prior to working at Edward Jones,

8a6b4569-b11f-4b86-b884-b17e9a14e9b5

Miller v. Edward Jones

3/11/2004                                                          Barbara Mosca

Page 7

1        Q      Do you understand my question?

2        A      I understand what you're trying to get at.

3        Q      Okay.

4        A      It was phrased incorrectly.  I'm not a team

5   leader.  I'm a regional leader.

6        Q      What is a regional leader?

7        A      A regional leader is someone who has a

8   responsibility for growth and healthy growth of a

9   certain area.

10       Q      Okay.  And what area is that that you're a

11  regional leader?

12       A      Brooklyn, Queens, Staten Island, the Bronx,

13  Putnam, Westchester, Long Island, and Fairfield County,

14  Connecticut.

15       Q      Fair to say that the only territory that

16  falls under your responsibilities in Connecticut is

17  Fairfield County; is that right?

18       A      Correct.

19       Q      And is it fair to also say that Fairfield

20  County was added to your responsibilities at a later

21  point in your tenure as regional leader?  Is that

22  correct?

23       A      Correct.

24       Q      And can you tell me when that was that

25  Fairfield County was added to your responsibilities?

8a6b4569-b11f-4b86-b884-b17e9a14e9b5

Miller v. Edward Jones

3/11/2004                                                    Barbara Mosca

Page 8

1         A     It was in October 2001, I believe.

2         Q     Do you know why Fairfield County was added to

3    your region?

4         A     The exact reason, I don't know.  There was a

5    reorganization.

6         Q     Okay.  When you say the exact reason, do you

7    have any idea as to why that reorganization was done by

8    Edward Jones?

9         A     No.

10        Q     You don't know?

11        A     Nope.

12        Q     Do you know who the -- the regional leader

13   was that -- to whom Fairfield County was assigned prior

14   to it being assigned to you?

15        A     Michael Cummins.

16        Q     And how long have you known Mr. Cummins?

17        A     The first time I ever met Michael Cummins was

18   early in my career at a seminar in Hartford,

19   Connecticut.  I was introduced to him.  I didn't really

20   know him that well.

21        Q     Did you and Mr. Cummins ever have any

22   discussion about the reorganization that you just

23   mentioned about Fairfield County?

24        A     No.

25        Q     Okay.  Who -- who told you at Edward Jones

8a6b4569-b11f-4b86-b884-b17e9a14e9b5

Miller v. Edward Jones

3/11/2004                                                    Barbara Mosca

Page 9

1      that Fairfield County would be transferred from Mr.

2      Cummins to your region?

3          A    My area partners, and they were Price

4      Woodward and Jeff Panchot.

5          Q    And what did they tell you -- strike that.

6               You mentioned Price Woodward.  Who was Price

7      Woodward?

8          A    Price Woodward is a general partner in St.

9      Louis on the area team for area 1.

10         Q    And the other person was, I'm sorry, I didn't

11     get his name?

12         A    Jeff Panchot.

13         Q    And what is Jeff Panchot?

14         A    He is a general partner in the area team for

15     area 1.

16         Q    And can you tell me, first of all, how you

17     came to find out that Fairfield County would be

18     assigned to you?

19         A    Jeff and Price called me up one day and said

20     that they were thinking of rearranging and how do I

21     feel about Fairfield County, and I said, "No problem."

22         Q    Okay.  And when you say the two -- did these

23     two gentlemen, they both called you at the same time,

24     did they?

25         A    Yes.  It was a conference call.

Brandon Smith Reporting

8a6b4569-b11f-4b86-b884-b17e9a14e9b5

Miller v. Edward Jones

3/11/2004                                                           Barbara Mosca

Page 13

1        A    I would review -- I would review the IR's

2   with Price Woodward, as it was in the normal course of

3   business, if they were meeting expectations, if they

4   were exceeding expectations or below expectations, how

5   we could help them on a regional basis, if they needed

6   assistance in developing their business.

7        Q    Did you have any discussions with Mr.

8   Woodward about Mr. Mahoney's performance subsequent to

9   your taking over the territory?

10       A    Yes.

11       Q    When did you have such a discussion?

12       A    I don't know exactly when, but it was around

13  the October period, the fall.

14       Q    The fall of 2001?

15       A    Correct.

16       Q    Okay.  And how many such discussions did you

17  have?

18       A    I don't know.

19            MR. RICKS:  Specifically about Mr.

20  Mahoney?

21            MR. SPITZER:  Yes.

22       Q    Would you say there was more than one?

23       A    Yes.

24       Q    More than two?

25       A    I think -- I don't know exactly.  Yeah, I

8a6b4569-b11f-4b86-b884-b17e9a14e9b5

Miller v. Edward Jones

3/11/2004                                                    Barbara Mosca

Page 14

1     would say it was more than two, and any conversation

2     was not specifically about one IR.   Example, Mike

3     Mahoney.

4          Q     But Mr. Mahoney was discussed in those -- in

5     the more than two conversations that you had?

6          A     It's typical that we discuss IR's.

7          Q     Okay.   What issues regarding Mr. Mahoney did

8     you discuss with Price Woodward?

9          A     We discussed that Mr. Mahoney had had several

10    BOA's.

11         Q     Okay.   And when you discussed Mr. Mahoney's

12    BOA's, did you discuss those in all the meetings or

13    during the first or second?   Can you identify a

14    specific meeting that you discussed the BOA's?

15         A     No, specific meeting, no, I can't identify

16    that.

17         Q     Okay.   And was Mr. Woodward telling you about

18    Mr. Mahoney's BOA's when you say it was discussed?

19         A     Not in any great detail.   He said he had

20    several BOA's, and, you know, he -- that he had several

21    BOA's, and I related that I had several BOA's also.   So

22    I could understand how having a BOA is a difficult part

23    of the business.

24         Q     Was that what Mr. Woodward was telling you,

25    Mr. Mahoney's having BOA's was a difficult part of the

8a6b4569-b11f-4b86-b884-b17e9a14e9b5

Miller v. Edward Jones

3/11/2004                                                    Barbara Mosca

Page 15

```
 1    business?

 2         A    No.  I said that.

 3         Q    What did Mr. Woodward say about Mr. Mahoney

 4    having a number of BOA's to you?

 5         A    I don't remember.

 6         Q    Okay.  Do you recall whether or not Mr.

 7    Woodward expressed a concern about the fact that Mr.

 8    Mahoney had had a number of BOA's?

 9              MR. RICKS:  Objection to the term

10    "concern."  Vague.  You may answer.

11         Q    Do you understand my question?

12         A    A concern -- we're concerned about all the

13    IR's, and we spoke about all the different IR's and how

14    we might be able to help.  The fact that Mike had

15    several BOA's was -- was something that was -- that we

16    talked about, you know, why was that.  You know, maybe

17    he wasn't able to hire the right person, and he would

18    get help from St. Louis in the interview process.

19         Q    Did Mr. Woodward tell you that Mr. Mahoney

20    had been having problems with BOA's?

21         A    Yeah, he was, you know, when you have

22    multiple BOA's, there's some sort of a -- it's -- yeah.

23    It's not smooth.

24         Q    Okay.  Simple question:  And what did he tell

25    you, if you can recall, was the problem that or what
```

8a6b4569-b11f-4b86-b884-b17e9a14e9b5

Miller v. Edward Jones

3/11/2004                                                    Barbara Mosca

Page 16

1    did you come to understand was the problem with having

2    multiple BOA's?

3          A    I'm sorry, would you --

4          Q    Yes.

5          A    -- my problem with having multiple BOA's or

6    for a broker?

7                MR. SPITZER:  Let me have the question

8    read back so you understand.

9                (Question read.)

10               MR. RICKS:  Do you mean Mr. Mahoney?

11               MR. SPITZER:  Yes.  Mr. Mahoney having

12   multiple BOA's.

13         A    Mr. Mahoney having multiple BOA's?

14         Q    Yes.

15         A    That he might be difficult to work for.

16         Q    And was that something that was discussed

17   with Mr. Woodward at the time?

18         A    It was mentioned.  I don't remember an

19   in-depth conversation about it or specific reasons why

20   that might be.

21         Q    Did you come to have any kind of discussion

22   with Mr. Woodward as to why it was that Mr. Mahoney had

23   had these multiple BOA's?  In other words, what had

24   happened to each one of them or one of them or several

25   of them?

8a6b4569-b11f-4b86-b884-b17e9a14e9b5

Miller v. Edward Jones

Page 17

1               MR. RICKS:  Objection.  Assumes facts

2      not in evidence.  Also vague as time.

3          Q    Do you understand my question?  You can

4      answer.

5          A    Yeah.  I just don't -- I didn't get specifics

6      from Price.

7          Q    Okay.  Subsequent to that, did you come to

8      understand any specifics about Mr. Mahoney's

9      relationship with his BOA's?

10              MR. RICKS:  Objection.  Vague as to time

11     and also vague --

12         Q    Subsequent to the meeting that you just

13     mentioned with Mr. Woodward.

14         A    Did I have -- did I know that there were

15     problems with BOA's --

16         Q    Yes.  No.  My question was --

17         A    -- other --

18         Q    -- whether you understood what the specific

19     problems were that Mr. Mahoney had had with any

20     individual BOA's that he may have worked for.

21         A    The only thing was that he might have been

22     abrasive.

23         Q    Okay.  Who told -- how did you come to

24     understand that he may have been abrasive?

25         A    Well, it was probably conversations with

8a6b4569-b11f-4b86-b884-b17e9a14e9b5

Miller v. Edward Jones

3/11/2004                                                    Barbara Mosca

Page 20

1    with Mr. Mahoney about having multiple BOA's?

2         A    I don't recall.  I know that I -- I haven't

3    spoken to Mike, you know, Mike wasn't somebody that I

4    would call all the time as another regional leader.

5         Q    Okay.

6         A    I don't really remember.  At the time when I

7    got Fairfield, I had almost 90 brokers, so --

8         Q    Okay.  So you don't recall having any

9    discussion with Mr. Cummins about the problems that Mr.

10   Mahoney may have been having with his BOA's?

11        A    Well, wait a second.  I do remember -- now, I

12   can't remember if it was Mike or if it was Price,

13   saying that Michael Mahoney had not really done too

14   much volunteerism, and after the meeting we had in

15   October at Mike's office, I distinctly remember walking

16   to the restaurant, and Mike came over to me and he

17   said, "You know, I'd like to volunteer.  I'd love to be

18   a mentor."

19             I said, "Good.  I'm glad you came forward

20   with that."

21             And after that, I remember calling him and

22   asking him if he was serious and if he wanted to be a

23   mentor and to help with the growth and the healthy

24   growth of the region.

25        Q    Okay.  Getting back to the issue of Mr.

Brandon Smith Reporting

8a6b4569-b11f-4b86-b884-b17e9a14e9b5

Miller v. Edward Jones

3/11/2004                                          Barbara Mosca

Page 21

1    Mahoney and any issues that he may have had with his

2    BOA's, did there come a time when you learned that Mr.

3    Mahoney had been assigned a coach by Edward Jones to

4    work with him on workplace-related issues?

5         A    Yes.

6         Q    When did you learn that?

7         A    Well, I don't exactly know.  It was in the

8    fall.  It had to be in October or November, because

9    those are the only two months that -- it was, I would

10   say, in the fall.  I don't remember.  It was not when I

11   first was introduced to the Fairfield County IR's.

12        Q    How did you come to learn that?

13        A    Mike had mentioned it to me once.  I believe

14   Price may have mentioned it to me.  It was a -- I'm

15   sorry.

16        Q    Go ahead.  Finish.

17        A    As I understood it, it was a coach for

18   interpersonal relationships, how to deal with people.

19        Q    Okay.  You said that Mike mentioned it.  You

20   said that -- I'm sorry.

21             You said that Mike mentioned it to you.

22   Would that be Mike Cummins that mentioned it to you?

23   Did Mr. Cummins mention it to you?

24        A    The coach?  No.  I meant Michael Mahoney.

25        Q    Mike Mahoney mentioned the coach to you.

Brandon Smith Reporting

8a6b4569-b11f-4b86-b884-b17e9a14e9b5

Miller v. Edward Jones

3/11/2004                                                    Barbara Mosca

Page 22

1        A     Yes.

2.       Q     You also -- did I understand you to say that

3    you also had conversations with Mr. Cummins about it as

4    well?

5        A     No, I didn't say Mr. Cummins.

6        Q     My mistake.  I apologize.  You also said that

7    you may have learned about it through, how?  Through

8    discussions with Mr. Woodward again?

9        A     I think Price must have mentioned it to me,

10   yes.

11       Q     Okay.  What did -- what did Mr. Woodward say

12   about the reason that Mr. Mahoney had been assigned a

13   coach?

14       A     He had -- he was abrasive with people in St.

15   Louis, you know, there is a way to get what you need in

16   a very -- in a very polite way and asking -- asking for

17   something or needing help, and because he had multiple

18   BOA's, there was a BOA that was transferred to another

19   office prior to Debbie, that this was something that

20   would help in his professional development.

21       Q     Did you come to understand who Mr. Mahoney

22   was going to work with as his personal coach?

23       A     No.

24       Q     Did you also come to understand or did you

25   come to understand at any time that if Mr. Mahoney was

8a6b4569-b11f-4b86-b884-b17e9a14e9b5

3/11/2004                                                          Barbara Mosca

Page 23

```
 1    not going to work with this personal coach, that he

 2    could be terminated from his employment with Edward

 3    Jones?

 4                  MR. RICKS:   Objection.  Assumes facts

 5    not in evidence, also --

 6                  MR. SPITZER:   Okay.

 7                  MR. RICKS:   -- lack of foundation.

 8         Q    You can answer.

 9         A    No, I didn't know that.

10         Q    Okay.  Did you ever come to see any kind of

11    correspondence regarding the assignment of a coach for

12    Mr. Mahoney?

13         A    No.

14         Q    Let me show you what has been marked as

15    Exhibit 7 in a deposition, a prior deposition that we

16    took, and ask you if you have ever seen that letter

17    before.  (Pause.)

18              Have you ever seen that before?

19         A    No.

20         Q    Okay.  Did there come a time, Ms. Mosca, when

21    you had any conversations with anyone from the HR

22    department in St. Louis regarding Mr. Mahoney?

23         A    I remember speaking to Steve Rarick because

24    I'd say Debbie was no longer there, and I'd say Mike is

25    inquiring when he can hire a BOA, you know, what is the
```

Miller v. Edward Jones

3/11/2004                                        Barbara Mosca

Page 24

1    status?  What's going on?  He said, "Well, for the time

2    being, she's on administrative" -- I believe he used

3    the term "administrative leave."

4           I wasn't Mike's supervisor.  So it's not that

5    I got involved in the HR issues.

6        Q    Okay.  What did Mr. Rarick -- first of all,

7    how many conversations did you have with Mr. Rarick

8    about Mr. Mahoney?

9        A    I don't know.  Maybe two.

10       Q    Okay.

11       A    Or three.  I don't know.

12       Q    So --

13       A    Two or three, maybe.

14       Q    Two or three conversations.  And why, if you

15   were not involved in -- with Mr. Mahoney in any kind

16   of -- in this particular matter, would Mr. Rarick be

17   contacting you?

18       A    Well, I remember Mike called me up and said,

19   "I'd like to get a BOA.  What's the holdup?  I'm not

20   hearing from Steve Rarick."

21           So I would call Steve and say, you know, "Is

22   there anything we can do?  What's the holdup?"

23           And he said it was -- it was being -- I don't

24   remember the word he used.  But it was being reviewed

25   or being considered.  I don't really know the exact

Brandon Smith Reporting

8a6b4569-b11f-4b86-b884-b17e9a14e9b5