1   word that Steve Rarick said.
2       Q   So is it fair to say, as you remember them,
3   the conversations that you had with Mr. Rarick had to
4   do with the Mr. Rarick -- with you calling Mr. Rarick
5   to inquire about the situation with Mr. Mahoney and why
6   it was that he's not being given a BOA?
7       A   Right.  Mike had called -- I remember one
8   instance where Mike had called me saying that her
9   salary was still on his P&L.  I said, "Look.  I don't
10  know.  I'll give Steve a call and see if there's
11  anything that we can do to, you know, move it along so
12  you can have authorization to get another BOA."
13      Q   When you say "move it along," move what
14  along?
15      A   Whatever the investigation or the situation
16  was.  See, I wasn't privy to all of this.  It's not
17  under my purview.
18      Q   All right.  You did not know anything about
19  the investigation?
20      A   I knew that there was difficulties in the
21  office.  I knew that she was on administrative -- I
22  believe it was administrative leave.  I knew that Mike
23  had a coach.  And whatever the HR issues are, that's
24  why we have a human resources department in St. Louis
25  to deal with this.

Page 26

1    Q    All right. And it's fair to say, I guess,
2  from your testimony, if I understand you correctly,
3  that's what I'm trying to do, that -- that the purpose
4  of your conversations with Mr. Rarick was just to help
5  Mr. Mahoney obtain another BOA?
6    A    Yes. Mike would call me up and say --
7         MR. RICKS: Objection. Vague as to
8  time.
9         MR. SPITZER: Okay.
10   Q    And you said there were three -- two or three
11 different conversations that you had with him?
12   A    Two or three.
13   Q    Okay. Do you remember -- do you remember the
14 specifics of any of those conversations, what Mr.
15 Rarick may have asked you and what you may have said to
16 him?
17   A    He didn't really ask me. I was asking him,
18 "Is there anything at this point that we can do so that
19 Mike can get another BOA?"
20        Because, you know, there's a lot of paperwork
21 in the office, and to try to operate a business without
22 a branch office assistant is difficult to do. Because
23 you have to do the paperwork and you have to do the
24 sales and so on.
25   Q    So that's what you were relating to Mr.

1   Rarick?

2   A   Yes. Mike was calling me and he said, "You
3   know, I'm not getting anywhere. Is there anything you
4   can do?"

5       I said, "Let me give Steve a call and see if
6   my calling will help you out."

7   Q   And in those conversations, there was --
8   there was -- you don't recall any discussion about the
9   investigation itself, the specifics of the
10  investigation; is that right?

11  A   Not really. That's an HR issue. There were
12  no -- really no specifics.

13  Q   And HR, meaning Mr. Rarick, never discussed
14  those with you; is that right?

15  A   Not specifics.

16  Q   Okay. Nothing specific in those
17  conversations about the --

18  A   There was difficulty with the BOA
19  relationship, with the IR, but there were no specifics.
20  It's not my -- it's not my job to -- to know all those
21  specifics.

22  Q   Okay. And in those conversations with Mr.
23  Rarick, you never advised him of any kind of issues
24  concerning any particular BOA that was working for --
25  for Mr. Mahoney? Do I have you right?

Page 31

1    Q    Did you have any occasion to speak with Mr.
2  Woodward again about the situation with Mr. Mahoney?
3    A    Yes.
4    Q    When?
5    A    Price and I would speak probably on a weekly
6  basis, and we would go over any issues in the region
7  that were -- that were happening, whether it was an IR
8  that was below expectations or if we were going to have
9  a regional meeting or issues such as this. And one of
10 them was that -- that Mike Mahoney's BOA was on
11 administrative leave.
12   Q    What about Mr. Mahoney's BOA -- and when you
13 say Mike's BOA being on administrative leave, do you
14 know who that specific BOA is?
15   A    Deborah Miller.
16   Q    Okay. What about Ms. Miller did you and Mr.
17 Woodward discuss at that time other than the fact that
18 she was on administrative leave?
19   A    We discussed -- I remember we discussed her
20 when we went up to the meeting in Connecticut, and I
21 said, "You know, I remember meeting Deborah. She was
22 very professionally dressed; she was very cordial in
23 the office to myself, Mike Cummins, and the other IR's,
24 and she had coffee and doughnuts there. My opinion was
25 she looked professional."

1   Q   Did you come to understand why it was that
2   Ms. Miller was on administrative leave in your
3   discussions with Mr. Woodward?
4   A   Because they were not -- there were sexual
5   harassment issues or reasons why that they couldn't get
6   along, and I knew of Mike's sexual orientation.  That
7   was always brought up.  How that -- in my opinion, how
8   that had to do with the relationship there, I didn't --
9   didn't know.
10  Q   Okay.  And you said that you knew of Mike's
11  sexual orientation.
12  A   Uh-huh.
13  Q   How did you come to know Mike's sexual
14  orientation?
15  A   How did I come to know that?  To tell you the
16  truth, I don't know.  To me, it's a non-event.  It's
17  nothing that I would think about.
18  Q   Okay.  I'm not asking you about what you
19  thought of it.  I'm only asking --
20  A   No, no, no.  I'm saying, it's like if you --
21  it's not something that I would take note of.
22  Q   Okay.  I'm not asking you --
23  A   So if you're asking me when I first knew of
24  his sexual orientation or somebody else's in Fairfield
25  County, I don't know.

Page 35

1   I'm speaking to a trader in St. Louis, and I approach
2   the trader as, "You need to do that for me right now,"
3   and start raising my voice versus, "Could you help me
4   out here," I know the correct way of doing it is
5   saying, "Could you help me out here" as opposed to
6   raising your voice or being extremely demanding.
7              That's my personal way of dealing and having
8   conversations with people in St. Louis and in the
9   region.  So my assumption is that Mike was not --
10             MR. RICKS:  Don't guess.
11             THE WITNESS:  Okay.
12             MR. SPITZER:  Mr. Ricks, I would ask
13  that you allow her to complete her answer.
14             MR. RICKS:  Okay.
15       A    My assumption is that his conversations with
16  St. Louis were not as mine were, as I said, you know,
17  could you help me out on a situation?  Because that's
18  my definition of not being abrasive.
19       Q    Fair enough.  Did you ever have an occasion
20  to come to any understanding of the specifics of what
21  Mr. Mahoney's interactions were with St. Louis?
22       A    No specifics.
23       Q    Did you ever come to have an understanding
24  who the people in St. Louis were that he had these
25  interactions with?

Page 36

```
 1     A    Not specifically.
 2     Q    You don't know the names of who they were?
 3  Okay?
 4          MR. RICKS:  You have to say yes or no.
 5     A    I'm sorry.  No.  I'm sorry.
 6     Q    What did Mr. Woodward tell you would be
 7  the -- if -- if he told you, what did Mr. Woodward tell
 8  you about the solution to the problems that Mr. Mahoney
 9  was having with his BOA's?
10          MR. RICKS:  Objection.  Calls for
11  hearsay.  Objection.
12     Q    Do you understand my question?
13          MR. RICKS:  There's been no showing of
14  foundation that this witness has knowledge.
15          MR. SPITZER:  Okay.
16     A    I understand your question, but I don't have
17  an answer for you.  I don't know.
18     Q    You don't know.  In other words, Mr. Woodward
19  never discussed anything like that with you?
20     A    The solution to Mike's interpersonal
21  relationship problem?
22     Q    Yes.
23     A    No.
24     Q    Did he discuss with you what Edward Jones's
25  plan was to deal with that interpersonal problem that
```

Page 37

1   Mr. Mahoney had?
2       A    No.  I only -- I knew that Mike had a coach.
3       Q    Did you and Mr. Woodward ever discuss what
4   would happen if Mr. Mahoney was not able to work with
5   that coach?
6       A    If Mr. Mahoney -- work with the coach.  No.
7       Q    Did you -- did you and Mr. Woodward ever
8   discuss any consequences of Mr. Mahoney's interactions
9   with the coach?
10      A    I remember Price and I saying that we hoped
11  that he would benefit from the coach so that he would
12  be able to conduct a good Edward Jones business.
13  Again, specifics and personnel issues were not part of
14  my -- a big part of my job as a regional leader.  When
15  HR -- when a situation is with human resources, you
16  know, my role there is not to step in and be a major
17  part of it.
18      Q    Were you ever told that if Mr. Mahoney was
19  not successful in working with this coach, that he
20  would be terminated?
21      A    To the best of my knowledge, I don't remember
22  that exactly.
23      Q    Never had the discussion with anyone at
24  Edward Jones?
25      A    I don't -- I don't remember.

Page 39

1   Q   Okay. And what do you recall about that
2   discussion?
3   A   Debbie called me from her cell phone, and I
4   believe she was at the post office and was complaining
5   to me about Mike Mahoney. She told me that he called
6   her up and told her to get -- pick him up breakfast and
7   she had to pick up lunch, and she was quite upset on
8   the phone.
9       So my first thing was to tell her to, you
10  know, calm down, you know, calm down, and, you know,
11  "You have to speak to human resources about this. This
12  is a situation in the branch where you have to speak to
13  St. Louis."
14  Q   So you identified these issues as something
15  that she would have to speak to human resources about;
16  is that right?
17  A   Well, yeah. The reason I said that is she
18  was extremely emotional and she was distressed on the
19  phone, yes.
20  Q   How long a conversation do you think you had
21  with her that time?
22  A   I guess -- a guess would be maybe five
23  minutes.
24  Q   And she -- she -- you talked about her
25  mentioning to you or talking to you about Mr. Mahoney's

Miller v. Edward Jones

3/11/2004                                                        Barbara Mosca

Page 40

```
 1   sending her out to get breakfast; is that right?
 2       A    To pick him up breakfast.
 3       Q    Pick him up breakfast.  Any other complaints
 4   that she had other than picking up breakfast?
 5       A    That he, you know, was very difficult to work
 6   for.
 7       Q    Okay.
 8       A    I'd like to add here that it is not a normal
 9   course of business that I as the regional leader or
10   broker get into lengthy conversations with BOA's.  So
11   my feeling was that this was something that they had to
12   get -- work it out in their office.
13       Q    Okay.  And you --
14       A    I'm hearing one side of the story.
15       Q    Right.
16       A    So my -- my -- I thought my job there was to
17   calm her down and go back to the office and speak to
18   Michael and speak to St. Louis.
19       Q    And -- so just so that I understand your
20   testimony, she called you and she was distressed, you
21   said.  What gave you the feeling that she was
22   distressed?
23       A    Because she was talking, she goes, "I'm at
24   the post office," and -- I don't remember exactly what
25   she said, but, you know, I mean her voice wasn't calm
```

Page 41

1  and cool and collected, and she said she left the
2  office, and as to exactly what she said to me, I cannot
3  recall what she said a couple years ago.
4      Q    Okay.  So -- so the tone of her voice was
5  what led you to the conclusion that she was distressed?
6      A    Yes.  She was very excited.
7      Q    Okay.  Did it appear to you that she was
8  crying?
9      A    She may have been crying.  I did not see if
10 she had tears in her eyes because I was on the phone
11 with her.
12     Q    Okay.  Did she ask you for any guidance in
13 that conversation?
14     A    I don't remember exactly if she asked me for
15 guidance.  I know that I said to her, "Calm down.  Go
16 back to the office."
17          And the reason for saying that is you just
18 don't leave the office and not go back.  And I told her
19 to speak with Michael.  It is something in the office.
20 "You have to get along, and talk to St. Louis," to make
21 sure she spoke to someone in St. Louis.
22     Q    Okay.  When you say that she was distressed,
23 did she -- was there anything irrational to you about
24 anything that she said?
25          MR. RICKS:  Would you please repeat that

Page 42

```
 1   question?
 2              MR. SPITZER:  Yes.
 3        Q     When you say she was distressed, I'm asking
 4   you was there an element of irrationality as to
 5   anything --
 6        A     Are you asking my opinion as to whether she
 7   was irrational?
 8        Q     Correct.
 9        A     Yes, I think she was irrational.
10        Q     In what sense?
11        A     Well, I think it was an overreaction to leave
12   an office and call me as regional leader to say that
13   she wasn't getting along with her IR.  I found that to
14   be unusual.  And to tell you the truth, I think it was
15   the first time a BOA had ever called me to tell me that
16   they weren't getting along with the IR.  That was not
17   the norm.
18        Q     So she was distressed and she was, as you
19   said, there was an element of irrationality to what she
20   was saying to you.
21        A     Yes.
22        Q     And she was talking about issues like, you
23   know, being sent out to buy breakfast for Mr. Mahoney.
24   Anything else that she said to you that comes to mind
25   that she complained of at that time?
```

Page 43

1    A    I wish I had a better recollection, but I
2  don't know the exact words, but I know that she
3  didn't -- they didn't get along with one another. You
4  know, I can't tell you exact words because I don't
5  remember exact words.
6    Q    My -- can you tell me in any general sense
7  any other topics that she might have covered in that
8  conversation other than buying breakfast for Mr.
9  Mahoney?
10   A    That he would raise his voice, he was
11 abrasive. I don't know. I don't know.
12   Q    That's all that you remember?
13   A    I don't know. I remember she called me up
14 and --
15   Q    Okay. And your advice at the time was call
16 St. Louis, correct?
17   A    Yes. I said, "Look, you have to go back to
18 the office. You just left the office. Calm down, take
19 a deep breath, and make sure that you speak to
20 associate relations in St. Louis."
21        When IR's and BOA's don't get along, it's
22 something that that's what we have, associate
23 relations, that's why we have human resources, that's
24 why we have this extensive group in St. Louis, to deal
25 with those issues.

Miller v. Edward Jones

3/11/2004                                                            Barbara Mosca

Page 47

```
 1      Q    Now, you mentioned that particular
 2  conversation that you had with Ms. Miller, that one.
 3      A    Yes.
 4      Q    Did you have any other conversations with her
 5  about workplace-related issues?
 6      A    If I were to call up Mike's office, she would
 7  answer the phone.  That's her job.  You know, when I
 8  call up an office, I'll say, "Hi, how are you doing?
 9  Is the IR there?"  Just a pleasantry.
10      Q    Nothing else of the kind of conversation that
11  you had with her when she called you about Mr. Mahoney?
12      A    Just don't know.  I don't remember.  Nothing
13  sticks out in my mind.
14      Q    Sitting here today, you don't remember
15  anything else?
16      A    No.
17      Q    Okay.  Did you ever have any conversation
18  with Mr. Woodward about reasons why Mr. Mahoney had
19  left Edward Jones?
20      A    Reasons why he left.  Yes.
21      Q    Can you tell me about those or those
22  conversations?
23      A    I got the word that Mike left.  He resigned,
24  and he went to another broker-dealer.  Our first
25  concern was who are we going to get to fill the office,
```

Miller v. Edward Jones

3/11/2004                                                    Barbara Mosca

Page 62

```
1      A    When I get it, I look and I just file it.
2      Q    It's not meant to indicate that in this case
3  Mahoney's resignation was less than voluntary, is it?
4      A    On there it does say, "Voluntary,
5  involuntary."  For the life of me, I don't remember
6  what it says.
7           MR. GILLESPIE:  Okay.
8           THE WITNESS:  Unfortunately, we get them
9  all the time.
10
11          CROSS-EXAMINATION BY MR. RICKS:
12
13     Q    I do have a couple quick questions.
14          You mentioned that the plaintiff had talked
15 with you on a couple of occasions, one time when she
16 called you on the cell phone, and then just I think a
17 couple of other times when you had called the Stamford
18 office and she just answer the phone, basically.  Is
19 that accurate?
20     A    Uh-huh.
21     Q    Okay.
22     A    Yes.
23     Q    In any of your conversations with the
24 plaintiff, did she ever mention any comments or conduct
25 of a sexual nature by Michael Mahoney?
```

Brandon Smith Reporting

8a6b4569-b11f-4b86-b884-b17e9a14e9b5