Miller v. Edward Jones

3/10/2004                                          Kristen Commander

Page 21

1        A    Not in specific.

2        Q    Okay.  Were they all work related?

3        A    Yes.

4        Q    Okay.  Did she ever complain about Mr.

5    Mahoney's use of language?

6        A    Not to me.

7        Q    Did she ever complain about his demeanor in

8    any way?

9        A    Just that he was demanding.

10       Q    Those were the only words that she used?

11       A    Yes.

12       Q    Okay.

13            MR. SPITZER:  Thank you.  I have no

14    further questions.

15            THE WITNESS:  Okay.

16            MR. RICKS:  I do have a couple of

17    questions.

18

19            CROSS-EXAMINATION BY MR. RICKS:

20

21       Q    In the branch notes, Exhibit 16, that you

22    were referring to a couple moments ago, Mr. Spitzer

23    asked you to look at a sentence where it says, "She,"

24    meaning -- "she," I think it meant you, if you'll

25    follow along with me here, "She said that he sometimes

Brandon Smith Reporting

720f0ed9-87f1-4839-9848-48a6f8c0499f

Miller v. Edward Jones

Page 22

1    says things that could be offensive to people, but she

2    did not think he realized it."

3              Now, do I understand that correctly that the

4    "she" refers to you?

5         A    Yes.

6         Q    Okay.  So Kristen Commander said that he, and

7    the "he" refers to --

8         A    Michael.

9         Q    Michael Mahoney?

10        A    Mahoney.

11        Q    Okay.  So that Michael Mahoney sometimes says

12   things that could be offensive to people.  When -- this

13   is a -- in this lawsuit, Ms. Miller has raised

14   allegations of sex harassment or potentially that or

15   sex discrimination or religious discrimination.

16             Was there any time that Ms. Miller ever said

17   anything to you that in any way indicated to you that

18   Mr. Mahoney was making any kind of statements that

19   referred to sex or religion or age or anything like

20   that in an offensive manner?

21        A    No.

22        Q    So when you used the term "offensive to

23   people" here, what did you -- assuming that the notes

24   that Mr. Rarick made here are correct and that you used

25   that term, what -- what does that mean to you?

720f0ed9-87f1-4839-9848-48a6f8c0499f

Miller v. Edward Jones

3/10/2004                                                    Kristen Commander

Page 23

```
 1       A    Michael can --
 2                 MR. SPITZER:  Object to form.  You can
 3     answer.
 4       A    I mean Michael basically says what's on his
 5     mind.  Sometimes he doesn't -- would speak before
 6     thinking.  But I'm guilty of that as well.  It's
 7     nothing that he ever said to me as being offensive.
 8     It's just like some people could take it in a different
 9     context than what he is meaning, and that could be
10     offensive to some people.
11       Q    And are you referring there to, if I've
12     understood correctly earlier, the things you were
13     talking about them complaining about one another all
14     had to do with work, in other words, either doing or
15     not doing specific tasks.
16       A    Right.
17       Q    So did the offensive -- when you used the
18     term "offensive," are you referring to that and how
19     they discussed it?
20       A    That's what I'm referring to, like she would
21     get annoyed that he would come out and ask her for
22     something when she was on the phone, because he
23     would -- he would just come up to her while she was on
24     the phone, which is rude and offensive, and she would
25     get all flustered and mad, and then he'd get mad
```

720f0ed9-87f1-4839-9848-48a6f8c0499f

Miller v. Edward Jones

3/10/2004                                    Kristen Commander

Page 24

```
 1    because she was mad, and then he'd go in his office.

 2    That's how the working relationship was to me when I

 3    was in the office.

 4         Q    That's what you observed?

 5         A    That's what I observed.  But never anything

 6    sexual or degrading or anything like that.

 7         Q    So nothing having to do with any use of

 8    language of a sexual nature?

 9         A    Never.

10         Q    Did Ms. Miller ever mention anything to you

11    about Mr. Mahoney ever using any language of a sexual

12    nature?

13         A    No.

14         Q    Or that Mr. Mahoney ever discussed any topics

15    of a sexual nature with Ms. Miller?

16         A    If he did, she never told me.

17         Q    Any -- did she ever mention anything to you

18    about comments relating to age?

19         A    Never.

20         Q    Or religion?

21         A    No.

22         Q    The next sentence says, and I'm referring

23    back to Exhibit 16, the branch notes, "She said that

24    both of them would call her and complain about the

25    other."
```

Miller v. Edward Jones

3/10/2004                                        Kristen Commander

Page 25

1           In other words, that's you, Kristen

2     Commander, said that both Ms. Miller and Mr. Mahoney

3     called you and complained about one another?

4           A     That's correct.

5           Q     Okay.  When you used the word "complain,"

6     what does that term mean to you?

7           A     That they weren't satisfied -- you know, he

8     wasn't satisfied with her work habits, seemed that she

9     was with his.  I think they didn't know what role they

10    should each be playing in the office.  I mean he's the

11    boss, and she's the assistant.  That's how it works,

12    and I don't think that she realized that.

13          Q     Did you ever hear anything from Ms. Miller

14    that would lead you to believe that Mr. Mahoney was

15    making any comments or statements to Ms. Miller that

16    were inappropriate?

17          A     No.

18          Q     Were you ever aware of Mr. Mahoney making any

19    comments to Ms. Miller that would have led you to think

20    in any way that Mr. Mahoney was violating any internal

21    Edward Jones policies?

22          A     No.

23          Q     If Ms. Miller hypothetically had ever said

24    anything to you about Mr. Mahoney making any comment of

25    a sexual nature or with sexual content in it, what

720f0ed9-87f1-4839-9848-48a6f8c0499f

Miller v. Edward Jones

3/10/2004                                    Kristen Commander

Page 26

```
 1    would you have done?

 2         A    I would have told her to call St. Louis

 3    because that's what we're all instructed to do.  If

 4    there's something that your IR is doing that's

 5    inappropriate, you call human resources.  That's that.

 6         Q    Okay.  Earlier I think that you said her --

 7    that Ms. Miller's only complaint about Mr. Mahoney was

 8    that he was demanding.  Did I understand you correctly

 9    on that?

10         A    Yes.

11         Q    And when you said that her only complaint

12    about him was that he was demanding, what does that

13    term "demanding" mean to you?

14         A    Just asking a little more than probably that

15    is necessary or interrupting and just being annoying,

16    basically, you know.  Things can get done in, you know,

17    an organized way.  It doesn't have to be interrupted

18    all the time.

19         Q    During your visits to the branch office where

20    Ms. Miller worked, what did you observe about her --

21    her organizational skills and work habits?

22         A    Well, I don't know how long she had been

23    there when I had gotten there because I'm not good with

24    the time thing, but there was no organization.

25         Q    You say there was no organization?
```

720f0ed9-87f1-4839-9848-48a6f8c0499f

Miller v. Edward Jones

3/10/2004                                            Kristen Commander

1        A     There was no organization.  Because the

2    office was in a shambles.  There were just piles of

3    paper and just no organization at all, and there wasn't

4    a real -- I didn't catch a real feel that she wanted to

5    get organized.  I was trying to show her different ways

6    of doing things, and she didn't seem -- it didn't seem

7    to matter.

8        Q     In a branch office, whose job is it to

9    organize things?

10       A     The branch office administrator.

11       Q     During the time that Deborah Miller was

12   working at Edward Jones, how often would she contact

13   you by telephone?

14       A     Quite often.

15       Q     What does that mean?

16       A     Sometimes it would be twice a day, sometimes

17   three times a day.  Then it would go a couple days she

18   wouldn't call; then she would call again.  But, like I

19   said, when somebody starts, if you have a problem, feel

20   free to call, you know, if you need help.  You say that

21   to everyone in all the offices:  "If you ever need

22   anything helpwise on the computer or anything, if

23   there's anything you need, just call us."  And she took

24   advantage of that.

25       Q     During those telephone calls, did she ever

720f0ed9-87f1-4839-9848-48a6f8c0499f

Miller v. Edward Jones

Page 28

```
1    say anything to you that would lead you to believe that

2    Mr. Mahoney was doing anything or saying anything that

3    was inappropriate or a violation of Edward Jones

4    policies?

5         A    No.

6         Q    So her complaints were all directly related

7    to Ms. Miller's job?

8         A    That's correct.

9              MR. RICKS:  No further questions.

10

11             CROSS-EXAMINATION BY MR. GILLESPIE:

12

13        Q    Ms. Commander, if you don't mind, I'd like to

14   ask you a few things.

15        A    Sure.

16        Q    And I always introduce myself on the record,

17   although I know we met just outside the room earlier.

18   So we're clear, my name is Peter Gillespie.  I'm a

19   lawyer.  I represent the individual defendant, Mr.

20   Mahoney, okay?

21        A    Yes.

22        Q    You've been at this for a little while.

23   Before I start, would you like a break or are you okay?

24        A    I'm fine.

25        Q    I won't be too long.
```

Brandon Smith Reporting

Miller v. Edward Jones

3/10/2004                                                    Kristen Commander

Page 30

```
 1    recollection at about what time you arrived at the

 2    Stamford Jones -- I'm sorry -- the Edward Jones

 3    Stamford office?

 4         A    Same time, because I took the same train

 5    there in the morning, and I think I left a little

 6    earlier that day only because we had finished up.

 7         Q    So that would be, what, 9:00 to 1:00, 9:00 to

 8    12:00?

 9         A    9:00 to 1:00, because I took an earlier train

10    home.

11         Q    So all together, you would have spent about

12    nine hours in the Stamford office?

13         A    Right.

14         Q    And were both Mr. Murphy and Ms. Miller with

15    you for almost all of that time?

16         A    Mr. Mahoney.  You said Mr. Murphy.

17         Q    I'm sorry.

18         A    That's okay.

19         Q    Let me try again.

20         A    That's okay.

21         Q    I'll withdraw that question.  Let me ask you

22    about this case now.

23              Were Mr. Mahoney and Ms. Miller with you for

24    almost all of that time?

25         A    Yes.
```

Miller v. Edward Jones

3/10/2004                                                    Kristen Commander

Page 31

1      Q    Okay.  Did you ever observe Mr. Mahoney using

2   profanity in the office?

3      A    No.

4      Q    Had you observed Mahoney at other times

5   during his employment at Edward Jones in addition to

6   these two office visits?

7      A    Yes.

8      Q    Did you ever observe him using profanity?

9      A    No.

10     Q    Are you aware of any claim at any time that

11  Mr. Jones -- Mr. Mahoney threw something at an Edward

12  Jones employee?

13     A    I never heard that.

14     Q    Never heard of him throwing anything at any

15  Edward Jones employee?

16     A    That's correct.  No.

17     Q    Okay.  Now, the first meeting that you

18  attended at the Edward Jones Stamford office, you

19  mentioned that you broke for lunch?

20     A    That's right.

21     Q    Just curious, do you have any recollection,

22  did you go out for lunch?  Was it brought in?  How did

23  lunch get done?

24     A    We ate in the conference room.

25     Q    And how did lunch come to the office?

Brandon Smith Reporting

Miller v. Edward Jones

3/10/2004                                                    Kristen Commander

Page 32

1       A     I believe Debbie went out and got it.

2       Q     Did she say there was anything inappropriate

3   about getting lunch that day?

4       A     No.  She had offered.

5       Q     And did she join you and Mr. Mahoney in

6   eating lunch in the office on that date?

7       A     Yes.  All of us, all three of us, ate in the

8   conference room.

9       Q     Do you happen of your own knowledge to know

10  who paid for lunch that day?

11      A     Michael Mahoney.

12      Q     How do you know that?

13      A     Because he said, "Here, let me get this."

14      Q     On that occasion, did you observe if there

15  was any phone that was active in the Edward Jones

16  office in addition to the office telephones?

17      A     She had her cell phone in her purse.

18      Q     Who?

19      A     Debbie had a cell phone in her purse

20  underneath her desk.

21      Q     Did it ring at any time?

22      A     Quite often.

23      Q     Could you characterize for me the relative

24  frequency of her cell phone compared to the office

25  telephones?

720f0ed9-87f1-4839-9848-48a6f8c0499f

Miller v. Edward Jones

Page 35

```
 1         Q     Let me ask you just a few final things, and
 2    I'll stop.
 3              When you went to the office on those two
 4    training sessions, with whom did you spend the majority
 5    of your time?
 6         A     Debbie, only because I was there to train
 7    her.  But then Michael would also be there because he,
 8    you know, he needs to know what she's doing as well.
 9    You know, him being a newer IR, he wanted to learn some
10    of the things, too, because it's only right that he's
11    her boss, he should possibly know what she's doing.
12         Q     Sure.
13         A     Basically going over account statements,
14    things like that, that he wasn't aware of.
15         Q     Well, if a claim was made that Mr. Murphy had
16    monopolized -- Mr. Mahoney had monopolized your time,
17    would that be, as best you recall it, accurate?
18         A     No.
19         Q     Okay.  Did Mr. Mahoney detract from your
20    ability to participate in the training of Ms. Miller?
21         A     No.
22         Q     So to the extent he was observing, it was not
23    terribly significant or an interruption to the task?
24         A     No.
25         Q     Okay.  Did you ever ask Ms. Miller about Mr.
```

Brandon Smith Reporting

720f0ed9-87f1-4839-9848-48a6f8c0499f

Miller v. Edward Jones

3/10/2004                                                    Kristen Commander

Page 36

1      Mahoney's sexual orientation?

2           A     No.

3           Q     Did you ever ask her if he was gay?

4           A     No.  She told me.

5           Q     On what occasion did she tell you?

6           A     It was on the first visit.

7           Q     Can you tell me, briefly, what was said and

8      its context?

9           A     I can't remember exact words, but I just

10     remember her saying, "Well, you know he's gay."

11                And I said, "Well, everybody has their

12     thoughts about things, but it's none of my business."

13                So I kind of left it at that.

14          Q     Did you ever tell Ms. Miller that other

15     people in the company poked fun at the fact that Mr.

16     Mahoney was gay?

17          A     No, because I had never said it to anybody.

18          Q     Did you tell Ms. Miller that employees who

19     had preceded her had had problems with Mr. Mahoney?

20          A     Yes.

21          Q     What did you say on that subject?

22          A     That Shannon -- there was a girl there that

23     was before her, Shannon had conflicts with him and had

24     moved to another office.

25          Q     Was that about all you said?

720f0ed9-87f1-4839-9848-48a6f8c0499f

Miller v. Edward Jones

Page 37

```
1        A    That's it.  That's the only other person I
2   knew in that office prior to her.
3        Q    Did you tell Ms. Miller that Mahoney was on
4   probation?
5        A    No.
6        Q    Had Ms. Bogus befriended you?
7        A    I met her once.  I was not friends with her.
8   She would call with questions concerning the Jones
9   system just like Debbie had.  So same type of scenario.
10            MR. GILLESPIE:  Thank you very much.
11   I'm sorry to keep you.  I have nothing further.
12
13            REDIRECT EXAMINATION BY MR. SPITZER:
14
15       Q    Just one question.  You were there to train
16   Ms. Miller when she started her employment?
17       A    Uh-huh.
18            MR. SPITZER:  No further questions.
19            MR. RICKS:  I have a follow-up question.
20
21            RECROSS-EXAMINATION BY MR. RICKS:
22
23       Q    Help me out.  I don't remember your exact
24   words, but it was something like this, and just tell me
25   what you recall.  I think you said something like that
```

Brandon Smith Reporting

Miller v. Edward Jones

3/10/2004                                                    Kristen Commander

Page 38

1    you had told Shannon Bogus that there had been -- that

2    you told Ms. Miller that Shannon Bogus had had problems

3    with Mahoney or something like that?  Did I understand

4    you correctly?

5         A    Yes.  They just said working conflict, saying

6    that he was a demanding person.

7         Q    Okay.  I was going to ask what were -- what

8    was your understanding of the problems that -- what

9    were you referring to?

10        A    Same situation where, you know, she'd be

11   doing something, he'd interrupt her, same type of

12   thing.

13        Q    So same type of thing meaning what?

14        A    Just that he wanted a lot of work done that

15   she hadn't gotten to learn at the time.  She didn't

16   know how to do it.  Then he would get frustrated and he

17   would say, "Why don't you call St. Louis and find out

18   how to do it, then."

19        Q    So is it a fair statement to say that when

20   you say that Shannon Bogus had problems with Mr.

21   Mahoney, it had to do with him being demanding or

22   impatient?

23        A    Exactly.

24        Q    Things of that sort?

25        A    Right.  That's all.

Brandon Smith Reporting