Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

COPY

MARIAN DEBORAH MILLER,                )
    Plaintiff,                        )
                                      )    Civil Action No.
VS                                    )    3:03CV0193-DJS
                                      )
EDWARD D. JONES & CO, L.P.,           )
MICHAEL MAHONEY, MICHAEL               )
CUMMINS, BARBARA MOSCA, and           )
STEVEN RARICK,                        )
    Defendants.                       )
                                      )

DEPOSITION OF: MICHAEL WILLIAM CUMMINS

DATE:          MARCH 10, 2004

HELD AT:       ACTON PUBLIC LIBRARY
               60 OLD BOSTON ROAD
               OLD SAYBROOK, CONNECTICUT

Reporter: JAMES A. SCALLY, RPR, CRR, LSR #80
         BRANDON SMITH REPORTING SERVICE
              44 Capitol Avenue
          Hartford, Connecticut 06106
              (860) 549-1850

Miller v. Edward Jones
3/10/2004                                                        Michael William Cummins

Page 5

1   me, and I'll try to clarify it or break it down. The

2   only thing I'll ask is wait until I finish asking my

3   question because the court reporter will be taking

4   notes, stenographic notes, and if we both talk at the

5   same time, he can't take down the record properly. So

6   just wait until I finish my question, and feel free to

7   answer however you want, okay?

8           Anything about what I've said so far that you

9   don't understand?

10       A   No.

11       Q   Great. Mr. Cummins, tell me your address,

12   please, first of all.

13       A   My home address?

14       Q   Yes.

15       A   Five Leada, L-e-a-d-a, Woods Road.

16       Q   Okay.

17       A   Old Saybrook.

18       Q   How long have you been there?

19       A   Since 1995.

20       Q   Your present employment is where, Mr.

21   Cummins?

22       A   15 Elm Street, Old Saybrook, Connecticut.

23       Q   And who do you work for?

24       A   Edward Jones.

25       Q   And in what capacity?

Miller v. Edward Jones

3/10/2004                                                  Michael William Cummins

Page 6

```
1     A    Investment representative.
2     Q    How long have you been an investment
3   representative for Edward Jones?
4     A    Since October of 1991.
5     Q    And prior to being, working for Edward Jones,
6   where did you work?
7     A    SMA Financial.
8     Q    Where are they located?
9     A    Up in Hartford.
10    Q    What did you do there?
11    A    Insurance and mutual fund sales.
12    Q    And how long were you with SMA Financial?
13    A    From 1984 until October of '91.
14    Q    And prior to SMA Financial, where did you
15  work?
16    A    I was in college.
17    Q    Okay.
18    A    Allow me to clarify that October of '91.  I
19  was able to sell for Edward Jones in October of '91.
20    Q    Okay.
21    A    I actually became employed in September.
22    Q    Okay.  And you said prior to your position at
23  SMA Financial, you were in college.  When did you
24  graduate college?
25    A    May of 1984.
```

Page 9

1   A   I was a trainer of new brokers. And
2   ultimately I became the regional leader.
3   Q   And when did you become a regional leader?
4   A   In 1994.
5   Q   What are the duties of a regional leader?
6   A   I would say they sort of fall along two main
7   segments. One is as a role model to other offices,
8   other brokers.
9   Q   Okay.
10  A   And the second is organizational, which is
11  organizing and hosting meetings.
12  Q   Let's break those down so I understand
13  exactly what you're telling me. You described the
14  first one as being a role model. What does that
15  entail?
16  A   Running a profitable, ethical business.
17  Q   Go ahead.
18  A   Along the Edward Jones model.
19  Q   And what do you do as a role model to make
20  sure that that happens?
21  A   I run my business.
22  Q   Okay. Do you also, in your role as a
23  regional leader, do you also help other investment
24  advisors run their business as well?
25          MR. RICKS: Objection. Vague, help.

Page 10

```
 1      Q   Do you have any role with other investment
 2   advisors in your role as a regional leader?
 3      A   For brand-new brokers with no experience.
 4      Q   Okay.
 5      A   I would go knock on doors with them, you
 6   know, teach them how to do that.
 7      Q   Okay.
 8      A   You know, really build on the training that
 9   they had already received in St. Louis.
10      Q   Okay.
11      A   You know, as they built their business; they
12   would call me for, you know, perspective on an
13   investment, you know, what are my thoughts about XYZ
14   mutual fund or XYZ stock or bond.  But it had to do
15   with, you know, building their business.
16      Q   Would it be fair to say that, we used to call
17   it a role of a mentor to these people?
18      A   No.  Because we have a separate role for
19   mentoring new brokers, and I was a role model, you
20   know.  This is a person who has built a business from
21   scratch:  If Mike Cummins can do it, you can too, using
22   the Edward Jones model.
23      Q   Now, the second part that you mentioned about
24   being a regional leader, you mentioned organizational.
25   What does that mean?
```

Page 11

1    A    From a due diligence standpoint, there are --
2    it's important to get together and review, you know,
3    products and investments. I believe the requirement is
4    three times a year.
5    Q    Okay.
6    A    The law's changed, so I don't know what it is
7    presently. And I would host a spring meeting, a summer
8    meeting, and a fall meeting. It was my responsibility
9    to, you know, organize the hotel, the location, the
10   agenda based on what Edward Jones thought the issues of
11   the day were, invite everybody, see who was going to
12   attend, and then be the MC for that meeting as speakers
13   came.
14   Q    Anything else that would encompass that
15   organizational piece that you just mentioned to me
16   other than what you've already said?
17   A    No.
18   Q    Okay. Now, as far as -- let me back up for a
19   second.
20        You mentioned that you were a regional
21   leader. What was your region that you were the leader
22   of?
23   A    Originally it was Connecticut and Rhode
24   Island. After a number of years, Rhode Island was spun
25   off into a separate region, you know, more recently the

Page 12

1    Fairfield County was spun off into a separate region,
2    you know, with part of Metropolitan New York.
3        Q    And that -- at that point Fairfield County
4    did not become, was taken out of your region.  Is that
5    fair to say?
6        A    Yes.  That was at the time that I was
7    relinquishing the role of regional leader.
8        Q    Okay.  Just so I have some idea of the time
9    frame, you mentioned that at some point Connecticut and
10   Rhode Island was your region.  When was that,
11   approximately?  When did that start and when did that
12   end?
13       A    Well, it began in 1994.
14       Q    Okay.
15       A    I believe 1999 was when Rhode Island was
16   separated.
17       Q    Okay.  And at that point you had, your region
18   encompassed Connecticut only?
19       A    Yes.
20       Q    The whole state of Connecticut?
21       A    Yes.
22       Q    And from 1999 until when did you have the
23   whole state of Connecticut?
24       A    Until about September of 2001, when Fairfield
25   County --

Page 13

1    Q    So sometime -- is it fair to say sometime, if
2    I have your testimony correct, sometime in September of
3    2001, Fairfield County was taken out of your region?
4    A    Yes.
5    Q    Now, let me back up again. As far as your
6    role as a regional leader, did you also maintain
7    certain reporting requirements with the other
8    investment officers that were within your region?
9         MR. GILLESPIE:  Objection. Vague. What
10   did you say, reporting?
11        MR. SPITZER:  Reporting, yes.
12   Q    Were the other -- were the other investment
13   advisors that were in your region, did they have any
14   reporting requirements to you?
15   A    No.
16   Q    You were -- so is it fair to say that you
17   would not have been considered their manager in any
18   way, if I can use that word?
19   A    I was not their manager.
20   Q    Okay. And just so I understand it, if I was
21   a, hypothetically, a representative in the Westport
22   office, who would be my manager?
23   A    Well, the person responsible for that area is
24   in IR development out in St. Louis.
25   Q    Okay.

Miller v. Edward Jones
3/10/2004                                                Michael William Cummins

Page 14

1   A   Which as of today would be Jeff Panchot and
2   Guy Cascella.
3   Q   Okay. And let me take you back to to 2001
4   when Mr. Mahoney was in the Westport office. Who would
5   have been his direct managers at that time?
6   A   Price Woodward, and I don't know if Jeff
7   Panchot had joined him at that point in time.
8   Q   Okay. So Price Woodward, you mentioned.
9   A   Yes.
10  Q   What is Price Woodward's position? What was
11  Price Woodward's position as you understood it back
12  when Mr. Mahoney was working for Edward Jones?
13  A   He is a partner in IR development.
14  Q   Just so that the report is clear, what does
15  IR development mean?
16  A   The job title that I hold is investment
17  representative, which is abbreviated to IR.
18  Q   Okay.
19  A   And so he is responsible for the development
20  of the IR's in his area.
21  Q   And would you -- would he also be
22  responsible -- would he also be responsible for you?
23  Would he be your manager as well?
24  A   Yes.
25  Q   Is he still your manager at this point?

Page 28

1  Sullivan?

2  Q  Mr. Cummins, let me do this: I'm going to
3  give you what I've marked Exhibit 6 through 10 for
4  identification and let you look at those and tell me if
5  anything of those reflect -- if any of those refresh
6  your recollection regarding the events following
7  that -- following Exhibit 5. I'm going to ask you to
8  please tell me what exhibit you're referring to when
9  you testify.

10  A  I received a wire from Mike Mahoney on
11  February 7th --

12  Q  Okay.

13  A  -- with -- informing me that there was going
14  to be a visit from HR. So that same day I received a
15  phone call from John Sullivan, who is the senior HR
16  generalist, I guess his title is, you know, I probably
17  called HR going, "Look, I have a wire from Mike
18  Mahoney, you know. I don't know what's going on."

19      And I got a call back from John Sullivan with
20  respect to the visit to Mike Mahoney that issues were
21  his BOA's performance and calling her at home. The
22  second issue was his treatment of her, and then there's
23  a note, I don't know if it was made the same day. I
24  sort of doubt it, but I don't know. It says, "Comas:
25  Can go into office based on Shannon's interview." I

Page 29

```
 1   would suspect that's a subsequent note because --
 2        Q    That you made?
 3        A    Yes.  And that's on item 9.
 4        Q    You are referring to Exhibit 9 now, and those
 5   constitute the notes that you just mentioned?
 6        A    Yes.
 7        Q    Okay.
 8        A    Subsequent to speaking with John Sullivan, I
 9   responded to Mike Mahoney in the negative that I
10   couldn't be there.
11        Q    Okay.
12        A    Okay?  The outcome of that meeting between
13   Mike Mahoney and HR was -- were Exhibit 7, which is a
14   photocopy of the letter, and then Exhibit 8, which is a
15   sticky that I have over Exhibit 7 --
16        Q    Okay.
17        A    -- of my notes, apparently -- it occurred on
18   March 1st, 2001, that I was given these items.
19   Apparently Cyndi Catalano and John Sullivan met with
20   Mike.  It appears that John had referred Mike to BOA
21   recruiting to replace Shannon.  Triple Creek and Mark
22   Stecher were recommended, which was a coaching program
23   that's mentioned in Exhibit 7 --
24        Q    Okay.
25        A    -- in paragraph 2.
```

Page 30

```
 1      Q    Okay.
 2      A    H. Hopworth, it's an extension in St. Louis.
 3   Good question.  And the last note, "Per John Sullivan,"
 4   you know, if Mike were to call and ask me about the
 5   severity of the visit, to give him the message clearly
 6   that if he bothers another person, he will be
 7   terminated.
 8      Q    And that is -- those are -- those notes are
 9   pursuant to the conversation that you had with John
10   Sullivan; is that right?
11      A    Yes.
12      Q    Okay.  And the conversation that you
13   mentioned with Mr. Sullivan happened, again, relating
14   to Exhibit 8 that's in front of you, the notes that you
15   put there are relating to a conversation you had with
16   Mr. Sullivan when?
17      A    On March 1st, 2001.
18      Q    And that would be after the meeting that you
19   referred to before?
20      A    Yes.
21      Q    The meeting with Mr. Mahoney that you could
22   not attend?
23      A    That's correct.
24      Q    Okay.  Do you remember whether you had called
25   Mr. Sullivan or he had called you in that conversation?
```

Page 32

```
 1   documents are dated on their face and speak for
 2   themselves.  Go ahead and answer if you can.
 3   BY MR. SPITZER:
 4        Q    All I'm trying to do, Mr. Cummins, I'm just
 5   trying to clarify the events that you just described to
 6   us.
 7        A    If I had to give a chronology of these
 8   documents, it would be Exhibit 5, Exhibit 9 --
 9        Q    Okay.
10        A    -- was the outcome of a conversation the same
11   day that I received Exhibit 5.
12        Q    Right.
13        A    I didn't hear anything until March 1st.
14        Q    Okay.
15        A    At which time, John Sullivan -- I made the
16   notes on March 1st that I then attached to a March 14th
17   letter.
18        Q    Okay.  That's what I was trying to get.
19   Thank you.  If I could have those back.
20             What is Triple Creek?
21        A    It is a management -- it is an interpersonal
22   coaching company.
23        Q    Okay.  And Mark Stecher --
24        A    If you read item 7, it gives something of a
25   definition, skills coaching and counseling, you know,
```

Page 33

1  to improve, learn and improve your management and
2  interpersonal relationship skills.
3      Q    Okay.  Had you heard of Triple Creek and/or
4  Mark Stecher prior to this correspondence that we just
5  referred to?
6      A    Yes.
7      Q    And in what context had you heard about them?
8      A    Another IR had gone through working with Mark
9  Stecher and Triple Creek.
10     Q    Okay.  Was that IR in your -- your region as
11 well?
12     A    He was in our region, yeah.
13     Q    Yes.  And who was that?
14     A    Chris Kroll (phon sp).
15     Q    And when did that take place, if you recall?
16     A    Prior to these dates.  I do not recall.
17     Q    In your note that appears on Exhibit 8, it
18 says, "Per John Sullivan, give message to" --
19          MR. RICKS:  Is it okay for him to look
20 at a copy?
21          MR. SPITZER:  Sure.
22     Q    Looking at Exhibit 8, there is a note that
23 appears, and you testified about it already, but I want
24 to clarify it with you.  It says, "Per John Sullivan,
25 give message to Mike that if he bothers another person,

Page 34

1  he will be terminated."  And you mentioned what you
2  thought you understood by that.  I want to just
3  clarify.
4              What was -- what was the conversation
5  specifically that you can recall that Mr. Sullivan --
6  where Mr. Sullivan told you that?
7       A    I believe the reason why I got these letters
8  in the first place was since Mike Mahoney contacted me
9  to begin with with Exhibit 5, if he were to contact me
10 following his interaction with Cyndi Catalano and John
11 Sullivan and, you know, felt -- downplayed the severity
12 of the meeting, or did not take what was said
13 seriously, you know, John wanted me to know and to
14 emphasize to Mike that if he, you know, if this were to
15 recur, his employment would be terminated.
16      Q    Okay.  And just so that I understand what
17 you're saying, when you say, "This was to reoccur," if
18 what was to reoccur?
19              MR. RICKS:  Objection.  Calls for
20 speculation, lack of foundation.
21      Q    If you know.
22      A    I don't know what the interaction was between
23 he and the BOA that led to this meeting in the first
24 place.
25      Q    Okay.