Miller v. Edward Jones

3/11/2004                                                 Marian Deborah Miller

Page 331

```
1    Q    What is your hourly wage rate?
2    A    $11.
3    Q    Do you have any employee benefits with Fox's?
4    A    No.
5    Q    Are you -- do you think that Edward Jones in
6  any way retaliated against you during your employment
7  with Edward Jones?
8    A    Yes.
9    Q    How?
10   A    I'm not sure I understand retaliated, what
11 you mean by that.  I can tell you what happened.
12   Q    Okay.  Well, my understanding is that in
13 your -- in the claims you're making against Edward
14 Jones, you're saying one of the things you think they
15 did wrong was they retaliated against you for
16 something.  I don't know.  Have I understood that
17 correctly?
18   A    I can tell you what happened -- what I think
19 is retaliating.
20   Q    Okay.
21   A    Okay?
22   Q    Tell me what you think -- you think there was
23 some retaliation?
24   A    You asked me that, sir.  I think -- what I
25 think Edward Jones did, like I said, I can tell you
```

Page 332

1    what happened.
2       Q    Please do.
3       A    After I did report Mr. Mahoney to the human
4    relations department, I was terminated.
5       Q    When you're saying that you reported Mr.
6    Mahoney to the associate relations department, that was
7    after you had left the office, right?
8       A    Yes.
9       Q    So you never returned to work again at Edward
10   Jones, right?
11      A    I never returned to that office.
12      Q    Right.  Now, but Edward Jones had in fact
13   asked you to return to the branch office in Stamford
14   where you'd been employed after you reported what you
15   thought was misconduct by Mr. Mahoney, didn't it?
16      A    Not that I can recall.
17      Q    So you don't recall Edward Jones ever asking
18   you to return to work?
19      A    No.
20      Q    Do you recall that -- do you recall that you
21   said to Edward Jones that you would not return to work
22   in the branch office with Mr. Mahoney?
23      A    No.  I don't recall that.
24      Q    So when you say that you -- that you were --
25   that Edward Jones retaliated against you by terminating

Page 333

1    your employment after you reported Mr. Mahoney's
2    conduct to Edward Jones, that's the retaliation -- the
3    retaliation that occurred?
4        A    Yes.
5        Q    Was there anything else that Edward Jones did
6    to retaliate against you or that you think constituted
7    retaliation?
8        A    I'm not really sure about what you mean by
9    the term "retaliation" in this instance, so I really
10   don't know what you're talking about.
11       Q    Do you remember the date that you are
12   referring to when you say you reported Mr. Mahoney to
13   associate relations?
14       A    I believe it was November 9th.
15       Q    Okay.  And that was -- that was after you had
16   walked out of the office, though, and left the Edward
17   Jones branch office, right?
18       A    That was the day I left the office, if I'm
19   correct.  I'm assuming that was the date.
20       Q    Now, in your lawsuit, you have also claimed
21   invasion of privacy.  Do you remember that?
22       A    Yes.
23       Q    In what way do you think your privacy was
24   invaded?
25       A    When Mr. Mahoney would call me at home, when

Page 334

1   Mr. Mahoney --

2       Q    On the telephone?

3       A    On the telephone. When Mr. Mahoney would ask
4   me about my relationship with my boyfriend, when Mr.
5   Mahoney would discuss my children and their sexual
6   orientation, when Mr. Mahoney would put on my clothing.

7       Q    That means your scarf and your coat?

8       A    Yes. When Mr. Mahoney would sit at my desk
9   and go through the papers on my desk. When he moved my
10  handbag under my desk. I can't recall anything else at
11  this point.

12      Q    You listed a number of things. I'm going to
13  go back and ask you about those now. You said that it
14  invaded your privacy when Mr. Mahoney called you at
15  home. To what are you referring there?

16      A    Mr. Mahoney called me at home.

17      Q    In what way did that invade your privacy?

18      A    It was not during a work -- the working day
19  or the workweek.

20      Q    Other than -- so it was the fact that he
21  called you other than during working hours?

22      A    Yes.

23      Q    Is there any other way that him placing
24  telephone calls to you at your home invaded your
25  privacy?

Page 335

1    A    That was the way it invaded my privacy. Just
2    by virtue of the fact that he made calls to my house.
3    Q    How often did these telephone calls occur?
4    A    On an average, four times a week.
5    Q    What was the content of those telephone
6    calls? First of all, let me ask you, did you -- did
7    you sometimes pick up the telephone and talk with Mr.
8    Mahoney?
9    A    Yes.
10   Q    And what was the content of those telephone
11   calls?
12   A    To bring him breakfast.
13   Q    Anything else?
14   A    I remembered when the incident happened on
15   9/11, I had been ill during that time. I believe it
16   was either September 10th or 11th that I had stayed
17   home from the office with fever and bronchitis, and he
18   called me while I was at home sick.
19   Q    About what?
20   A    I don't recall the exact reason.
21   Q    When you say that he called you to ask you to
22   bring breakfast, does that mean that he would ask you,
23   for example, if you could stop off and bring in a bagel
24   or a doughnut or something like that?
25   A    Yes, sir. Coffee and a bagel or a muffin.

```
 1      Q    Okay.  Was there any other content to the
 2  telephone calls that Mr. Mahoney made to your home that
 3  you thought, anything about the content of the phone
 4  calls that you thought invaded your privacy?
 5      A    Just by virtue of the fact that Mr. Mahoney
 6  called me at home during times that were not working
 7  hours was an invasion of my privacy.  I was not paid to
 8  discuss any business or to work outside of the hours
 9  that I was being paid for my Edward Jones employment.
10  This constitutes for me an invasion of my privacy,
11  because it happened so frequently.
12      Q    I think you said on average four times a
13  week; is that right?
14      A    Yes, sir.  That was an average.  Sometimes
15  more; sometimes less.
16      Q    How long would any -- on average -- would
17  these telephone calls last when Mr. Mahoney would call
18  you at your home?
19      A    I don't recall.
20      Q    Are we talking about less than five minutes?
21      A    I don't recall.
22      Q    So you don't remember them being any more
23  than a couple minute at any given time?
24      A    I don't recall.
25      Q    You said that also you think it was an
```

Page 337

1  invasion of privacy for him to ask about your
2  relationship with a boyfriend; is that true?
3      A   Yes.
4      Q   What specifically did Mr. Mahoney ask that
5  you thought invaded your privacy about your
6  relationship with your boyfriend?
7      A   He asked about our sexual relationship.
8      Q   What did he ask?
9      A   He asked about our sexual relationship.
10     Q   What did he ask?
11     A   About our sexual relationship.
12     Q   What were the words that he used?
13     A   I cannot discuss that here.
14     Q   So you're refusing to answer the question?
15     A   For religious reasons.
16     Q   Does that mean for religious reasons, you're
17 refusing to answer the question?
18     A   It means that the way you're phrasing the
19 question, that for religious reasons I cannot, under
20 the laws of my religion and through the eyes of God,
21 answer those questions.
22     Q   You said that -- you listed also that you
23 thought it was an invasion of privacy for Mr. Mahoney
24 to ask something about your children's sexual
25 orientation. Now, I think we've already talked about

Page 338

```
1    that before?
2       A    Yes, sir.
3       Q    Is there anything other than what you've
4    already said about that, is there anything different
5    than what you've already mentioned?
6       A    No, sir.
7       Q    And you said it invaded your privacy for him
8    to put on your clothing.  That's your scarf and your --
9    your coat that you mentioned a while ago, right?
10      A    Yes.
11      Q    There was nothing else about that, right?
12      A    No.
13      Q    On how many occasions did that happen when he
14   put on a scarf or a coat in the office?
15      A    Maybe half a dozen times.  I don't recall the
16   amount of times that he's done it.
17      Q    So half a dozen times or less?
18      A    I don't recall the number of times.  I
19   remember him parading around the room in my coat.
20      Q    You said that it invaded your privacy for him
21   to go through the papers on your desk at Edward Jones,
22   correct?
23      A    Correct.
24      Q    How did that invade your privacy for Mr.
25   Mahoney to go through papers that were on your desk at
```

Page 339

1   Edward Jones?

2   A   I don't understand the question.

3       MR. RICKS: Would you read it back?

4       THE WITNESS: I said I didn't understand

5   it. I heard it, but I don't understand what you mean.

6       (Question read.)

7   A   I just felt it was an invasion of privacy.

8   Q   Were these personal papers --

9   A   No.

10  Q   -- or business papers?

11  A   Business papers.

12  Q   So Mr. Mahoney would look at documents that

13  were on your desk concerning Edward Jones business?

14  A   No.

15  Q   What is incorrect about that statement?

16  A   Mr. Mahoney would move papers around all over

17  my desk, not just look at them, and create what was an

18  organized situation into a chaotic situation. And

19  other than saying that that's an invasion of my

20  privacy, it is an invasion of the space within which I

21  worked at Edward Jones and trying to keep things

22  organized.

23      Perhaps it's not an invasion of privacy.

24  Perhaps it was just an invasion of sorts. I don't know

25  what label you would put on it. I can just tell you

Page 340

1  what happened, because I don't understand what you mean
2  by invasion of privacy exactly in this instance.
3      Q    Well, Mr. --
4      A    I can just tell you what happened, Mr. Ricks.
5  I can't -- you know, some of the terms that you use
6  legally, legal terms, I'm not familiar with all the
7  time.  I'm trying to answer the best I can, but please
8  try to remember that I'm not a lawyer.
9      Q    The papers that you say Mr. Mahoney
10 rearranged on your desk at Edward Jones, these were not
11 your personal papers, though, right?
12     A    Correct.
13     Q    The next thing that you indicated was that
14 you thought it was an invasion of privacy that he would
15 move your handbag that was under your desk.
16     A    Correct.
17     Q    Now, by that what does that mean when you say
18 he would move your handbag?
19     A    That means that Mr. Mahoney on several
20 occasions sat at my desk when I would go either to go
21 get lunch or go to the powder room, and when I would
22 return, my bag had been moved.  Now, there were several
23 times when I just took my wallet with me or just went
24 to the ladies' room and didn't take my handbag with me,
25 would just go to the ladies' room and return.  If my

Page 341

1  handbag was -- ordinarily I would keep my handbag at
2  two o'clock, and when I would return, it was at eleven
3  o'clock.
4      Q    Are you talking about under your desk?
5      A    Correct.
6      Q    Now, let me make sure I understood this.
7  You're not saying, though, that Mr. Mahoney was opening
8  and going through your purse. He just moved it from
9  one location to another; is that right?
10     A    I can't say if it's right or not. I wasn't
11 in the room at the time. Mr. Mahoney could have or he
12 couldn't have. I don't know.
13     Q    Okay.
14     A    I wasn't there. So if I wasn't there, I
15 would not be able to see if he had done it. I just
16 noticed that he had moved my handbag on several
17 occasions.
18     Q    All right. You never observed Mr. Mahoney
19 going through your handbag, though, right?
20     A    I cannot recall that.
21     Q    Okay. So you're saying it was just an
22 invasion of privacy that he moved the location of the
23 handbag from one spot under your desk to another spot
24 under your desk?
25     A    However, now that we are talking about it and

Page 342

```
 1    you're asking me all these questions, I do remember one
 2    instance where the contents of my handbag were in
 3    disarray after I returned from the ladies' room.  And I
 4    knew that I hadn't left it that way.  So I do remember
 5    something, yes, sir.
 6         Q    What is it that you remember?
 7         A    I remember that my handbag was organized and
 8    that it was in disarray when I returned.
 9         Q    Okay.  That was on one occasion, right?
10         A    I remember that on one occasion, yes, sir.
11         Q    And other than that, your mention of the
12    handbag was simply that it moved from one location to
13    another location under your desk?
14         A    Other than that, other than that instance, I
15    believe that was it.
16         Q    Okay.
17         A    But I believe that there were things in
18    disarray.
19         Q    On one occasion?
20         A    I believe it was one occasion.  Could have
21    been more.  It could have been more.
22         Q    In fact, you don't know that Mr. Mahoney ever
23    looked in your -- in your handbag, correct?
24         A    I don't know, Mr. Ricks.  I wasn't in the
25    room at the time that that could have occurred.  I
```

Miller v. Edward Jones

3/11/2004                                      Marian Deborah Miller

Page 343

1   don't know.  I've never seen him -- I never saw him do
2   it.  But when I returned to the room, the contents were
3   in disarray.
4       Q    On one occasion?
5       A    It could have been more.  I remember one
6   occasion.
7       Q    Okay.
8            MR. SPITZER:  Let's take a five-minute
9   break.
10           MR. RICKS:  That's fine.
11           (Recess:  12:35 p.m. to 12:40 p.m.)
12      Q    Ms. Miller, do you recall that when we were
13  up here, I think it might have been the last time, you
14  completed a medical release authorization form for Dr.
15  Schechter for your medical records?
16           MR. SPITZER:  Do you remember that?
17      A    I don't remember.
18      Q    Okay.  Well, I'll go get a copy of it, then.
19  But we have attempted to obtain your medical records
20  from Dr. Schechter, and Dr. Schechter says that in
21  spite of your written authorization to release the
22  records, that he has a practice of calling and talking
23  with the patient to make sure that that's okay with
24  them, and that you have instructed him not to release
25  those medical records to us.  Is that true?

Miller v. Edward Jones

3/11/2004                                             Marian Deborah Miller

Page 351

```
 1    of his.
 2        A     Yes.
 3        Q     I take it all of these things led up to an
 4    occasion when there was an assault, when you thought
 5    you were being actually threatened; is that right?
 6        A     Yes.
 7        Q     What was that date?
 8        A     November 9th.
 9        Q     What happened --
10        A     If that indeed was the day that I left.
11        Q     It is my understanding that that is the day
12    that you left --
13        A     Yes.
14        Q     -- but that's the day you mean to indicate?
15        A     Correct.
16        Q     That was the date on which you believe he
17    assaulted you?
18        A     I believe that I was in danger of being
19    assaulted.
20        Q     Now, on November 9, you went to work, and you
21    arrived at the Edward Jones Stamford office; is that
22    right?
23        A     That's correct.
24        Q     What time did you arrive that day?
25        A     8:45.
```

Page 354

1  for me. It was indeed for him. I said, "This is not
2  my message. It's your message."
3          At that point, he walked back into his
4  office. Then he came back out of his office, and he
5  confronted me face to face, and all this time he was --
6  he was hollering, he was yelling, and he was very
7  angry, and he was -- and just a couple of inches from
8  my face. Yelling at me and spitting at me.
9     Q    And was that the end of everything that
10 happened between you that day?
11    A    Other than the words that he was screaming at
12 me and yelling, I suppose that would be it.
13    Q    Yes.
14    A    I walked out. I was afraid --
15    Q    Okay.
16    A    -- of being assaulted.
17    Q    I've asked you a couple of times what he did
18 or said. You've described it. Is there anything
19 further that you recall him doing or saying that day
20 that you have not yet described?
21    A    I don't recall exactly if it was -- well, I
22 don't recall all the details of that -- what he was
23 saying because I was frightened.
24    Q    Sure. And it was a long time ago, wasn't it?
25    A    Not that long ago.