UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-----------------------------------------------------------X

MARIAN DEBORAH MILLER,

                Plaintiff,

       -against-                            CIV NO.
                                          3:03CV 0193 (MRK)

EDWARD D. JONES & CO., L.P.,
MICHAEL MAHONEY, MICHAEL
CUMMINS, BARBARA MOSCA, and
STEVEN RARICK,

                Defendants.             JUNE 25, 2004

-----------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MICHAEL CUMMINS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Rule 7(a) of the Local Rules of Civil Procedure, Plaintiff Marian Deborah Miller (hereinafter referred to as "Plaintiff" or "Miller") submits this Memorandum of Law in opposition to Defendant Michael Cummins' ("Cummins") Motion for Summary Judgment in the above-captioned action, in that Plaintiff respectfully request that this Court rule that Defendant's Motions for Summary Judgment.

### I.    Introduction

Plaintiff brought this action against her former employer, Edward Jones, LP ("Edward Jones"), Cummins, and others to seek redress for discrimination on the basis of sex and age in the terms, conditions, and privileges of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq* ("Title VII"), the Connecticut General Statutes Section 46a-51 *et seq*, as amended ("State of Connecticut Human Rights Law"), the ADEA, and for intentional infliction of emotional distress, negligent infliction of emotional distress, invasion of

privacy, and negligent hiring, supervision, and retention under the law of torts of the State of Connecticut.

As set forth fully below, Cummins is not entitled to summary judgment on Plaintiff's claims. The evidence in this case, when viewed in a light most favorable to plaintiff as it must be on summary judgment, establishes or at the very least creates a material factual issue concerning whether Cummins retaliated against Plaintiff, aided and abetted the discriminatory practices of Edward Jones, and intentionally inflicted extreme emotional distress upon Plaintiff.

As set forth below, summary judgment must be denied in this case.

## II.    Statement of Facts

Plaintiff as a Branch Office Administrator ("BOA") was employed at Edward Jones, in a two-person office with Michael Mahoney, since July 14, 2001.[1] Plaintiff was discriminated against in the terms and conditions of her employment on the basis of her gender, age, religion, and sexual orientation and subsequently terminated from Edward Jones on February 28, 2002, after having complained to Rarick about the discriminatory harassment she was subjected to by her supervisor, Mahoney, Investment Representative. Mahoney's continuous discriminatory treatment, which began as a pattern of sexual harassment continued through multiple acts of retaliation (as described below) for Plaintiff's complaints about his behavior leading to her termination on February 28, 2002.

Beginning in or about July 2001 and continuing through in or about November 2001, Mahoney discussed his personal life regarding his sexual preferences. Plaintiff informed him that she was uncomfortable with him engaging in discussions regarding sexuality in a professional setting. (Miller dep. P. 98, L. 1-5; P. 194, L. 1-12). Mahoney often made lewd gestures in the office, including but not limited to simulating masturbation while he was on the telephone and

---

[1] Plaintiff incorporates by reference her Local Rule 56 Statement as supportive of her factual allegations.

3

frequently using the word "fuck." (Miller Dep. P. 145, L. 16-18; P. 206, L. 1-20; P. 208, L. 21-24; P. 209, L. 1-3). Mahoney aggressively harassed Plaintiff regarding her sexual orientation. This harassment included, among other things, ongoing references and questions concerning her sexuality and her boyfriend (Miller Dep. P. 73; P. 74, L. 1-9; P. 186, L. 20-24; P. 191, P. 193, L. 2-19; P. 300, L. 5-8 and 19-25; P. 304, L. 23-25, P. 305, L. 22-25), questions about the sexuality of Plaintiff's young sons (Miller Dep. P. 124, L. 14-24, P. 125, L. 1-9; P. 197, L. 5-6, P. 210, L. 4-7), and comments and questions regarding her personal relationship with her boyfriend, such as "he's got a body like an Adonis," (Miller Dep. P. 74, L. 4-12) that he could please him better sexually than Plaintiff (Miller Dep. 187, L. 4-12), and comments on her body, stating she had a "nice rack." (Miller Dep. P. 199, L. 12-21). Although Plaintiff informed him that she believed his conversation to be unprofessional, he continued to persist in his speculation regarding Plaintiff's sons and pursuing a relationship with her former boyfriend. Plaintiff was made uncomfortable by his harassing conduct and felt he was intruding on her privacy. As a result of Mahoney's unprofessional and inappropriate conduct, Plaintiff was often reduced to tears. Although Rarick was aware of Mahoney's hostility toward Plaintiff, through her previous complaints to Edward Jones, he refused to effectively deal with the situation. Mahoney frequently commented that Plaintiff would make a good lesbian and that she should frequent the "lipstick lesbian" bars in New York. Additionally, Mahoney frequently suggested Plaintiff take their lesbian clients out to dinner in order to attract them and garner more business. (Miller Dep. P. 186, L. 1-19; P. 187, L. 22-24; P. 188-P. 191; P. 193, L. 2-19; P. 209, L. 17-22; P. 300, L. 5-8 and 19-25; P. 304, L. 23-25; P. 305, L. 22-25). Plaintiff was humiliated by Mahoney's harassing conduct.

Beginning in or about July 2001 and continuing through in or about November 2001, Mahoney interfered with the performance of the duties of Plaintiff's position as he ordered her to

4

perform menial tasks outside the scope of the duties, which included making him coffee, traveling back and forth to pick up his lunch, water his plants, clean the office, attend to his personal business regarding his condominium association paperwork. Mahoney continuously insisted Plaintiff attend to his personal tasks, including typing letters and making voluminous copies at home for him, which remain unreimbursed, having her son perform graphic design work for him which also was not compensated. Mahoney continuously insisted Plaintiff attend to his personal tasks, often calling her at home and disturbing her in the evening and early morning. Mahoney also engaged in threatening behavior with Plaintiff, which often left her in fear that he might physically strike her. (Miller Dep. P. 124, L. 3-7; p. 225, L. 5-14; P. 246, L. 4-24; P. 247, L. 1-6; P. 352, L. 20-24; P. 354, P. 356, L. 21-25). Additionally, he blamed Plaintiff for problems not of her own making, including his failure to place trades for clients, and pressured Plaintiff to engage in improper activity, including cheating on the examinations required of her position, which she refused to do. Mahoney's actions were motivated by discrimination on the basis of Plaintiff's gender. Plaintiff was deeply humiliated and felt degraded by his unprofessional behavior.

In or about July 2001, Kristin Commander, ("Commander"), the assistant to Michael Cummins, the Regional Leader, came to the Stamford, Connecticut office to assist with Plaintiff's training, which was critical to the success and growth of her position. During this training, Mahoney treated Plaintiff in a condescending manner and aggressively interfered with her training and ordered Plaintiff to perform menial tasks outside the scope of the duties of her function, which included making him coffee, traveling back and forth to pick up his lunch, water his plants, clean the office, and attend to his personal business regarding his condominium paperwork. Mahoney's actions were motivated by discrimination on the basis of Plaintiff's gender. Plaintiff was deeply humiliated and felt degraded by his unprofessional behavior.

5

In or about August 2001, Plaintiff contacted Commander, regarding Mahoney's unprofessional and harassing conduct. She informed Plaintiff that he was on probation and that she would inform Cummins of Mahoney's conduct.

In or about August 2001, shortly after Plaintiff's conversation with Commander, Mahoney angrily confronted Plaintiff and stated, "If you have a problem with me, why didn't you just come to me." Plaintiff informed him that she found it difficult to communicate with him because of his unprofessional attitude and mood swings. Additionally, his threatening conduct toward her, and Plaintiff's fear of retribution in the close confines of their office made her reluctant to approach him directly.

In or about August 2001, as part of the functions of Plaintiff's position, she was expected to foster business relationships between Mahoney and prospective clients. As a result, Plaintiff invited Mahoney to a social function hosted by her friend in order to introduce Mahoney to potential clients. During the function, Mahoney expressed his attraction for Plaintiff's boyfriend and spent the entire evening flirting with him. Shortly after this function, Mahoney expressed his interest in her boyfriend and interrogated her daily concerning Plaintiff's boyfriend. Miller dep. P. 73; P. 74, L. 1-9; P. 186. L. 20-24; P. 187, L. 1-12; P. 196, L. 1-2; P. 209, L. 5-8). He did so even after he became aware that Plaintiff was no longer involved in a relationship with her boyfriend and the subject made Plaintiff uncomfortable and upset and she found it inappropriate and unprofessional, Mahoney ignored Plaintiff and suggested, "Every man is one drink away from being gay, and that he probably sucked better than I did anyway." (Miller Dep. P. 187, L. 5-12). Plaintiff was extremely uncomfortable as a result of his inappropriate conduct.

In or about September 2001, Plaintiff informed Mahoney that she would need to take personal days in observance of the Jewish holidays. Prior to this, although Plaintiff was scheduled

6

to work approximately 40 hour weeks, Mahoney continuously insisted that she work later than she was scheduled but consistently refused to compensate Plaintiff for her time because it would come out of his profit and loss statements. In spite of this, Plaintiff assured him that she would come in early and make up the time. Mahoney refused to accommodate Plaintiff (Miller Dep. P. 314, L. 22-25; P. 315, L. 1-6) and accused her of manufacturing the holidays while he mocked her faith, referring to Rosh Hoshanah as "rush a homa," (Miller Dep. P. 147, L. 2-5; P. 313, L. 1-22) while derogatorily commenting on Jewish names. (Miller Dep. P. 315, L. 7-25; P. 316, L. 1-26). As a result, Plaintiff was forced to observe these holidays in fear of retaliation from Mahoney. (Miller Dep. P. 230, L. 15-18, P. 315, L. 1-6).

On or about September 4, 2001, as a result of the hostile environment Plaintiff was subject to, she was forced to seek medical treatment. Plaintiff's physician prescribed medication to treat her intestinal problems, loss of hair, and depression which is attributed to the stressful conditions created by Mahoney and condoned by Edward Jones.

On or about September 14, 2001, while Plaintiff remained at home from work due to an illness, Mahoney constantly telephoned Plaintiff and continued to harass her and threaten her position. Although Plaintiff was ill, she went to work to appease him. Plaintiff was humiliated by Mahoney's threatening and unprofessional behavior which was motivated by discrimination on the basis of her gender.

On or about September 17, 2001, October 8, 2001, and October 31, 2001, Mahoney exhibited his contempt for Plaintiff by handling her personal property, including her purse. Although Plaintiff had asked him to refrain from touching her personal items, he continued to mock her. Mahoney's behavior was motivated by discrimination on the basis of Plaintiff's gender.

In or about October 2001, Plaintiff reported Mahoney's harassing conduct to Mosca, the Regional Leader. She advised Plaintiff to ignore Mahoney and continue doing her job. Plaintiff was deeply disappointed by Mosca's response and refusal to address Mahoney's harassing behavior.

On or about November 9, 2001, although Plaintiff felt ill, she went to work. When Plaintiff arrived, Mahoney informed her of a communication from an irate client. Although Mahoney's actions had resulted in the client's unhappiness, he attempted to transfer responsibility for the incident to Plaintiff. He screamed accusations at her, behaving in a threatening manner, and in Plaintiff's weakened condition, she was reduced to tears. In fear for her safety, Plaintiff was forced to leave the office immediately. (Miller Dep. P. 170, L. 17-20).

On or about November 9, 2001, shortly after the incident with Mahoney, Plaintiff contacted Rarick regarding Mahoney's harassment, lack of professionalism, false accusations, which has caused her severe emotional distress. Prior to this, although Commander, Cummins, Mosca, and Rarick were aware of Mahoney's hostility toward Plaintiff, they refused to effectively deal with the situation. (Miller Dep. P. 207-213; P. 274, L. 24-25; P. 275, L. 1-13; P. 207, L. 22-24; P. 208, L. 17-24; P. 209, L. 17-24; P. 210, L. 1-12; P. 211; P. 212, L. 1-8; P. 230, L. 12-18).

In or about November 2001, following Plaintiff's reporting of Mahoney's conduct to Rarick, he informed Plaintiff that she would be utilized "as needed" at other Edward Jones offices in the area when other employees were not available. Edward Jones refused to investigate Mahoney's conduct. Additionally, as a result of Mahoney's conduct, Plaintiff was not reassigned another position, and although Plaintiff continued to be paid until December 31, 2001, her position was terminated by Edward Jones on February 28, 2002.

In addition to the discriminatory treatment Plaintiff received because of her gender, she was also discriminated against on the basis of her religious beliefs and age. Throughout Plaintiff's employment, Mahoney made constant derogatory references to her religious beliefs and her age. He continuously questioned the validity of her Jewish holidays and refused to accommodate Plaintiff regarding her observance of her faith. (Miller Dep. P. 147, L. 2-5; P. 230, L. 15-18; P. 313, L. 1-22; P. 314, l. 22-25; P. 315). Additionally, he was verbally abusive and contemptuous toward Plaintiff regarding her age, frequently making references that she was "too old." (Miller Dep. P. 231, L. 18-24; p. 232, L. 1-16; P. 234, L. 5-24; P. 235-238).

Throughout Plaintiff's employment with Edward Jones, although she was devoted to her position and instrumental in implementing and executing the duties of her position with little or no support, she was subjected to a hostile environment, dominated by Mahoney's intolerant attitude toward women and verbal abuse, which was ignored and condoned by Edward Jones, and which was calculated to force Plaintiff's resignation. As a result of the treatment she has suffered from Mahoney and Edward Jones, Plaintiff has suffered extreme emotional and psychological distress due to the harassment she experienced from Mahoney, which was compounded by the failure of Cummins, Mosca, and Rarick to investigate the harassment against Plaintiff and effectively end it. Additionally, Plaintiff was treated differently on the basis of her religious beliefs and age. Further the decision to remove Plaintiff from her position which effectively terminated her employment constituted discrimination against her for her gender, her religious beliefs, and her age.

Plaintiff's psychologist Jeffrey S. Cohen, PhD, who conducted examinations of Plaintiff, confirms that Plaintiff suffers from emotional distress as a result of Edward Jones' hostile work environment. In his deposition, Dr. Cohen states, "Ms, Miller, when I talked with her about what happened or her employment at Edward Jones, she cries, she becomes very tense and fidgety, she

9

has repetitive, intrusive thoughts about what's happened to her. She's afraid to go back into the workplace in a financial center. Her self-esteem is extremely low. I would say it's the anxious arousal that she has, that she's very tense and worried, and these are signs of intrusive ideation similar to people that have PTSD [post traumatic stress disorder]." (Deposition of Jeffrey S. Cohen, PhD at 60-61).

### III.   Argument

####   A.   Legal Standard

In reviewing a motion for summary judgment, the "court must 'resolve all ambiguities and inferences…in the light most favorable to the party opposing the motion,' United States v. One Tintoretto Painting, 691 F.2d 603, 606 (2d Cir. 1982)(citations omitted), and may grant the motion only if "there is no genuine issue as to any material fact and…the moving party is entitled to judgment as a matter of law.' Fed.R.Civ.P.56(c)." Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986). See also Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir. 1991). Defendant, as the moving party, has the burden of demonstrating clearly the absence of any genuine issue of fact and showing its entitlement to a favorable determination under applicable principles of substantive law. See Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). On summary judgment, the court must not try issues of fact; rather it must only determine whether there are such issues to be tried. See Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 36-37 (2d Cir. 1994). "If, as to the issue on which summary judgment is sough, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Id.

"[I]n an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment." Kerzer v. Kingly

10

Manufacturing, 156 F.3d 396 (2d Cir. 1998). See also Distasio v. Perkin Elmer Corporation, 157 F.3d 55, 61 (2d Cir. 1993) ("Summary judgment should be used 'sparingly' when, as is often the case in sexual harassment claims, state of mind or intent are at issue."); Dobrich v. General Dynamics Corp., 40 Supp.2d 90, 94 (D.Conn. 1999) ("the Second Circuit has held that a district court should exercise particular caution when deciding whether summary judgment should issue in an employment discrimination case.").

    B.    Defendants' Motion for Summary Judgment on Plaintiff's Retaliation Claims Must be Denied

Defendant argues in his Memorandum of law and by reference to Defendant Edward Jones' Memorandum of Law that he is entitled to summary judgment on plaintiff's claim for retaliation under federal and state law on the basis that plaintiff cannot establish that her evidence on the elements of retaliation. In order to establish a *prima facie* case of retaliation, plaintiff must show: (1) participation in a protected activity that is known to defendant, (2) an employment decision or action disadvantaging plaintiff, and (3) a causal connection between the protected activity and the adverse decision. Richardson v. New York State Department of Correctional Service, 180 F.3d 426, 443 (2d Cir. 1999). A plaintiff suffers "adverse employment action" if she "endures a materially adverse change in the terms and conditions of employment."" Id. at 446 (quotations omitted). "Because there are no bright-line rules as to which employment actions meet the threshold for 'adverse' courts must make this determination on a case-by-case basis." Wilburn v. Fleet Financial Group, Inc., 170 F.Supp.2d 219, 237 (D.Conn. 2001)(citing Richardson at 446).

Defendant claims that Plaintiff's refusal to submit to Mahoney's discriminatory and harassing conduct and her complaints do not qualify as "protected activity," asserting that Mahoney's conduct was not unlawful harassment or discrimination and even if it was, Plaintiff passively submitted to it until she walked out. Although Defendant denies that any discrimination

11

or retaliation took place, its characterization of Plaintiff's termination of employment being attributed to her failure to return to work with the man who sexually harassed her is a reflection of its unwillingness to effectively remedy the discriminatory and hostile environment Plaintiff was forced to endure in the interest of business. Plaintiff provides a detailed account of incidents throughout her employment culminating with Mahoney's harassing conduct, Defendant's refusal to effectively address and cease the conduct despite Plaintiff's repeated appeals, and her subsequent termination that clearly illustrates a pattern of discrimination and retaliation.

The evidence in this case establishes that plaintiff suffered "adverse employment action" in retaliation for the complaints she made to Vasil, Commander, Cummins, Mosca, and Rarick about Mahoney's offensive and harassing conduct. As stated previously and as set forth in detail in Plaintiff's Statement of Facts, Cummins took no effective action in response to plaintiff's complaints and refused to acknowledge any responsibility, as characterized by Mosca's failure as regional leader to intervene, but instead her advice to plaintiff to go back to the office despite her clear distress over Mahoney's harassing conduct. Additionally, Mosca did not report the conduct or plaintiff's distress to Associate Relations as instructed in Edward Jones' nondiscrimination policy. These circumstances establish that plaintiff suffered "adverse employment action." See Richardson at 446 ("An employer subjects an employee to a materially adverse change in the terms and conditions of her employment if it "knew about but failed to take action to abate retaliatory harassment inflicted by co-workers."). In addition, the evidence shows that plaintiff suffered an adverse employment action in that she was constructively discharged. See Fitzgerald v. Henderson, 251 F.3d 345, 357 (2d Cir. 2001) (adverse employment actions include discharge from employment whether by actual termination of employment by the employer of "constructive

discharge"); Wilburn at 238, n.49 (constructive discharge qualifies as adverse employment action); Downing v. West Haven Board of Ed., 162 F.Supp.2d 19, 29 (D.Conn. 2001) (same).

As stated in Wilburn,

> [c]onstructive discharge of an employee occurs where an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit voluntarily. To find that an employee was constructively discharged, the trier of fact 'must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

Wilburn at 238 (emphasis in original). See also Colter v. Yale University, 2000 WL 559023, *3 (D.Conn., Mar. 24, 2000) ("The conditions are judged from the perspective of a reasonable person in plaintiff's position.") Evidence in support of a claim for constructive discharge must be viewed as a whole. See Chertkova v. Connecticut General Life Insurance Co., 92 F.3d 81, 90 (2d Cir. 1996), and, while certain factors standing alone may be legally insufficient to demonstrate a constructive discharge,

> the effect of a number of adverse actions in the workplace is cumulative. A constructive discharge occurs if a reasonable person subjected to the same conditions as plaintiff would have felt compelled to step down.

Id. (holding that "[b]ecause a reasonable person encounters life's circumstances cumulatively and not individually, it was error [for the district court] to treat the various conditions as separate and not individually, it was error [for the district court] to treat the various conditions as separate and distinct rather than additive" in reversing summary judgment.)

Over the course of her employment, Plaintiff displayed her dedication and loyalty to her position by attending to duties beyond the parameters of her position such as dealing with the cleaning of extensive trash in the office, attending to Mahoney's personal requests which were often time-consuming and involved no relation to her professional duties, while continuously being subjected to a hostile environment, which was apparent to others including Comander, Vasil, and

Karen Mugman ("Mugman"), who worked in the same office building. Although Edward Jones and Cummins assert that with the exception of the cleaning of the office, these personal duties imposed by Mahoney were within the parameters of her position as long as they did not interfere with her professional duties, the fact is Mahoney constantly interfered with Plaintiff's training and pressured Plaintiff to give priority to his personal chores ahead of becoming fully knowledgeable and trained in her position, often pressuring her to stay beyond her normal working hours without compensating her, as it would come out of his private income. To that end, he pressured her to be deceitful and obtain answers involved in her training from others, instead of spending the time to learn. Additionally, although Edward Jones facetiously comments that Plaintiff never complained regarding cleaning the office, the fact is Mahoney threatened her with the termination of her position if she failed to pick up the trash that he threw at her and clean the office, which often required heavy industrial cleaning due to Mahoney's slovenly manner. Mahoney's behavior to stem from contempt for her gender, which was confirmed by his unwarranted condescending and contemptuous behavior toward her, referring to her as a "lowlife" and her position as "menial," and often rifling through her private belongings, including her purse.

Plaintiff proved to be an invaluable employee who performed the duties of her position under the most difficult of conditions, repair relations and restore customer confidence. On November 9, 2001, after being faced with yet another incident involving an irate customer due to Mahoney's incompetence, which he blamed her for and violently berated her for, Plaintiff was reduced to tears and in fear for her physical safety, she left the office and contacted Rarick. Although Edward Jones refers to Plaintiff as "insubordinate" using her use of her cell phone to criticize her performance and undermine her, at no time was Plaintiff informed that there was a

problem with her performance, and the fact remains that Edward Jones asserts that Plaintiff was to return to work with Mahoney despite its vague allegations of her substandard performance. However, Plaintiff was understandably reluctant to place herself in the vulnerable position of returning to the two-person office consisting only of the man who had repeatedly discriminated against her and threatened her. As a result, Plaintiff was retaliated against and her position was ultimately terminated for complaining against Mahoney, initially by Edward Jones and Cummins' refusal and failure to address her complaints and insistence that she ignore him, and subsequently by reducing her position to an "as needed" basis, while leaving her with two months without pay.

This evidence at the very least creates an issue of material fact concerning whether plaintiff was constructively discharged and, thus, whether plaintiff suffered adverse employment action. See, e.g. Van Steenburgh v. Rival Company, 171 F.3d 1155, 1160 (8th Cir. 1999) (evidence was sufficient to establish constructive discharge where employer failed to remedy harassment despite repeated complaints indicating that plaintiff had a "lack of recourse against the harassment within [the company's] organization."); Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 574-75 (8th Cir. 1997 ("reasonable jury could find that the continuing harassment and management's indifference rendered [plaintiff's] working conditions intolerable and forced her to quit" even where management offered plaintiff other positions at exit interview because management "made no suggestion that [it] would investigate her complaints or try to ameliorate the situation or consider disciplinary action."). Plaintiff's options, to continue to work for Michael Mahoney in an increasingly hostile and retaliatory environment or to be constructively discharged constitute "adverse employment action," as set forth above.

15

Contrary to Edward Jones and Cummins' arguments, the evidence shows that Plaintiff engaged in protected activity and suffered adverse employment action. Therefore, Defendant is not entitled to summary judgment on plaintiff's retaliation claim.

### C. Defendants' Motion for Summary Judgment on Plaintiff's Aiding and Abetting Claim Must be Denied

In Plaintiff's Complaint, Plaintiff states a claim for violation of Conn. Gen. Stat. §46a-60(a)(5) against Defendant Cummins. Conn. Gen. Stat. §46a-60(a)(1) makes it unlawful for an employer, by himself or his agent, to discriminate against an individual in compensation or in the terms, conditions, or privileges of employment based on ...gender." Conn. Gen. Stat. §46a-60(a)(5) provides in relevant part, that it is a discriminatory practice "[for] any person...to aid, abet, incite, compel...the doing of any act declared to be a discriminatory employment practice..." Defendant Edward Jones asserts that Plaintiff fails to sufficiently allege this claim as a matter of law.

In a recent decision, following an exhaustive analysis, the Connecticut Supreme Court held that Section 46a-60(a)(1) does not impose liability on individual municipal employees. Perodeau v. Hartford, 259 Conn. 729, 744 (2002). Defendant asserts that as individual employees conduct can never constitute unlawful employment practice, Cummins cannot have aided or abetted anyone. This is an expansive reading of Perodeau that frustrates the intent of Section 46a-60(a)(5) and renders it void when viewed according to Defendant's interpretation. In her Complaint, Plaintiff provides a detailed account which clearly illustrates that the discrimination by Edward Jones by subjecting her to a hostile environment, its failure to address the sexually harassing conduct, and its retaliation against Plaintiff for her complaints regarding Defendant Mahoney's sexually harassing conduct which continued for at least for four months aided, abetted, and incited Defendant Mahoney's sexually harassing conduct. Additionally, as asserted by The Honorable

16

Alan Nevas, U.S.D.J. in Murphy v. Burgess & Norwalk Economic Opportunity Now, Inc., "[i]t would produce an illogical result if the statute were read to impose personal liability on supervisory employees who aid and abet harassment but allow supervisory employees who actually engage in the prohibited acts to escape liability." 1997 WL 529610 (D.Conn.) at p. 6 (citing Tomka v. Seiler Corp., 66 F.3d 1295 (2d Cir.1995) (holding that an employee who participates in the conduct giving rise to a discrimination claim may be personally liable under New York's virtually identical aiding and abetting section.) Defendant Cummins' egregious conduct and Plaintiff's opposition of it, sufficiently alleges facts that would support a cause of action for a violation of Conn. Gen. Stat. §46a-60(a)(5).

> D. Defendants' Motion for Summary Judgment on
> Plaintiff's Emotional Distress Claim Must be Denied
>
> > 1. "Extreme and Outrageous Conduct"
> >
> > > a. Intentional Infliction of Emotional Distress

In order to maintain an intentional infliction of emotional distress claim in Connecticut, Plaintiff must prove that defendant's actions were "extreme and outrageous." See Peyton v. Ellis, 200 Conn. 243, 253 (1986). In its analysis, the Peyton court notes: "The rule which seems to have emerged is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." (emphasis omitted). Peyton, supra, 254, n.5, quoting W. Prosser & W. Keeton, Torts (5th Ed.) Section 12, p. 60; see also DeLaurentis v. New Haven, 220 Conn. 225, 267 (1991). "Whether the defendant's conduct and the plaintiff's resulting distress are sufficient satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. Only where reasonable minds disagree does it become an issue for the jury." (internal quotations omitted). Appleton v. Board of Education of the Town of Stonington et al., 254 Conn. 205, 210

17

(2000). "There is no bright line rule to determine what constitutes extreme and outrageous conduct sufficient to maintain an action. The court looks to the specific facts and circumstances of each case in making its decision." (citations omitted; internal quotation marks omitted). Rosenberg v. Meriden Housing Authority, Superior Court, Judicial District of New Haven at New Haven, Docket No. 377376 (October 29, 1999).

"Mere insults, indignities, or annoyances that are not extreme or outrageous will not suffice... Such conduct may, however, give rise to a cause of action where the defendant is aware of the peculiar sensitivities of the plaintiff." Brown v. Ellis, 40 Conn.Supp. 165, 167. "The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know." (Internal quotation marks omitted.) Id. The requirement of outrageous conduct may arise where there is an "abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." Mellaly v. Eastman Kodak Company, 42 Conn.Sup. 17, 20 (1991, Berdon, J) quoting 1 Restatement (Second) of Torts Section 46, comment (d); Champion v. Lipscomb, supra 8 CSCR 562. Additionally, "alleged retaliatory conduct is that type of extreme and outrageous conduct, which, together with the other elements of the tort, constitutes intentional infliction of emotional distress." (internal quotation marks omitted). Talit v. Peterson, 44 Conn.Supp. 490, 498.

In the case at bar, Plaintiff alleges a series of incidents which, taken as a whole, amount to extreme and outrageous conduct by Cummins. As communicated by Plaintiff in her correspondence to Rarick on November 9, 2001, Plaintiff had suffered harassment at the hands of

18

Mahoney since the inception of her position on July 11, 2001. Plaintiff worked in the close confines of an office with Mahoney, where she was subjected to his speculation regarding her sexual orientation, derogatory references to her age, religion, and gender. Plaintiff complained repeatedly to regional leaders in the past, which included Cummins and Mosca. Pursuant to the "nondiscrimination" policy and "sexual harassment" policy, as regional leaders, these individuals are "specifically responsible for reporting to the Associate Relations Department any information/issue on the topic of harassment or discrimination, regardless of its source."

After months of enduring the hostile environment she was subjected to which went virtually ignored by Defendants, in fear for her safety, Plaintiff finally pleaded with Rarick via correspondence and telephone to address Mahoney's sexually harassing conduct.[2] Additionally, counsel for Plaintiff forwarded Defendants correspondence detailing Plaintiff position and informed of her fear to return to such a hostile environment with the continued presence of Mahoney. Despite the severity of the incidents detailed in her complaint and the fact Cummins acknowledges that Mahoney engaged in offensive behavior which Rarick assured Plaintiff would lead to the termination of Mahoney's employment, Edward Jones and Cummins refused to terminate Mahoney's position and in fact insisted that Plaintiff return to work with him in the close confines of his office instead of transferring her to another office as she repeatedly requested after placing her on a "as needed" basis for complaining about Mahoney, which forced her to remain unpaid for two months. In essence, Plaintiff would return to working under Mahoney, the man who had sexually harassed her and had confronted Plaintiff in a threatening manner when she had initially reported his conduct to Commander.

---

[2] Defendants draw attention to and appear to mock the fact Plaintiff transmitted by facsimile correspondence to Rarick on November 9, 2001 twice. However, Plaintiff sent the document a second time when Rarick failed to respond after she had initially sent it, which he assured her he would, which prompted her to believe that either he was ignoring her complaint, which was consistent with Defendants' behavior in the past, or that he had not received it.

19

Plaintiff provides a detailed account of incidents throughout her employment including Cummins' refusal and failure to effectively address Mahoney's harassing conduct for months, in fact encouraging it by forcing Plaintiff to work in close contact with him, refusing to address her complaints by reporting them to someone who could effectively deal with it as outlined in company policy, retaliating against Plaintiff after her complaints, and culminating with her subsequent termination that clearly illustrates that the behavior of Cummins was indeed extreme and outrageous in order to support claims for intentional and negligent infliction of emotional distress. See also Lapadula v. City of Middletown, 1994 WL 450329, *2 (Conn.Super., Aug. 16, 1994, Gaffney, J.) (In an emotional distress case where "the inferences which the parties seek to have drawn with questions of motive, intent and subjective feelings and reactions," summary judgment is particularly Court finds that Mahoney, Cummins, Mosca, and Rarick were not acting within the scope of their employment, as Mahoney, Cummins, Mosca, and Rarick were upon Edward Jones' property and using Edward Jones in furtherance of their conduct, and Edward Jones knew it had the ability to control its employees Mahoney, Cummins, Mosca, and Rarick, Edward Jones was under a duty to prevent them from inappropriate) (quoting Connell v. Colwell, 214 Conn. 242, 251 (1990)).

The extreme and outrageous conduct that Cummins engaged in with respect to Plaintiff employment including his refusal and failure to effectively address Mahoney's harassing conduct for months, in fact encouraging it by forcing Plaintiff to work in close contact with him, refusing to address her complaints by reporting them to someone who could effectively deal with it as outlined in company policy, retaliating against Plaintiff for her complaints, and the subsequent termination of Plaintiff's employment, was truly outrageous. The requirement of outrageous conduct may arise where there is "an abuse by the actor of a position, or a relation with the other, which gives

## **CERTIFICATION**

I hereby certify that pursuant to section 5(b) of the Federal Rules of Civil Procedure, a copy of the foregoing was mailed on June 25, 2004, postage prepaid to:

Fred A. Ricks, Jr. Esq.
Harris Dowell Fisher & Harris, L.C.
15400 South Outer Forty – Suite 202
St. Louis, Missouri 63017-2063

Michael N. LaVelle, Esq.
Pullman & Comley, LLC
850 Mail Street, P.O. Box 7006
Bridgeport, CT 06601-7006

Peter E. Gillespie, Esq.
46 Riverside Avenue
Westport, CT 06880

_____
Lewis D. Brey