UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------X

MARIAN DEBORAH MILLER,

        Plaintiff,

    -against-

EDWARD D. JONES & CO., L.P.,
MICHAEL MAHONEY, MICHAEL
CUMMINS, BARBARA MOSCA, and
STEVEN RARICK,

        Defendants.

CIV NO.
3:03CV 0193 (MRK)

JUNE 25, 2004

------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S EDWARD D. JONES & CO., L.P., MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Rule 7(a) of the Local Rules of Civil Procedure, Plaintiff Marian Deborah Miller (hereinafter referred to as "Plaintiff" or "Miller") submits this Memorandum of Law in opposition to Defendants' Edward Jones & Co., L.P. ("Edward Jones") Motion for Summary Judgment in the above-captioned action, in that Plaintiff respectfully request that this Court rule that Defendant's motions for summary judgment be denied.

### I.    Introduction

Plaintiff brought this action against her former employer, Edward Jones, to seek redress for discrimination on the basis of sex and age in the terms, conditions, and privileges of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq* ("Title VII"), the Connecticut General Statutes Section 46a-51 *et seq*, as amended ("State of Connecticut Human Rights Law"), the ADEA, and for intentional infliction of emotional distress, negligent infliction of emotional distress, invasion of privacy, and negligent hiring, supervision, and retention under the law of torts of the State of Connecticut.

2

Defendant Edward Jones moves for summary judgment on plaintiff's federal and state law discrimination on the basis of sex, gender, religion, and age, and retaliation claims on the grounds that: 1) plaintiff admits she was not subjected to sex discrimination; 2) plaintiff was not subjected to sexual harassment; 3) alleged harassment did not result in a tangible employment action; 4) plaintiff unreasonably failed to make timely use of Edward Jones' discrimination and harassment complaint procedures; 5) Edward Jones acted promptly and reasonably to correct any unlawful harassment and prevent its recurrence; 6) plaintiff was not subjected to religious or age discrimination; 7) there was no adverse action taken against plaintiff; 8) plaintiff's aiding and abetting claim is insufficient as a matter of law; 9) Edward Jones did not intend to inflict emotional distress; 10) there was no egregious, outrageous, inconsiderate, humiliating, or embarrassing conduct in termination of plaintiff's employment; 11) no liability for invasion of privacy; and 12) Edward Jones did not negligently hire, supervise or retain individual defendants.[1]

As set forth fully below, Edward Jones is not entitled to summary judgment on plaintiff's claims. The evidence in this case, when viewed in a light most favorable to plaintiff as it must be on summary judgment, establishes or at the very least creates a material factual issue concerning whether plaintiff's employer subjected her to a hostile work environment on the basis of her sex, because plaintiff, as a heterosexual woman, was offended by Michael Mahoney's ("Mahoney") crude and vulgar behavior, including references to her as a "lipstick lesbian," (Miller Dep. P.186, L. 8-14; P.187, L.22-24; P. 188-P.190; P. 209, L. 17-22) repeated comments regarding his sexual interest in her boyfriend (Miller Dep. P. 73; P. 74, L. 1-9; P. 186, L. 20-24; P. 187, L. 1-12; P. 196, L. 24, P. 197, L. 1-2; P. 209, L. 5-8), pressure to frequent lesbian bars and hold herself out as a lesbian to attract potential clients (Miller Dep. P. 186, L. 1-19; P. 190, L. 10-24, P. 191, P. 193, 2-19; P. 300, L. 5-8 and 19-25; P. 304, L. 23-25, P. 305, L. 22-25), and speculation as to sexual

---

[1] The fact that Edward Jones disputes Plaintiff's claims on the basis of at least twelve different issues is clear evidence that there exist material issues of fact warranting dismissal of motion for summary judgment.

3

orientation of her young sons (Miller Dep. P. 124, L. 14-24, P. 125, L. 1-9; P. 197, L. 5-6; P. 210, L. 4-7). Defendant is, furthermore, not entitled to summary judgment on the issue of liability because, contrary to its argument, it failed to act reasonably in that, despite notice of the hostile and abusive work environment and the resulting severe emotional distress to plaintiff, management failed to correct or even investigate the harassment, contrary to defendant's stated sexual harassment policy, and instead ignored, tolerated or condoned the harassment, blaming and retaliating against plaintiff for the circumstances by sending her back to work in the hostile environment or face alternative of loss of her position.

As set forth below, summary judgment must be denied in this case.

## II.     Statement of Facts

Plaintiff as a Branch Office Administrator ("BOA") was employed at Edward Jones, in a two-person office with Michael Mahoney, since July 14, 2001. [2] Plaintiff was discriminated against in the terms and conditions of her employment on the basis of her gender, age, religion, and sexual orientation and subsequently terminated from Edward on February 28, 2002, after having complained about the discriminatory harassment she was subjected to by her supervisor, Mahoney, Investment Representative (Miller Dep. P. 207-213, P. 274, L. 24-25, P. 275, L. 1-13; P. 207, L. 22-24; P. 208. L. 17-24; P. 209, L. 17-24; P. 210, L. 1-12; P. 211; P. 212, L. 1-8; P. 230, L. 12-18)). Mahoney's continuous discriminatory treatment, which began as a pattern of sexual harassment continued through multiple acts of retaliation (as described below) for Plaintiff's complaints about his behavior leading to her termination on February 28, 2002.

Beginning in or about July 2001 and continuing through in or about November 2001, Mahoney discussed his personal life regarding his sexual preferences. Plaintiff informed him that she was uncomfortable with him engaging in discussions regarding sexuality in a professional setting (Miller Dep. P. 98, L. 1-5; P. 194, L. 1-12. Mahoney often made lewd gestures in the office,

including but not limited to simulating masturbation while he was on the telephone (Miller Dep. P. 89, L. 22-24) and frequently using the word "fuck." (Miller Dep. P. 145, L. 16-18, P. 206, L. 1-20; P. 208, L. 21-24; P. 209, L. 1-3). Mahoney aggressively harassed Plaintiff regarding her sexual orientation. This harassment included, among other things, ongoing references and questions concerning her sexuality, questions about the sexuality of Plaintiff's young sons, and comments and questions regarding her personal relationship with her boyfriend, such as "he's got a body like an Adonis," (See above and Miller Dep. P. 74, L. 6-8) that he could please him better sexually than Plaintiff Miller Dep., P. 187, L. 4-12), and comments on her body, stating she had a "nice rack." (Miller Dep., P. 199, L. 12-21). Although Plaintiff informed him that she believed his conversation to be unprofessional, he continued to persist in his speculation regarding Plaintiff's sons and pursuing a relationship with her former boyfriend. Plaintiff was made uncomfortable by his harassing conduct and felt he was intruding on her privacy. As a result of Mahoney's unprofessional and inappropriate conduct, Plaintiff was often reduced to tears. Although Cummins and Rarick were aware of Mahoney's hostility toward Plaintiff, through her previous complaints to Edward Jones (Miller Dep., P. 207-213, P. 274, L. 24-25, P. 275, L. 1-13; P. 207, L. 22-24; P. 208. L. 17-24; P. 209, L. 17-24; P. 210, L. 1-12; P. 211; P. 212, L. 1-8), they refused to effectively deal with the situation. Mahoney frequently commented that Plaintiff would make a good lesbian and that she should frequent the "lipstick lesbian" bars in New York. Additionally, Mahoney frequently suggested Plaintiff take their lesbian clients out to dinner in order to attract them and garner more business (Miller Dep. P.186, L. 1-19; P.187, L.22-24; P. 188-P.190; P. 191, P. 193, 2-19; P. 209, L. 17-22,; P. 300, L. 5-8 and 19-25; P. 304, L. 23-25, P. 305, L. 22-25). Plaintiff was humiliated by Mahoney's harassing conduct.

Beginning in or about July 2001 and continuing through in or about November 2001, Mahoney interfered with the performance of the duties of Plaintiff's position as he ordered her to

---

[2] Plaintiff incorporates by reference her Local Rule 56 Statement as supportive of her factual allegations.

perform menial tasks outside the scope of the duties, which included making him coffee, traveling back and forth to pick up his lunch, water his plants, clean the office, attend to his personal business regarding his condominium association paperwork.  Mahoney continuously insisted Plaintiff attend to his personal tasks, including typing letters and making voluminous copies at home for him, which remain unreimbursed, having her son perform graphic design work for him which also was not compensated.  Mahoney continuously insisted Plaintiff attend to his personal tasks, often calling her at home and disturbing her in the evening and early morning.  Mahoney also engaged in threatening behavior with Plaintiff, which often left her in fear that he might physically strike her. (Miller Dep. P. 124, L. 3-7; P. 225, L. 5-14; P. 246, L. 4-24; P. 247, L. 1-6; P. 352, L. 20-24; P. 354; P. 356, L. 21-25)  Additionally, he blamed Plaintiff for problems not of her own making, including his failure to place trades for clients, and pressured Plaintiff to engage in improper activity, including cheating on the examinations required of her position, which she refused to do. Mahoney's actions were motivated by discrimination on the basis of Plaintiff's gender.  Plaintiff was deeply humiliated and felt degraded by his unprofessional behavior.

In or about July 2001, Kristin Commander, ("Commander"), the assistant to Michael Cummins, the Regional Leader, came to the Stamford, Connecticut office to assist with Plaintiff's training, which was critical to the success and growth of her position.  During this training, Mahoney treated Plaintiff in a condescending manner and aggressively interfered with her training and ordered Plaintiff to perform menial tasks outside the scope of the duties of her function, which included making him coffee, traveling back and forth to pick up his lunch, water his plants, clean the office, and attend to his personal business regarding his condominium paperwork.  Mahoney's actions were motivated by discrimination on the basis of Plaintiff's gender.  Plaintiff was deeply humiliated and felt degraded by his unprofessional behavior.

6

In or about August 2001, Plaintiff contacted Commander, regarding Mahoney's unprofessional and harassing conduct. She informed Plaintiff that he was on probation and that she would inform Cummins of Mahoney's conduct.

In or about August 2001, shortly after Plaintiff's conversation with Commander, Mahoney angrily confronted Plaintiff and stated, "If you have a problem with me, why didn't you just come to me." (Miller Dep., P. 97, L. 21-23). Plaintiff informed him that she found it difficult to communicate with him because of his unprofessional attitude and mood swings. Additionally, his threatening conduct toward her, and Plaintiff's fear of retribution in the close confines of their office made her reluctant to approach him directly.

In or about August 2001, as part of the functions of Plaintiff's position, she was expected to foster business relationships between Mahoney and prospective clients. As a result, Plaintiff invited Mahoney to a social function hosted by her friend in order to introduce Mahoney to potential clients. During the function, Mahoney expressed his attraction for Plaintiff's boyfriend and spent the entire evening flirting with him. Shortly after this function, Mahoney expressed his interest in her boyfriend and interrogated her daily concerning Plaintiff's boyfriend (Miller Dep. P. 73; P. 74, L. 1-9; P. 186, L. 20-24; P. 187, L. 1-12; P. 196, L. 24, P. 197, L. 1-2; P. 209, L. 5-8). He did so even after he became aware that Plaintiff was no longer involved in a relationship with her boyfriend and the subject made Plaintiff uncomfortable and upset and she found it inappropriate and unprofessional, Mahoney ignored Plaintiff and suggested, "Every man is one drink away from being gay, and that he probably sucked better than I did anyway." (Miller Dep. P. 187, L. 5-12). Plaintiff was extremely uncomfortable as a result of his inappropriate conduct.

In or about September 2001, Plaintiff informed Mahoney that she would need to take personal days in observance of the Jewish holidays. Prior to this, although Plaintiff was scheduled to work approximately 40 hour weeks, Mahoney continuously insisted that she work later than she was scheduled but consistently refused to compensate Plaintiff for her time because it would come

7

out of his profit and loss statements. In spite of this, Plaintiff assured him that she would come in early and make up the time. Mahoney refused to accommodate Plaintiff (Miller Dep., P. 314, L. 22-25; P. 315, L. 1-6) and accused her of manufacturing the holidays while he mocked her faith, referring to Rosh Hoshanah as "rush a homa," (Miller Dep. P. 147, L. 2-5; P. 313, L. 1-22) while derogatorily commenting on Jewish names. (Miller Dep., P. 315, L. 7-25; P. 316, L. 1-26) As a result, Plaintiff was forced to observe these holidays in fear of retaliation from Mahoney (Miller Dep., P. 230, L. 15-18; P. 315, L. 1-6).

On or about September 4, 2001, as a result of the hostile environment Plaintiff was subject to, she was forced to seek medical treatment. Plaintiff's physician prescribed medication to treat her intestinal problems, loss of hair, and depression which is attributed to the stressful conditions created by Mahoney and condoned by Edward Jones.

On or about September 14, 2001, while Plaintiff remained at home from work due to an illness, Mahoney constantly telephoned Plaintiff and continued to harass her and threaten her position. Although Plaintiff was ill, she went to work to appease him. Plaintiff was humiliated by Mahoney's threatening and unprofessional behavior which was motivated by discrimination on the basis of her gender.

On or about September 17, 2001, October 8, 2001, and October 31, 2001, Mahoney exhibited his contempt for Plaintiff by handling her personal property, including her purse. Although Plaintiff had asked him to refrain from touching her personal items, he continued to mock her. Mahoney's behavior was motivated by discrimination on the basis of Plaintiff's gender.

In or about October 2001, Plaintiff reported Mahoney's harassing conduct to Mosca, the Regional Leader. She advised Plaintiff to ignore Mahoney and continue doing her job. Plaintiff was deeply disappointed by Mosca's response and refusal to address Mahoney's harassing behavior.

8

On or about November 9, 2001, although Plaintiff felt ill, she went to work. When Plaintiff arrived, Mahoney informed her of a communication from an irate client. Although Mahoney's actions had resulted in the client's unhappiness, he attempted to transfer responsibility for the incident to Plaintiff. He screamed accusations at her, behaving in a threatening manner, and in Plaintiff's weakened condition, she was reduced to tears. In fear for her safety, Plaintiff was forced to leave the office immediately.    (Miller Dep. P. 170, L. 17-20).

On or about November 9, 2001, shortly after the incident with Mahoney, Plaintiff contacted Rarick regarding Mahoney's harassment, lack of professionalism, false accusations, which has caused her severe emotional distress. Prior to this, although Commander, Cummins, Mosca, and Rarick were aware of Mahoney's hostility toward Plaintiff, they refused to effectively deal with the situation. (Miller Dep. P. 207-213; P. 274, L. 24-25, P. 275, L. 1-13; P. 207, L. 22-24; P. 208. L. 17-24; P. 209, L. 17-24; P. 210, L. 1-12; P. 211; P. 212, L. 1-8; P. 230, L. 12-18).

In or about November 2001, following Plaintiff's reporting of Mahoney's conduct to Rarick, he informed Plaintiff that she would be utilized "as needed" at other Edward Jones offices in the area when other employees were not available. Edward Jones refused to investigate Mahoney's conduct. Additionally, as a result of Mahoney's conduct, Plaintiff was not reassigned another position, and although Plaintiff continued to be paid until December 31, 2001, her position was terminated by Edward Jones on February 28, 2002.

In addition to the discriminatory treatment Plaintiff received because of her gender, she was also discriminated against on the basis of her religious beliefs and age. Throughout Plaintiff's employment, Mahoney made constant derogatory references to her religious beliefs and her age. He continuously questioned the validity of her Jewish holidays and refused to accommodate Plaintiff regarding her observance of her faith. (Miller Dep., P. 147, L. 2-5; P. 230, L. 15-18; P. 313, L. 1-22; P. 314, L. 22-25; P. 315) Additionally, he was verbally abusive and contemptuous

toward Plaintiff regarding her age, frequently making references that she was "too old." (Miller

Dep. P. 231, L. 18-24; P.232, L. 1-16; P. 234, L. 5-24; P. 235-238).

Throughout Plaintiff's employment with Edward Jones, although she was fiercely devoted

to her position and instrumental in implementing and executing the duties of her position with little

or no support, she was subjected to a hostile environment, dominated by Mahoney's intolerant

attitude toward women and verbal abuse, which was ignored and condoned by Edward Jones, and

which was calculated to force Plaintiff's resignation.  As a result of the treatment she has suffered

from Mahoney and Edward Jones, Plaintiff has suffered extreme emotional and psychological

distress due to the harassment she experienced from Mahoney, which was compounded by the

failure of Cummins, Mosca, and Rarick to investigate the harassment against Plaintiff and

effectively end it.  Additionally, Plaintiff was treated differently on the basis of her religious beliefs

and age.  Further the decision to remove Plaintiff from her position which effectively terminated her

employment constituted discrimination against her for her gender, her religious beliefs, and her age.

Plaintiff's psychologist Jeffrey S. Cohen, PhD, who conducted examinations of Plaintiff,

confirms that Plaintiff suffers from emotional distress as a result of Edward Jones' hostile work

environment.  In his deposition, Dr. Cohen states, "Ms, Miller, when I talked with her about what

happened or her employment at Edward Jones, she cries, she becomes very tense and fidgety, she

has repetitive, intrusive thoughts about what's happened to her.  She's afraid to go back into the

workplace in a financial center.  Her self-esteem is extremely low.  I would say it's the anxious

arousal that she has, that she's very tense and worried, and these are signs of intrusive ideation

similar to people that have PTSD [post traumatic stress disorder]." (Deposition of Jeffrey S. Cohen,

PhD, P.60-61).

## III.    Argument

### A.    Legal Standard

In reviewing a motion for summary judgment, the "court must 'resolve all ambiguities and inferences...in the light most favorable to the party opposing the motion,' United States v. One Tintoretto Painting, 691 F.2d 603, 606 (2d Cir. 1982)(citations omitted), and may grant the motion only if "there is no genuine issue as to any material fact and...the moving party is entitled to judgment as a matter of law.' Fed.R.Civ.P.56(c)." Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986). See also Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir. 1991). Defendant, as the moving party, has the burden of demonstrating clearly the absence of any genuine issue of fact and showing its entitlement to a favorable determination under applicable principles of substantive law. See Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). On summary judgment, the court must not try issues of fact; rather it must only determine whether there are such issues to be tried. See Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 36-37 (2d Cir. 1994). "If, as to the issue on which summary judgment is sough, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Id.

"[I]n an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment." Kerzer v. Kingly Manufacturing, 156 F.3d 396 (2d Cir. 1998). See also Distasio v. Perkin Elmer Corporation, 157 F.3d 55, 61 (2d Cir. 1993) ("Summary judgment should be used 'sparingly' when, as is often the case in sexual harassment claims, state of mind or intent are at issue."); Dobrich v. General Dynamics Corp., 40 Supp.2d 90, 94 (D.Conn. 1999) ("the Second Circuit has held that a district court should exercise particular caution when deciding whether summary judgment should issue in an employment discrimination case.").

### B.    Defendants' Motion for Summary Judgment on

### Plaintiff's Sexual Harassment Claims Must be Denied

Edward Jones argues that it is entitled to summary judgment on plaintiff's sexual harassment claims under federal and state law on the basis that plaintiff cannot establish that she was subjected to harassment on the basis of her sex.[3] Edward Jones asserts specifically the following:  1) plaintiff admits she was not subjected to sex discrimination; 2) plaintiff was not subjected to sexual harassment; 3) alleged harassment did not result in a tangible employment action; 4) plaintiff unreasonably failed to make timely use of Edward Jones' discrimination and harassment complaint procedures; and 5) Edward Jones acted promptly and reasonably to correct any unlawful harassment and prevent its recurrence.  Contrary to defendant's argument, the evidence presents, at the very least, a material factual issue concerning whether plaintiff's employer subjected her to a hostile and abusive working environment on the basis of sex.

Plaintiff's Complaint asserts Plaintiff was discriminated against on the basis of her sex (gender) (See Complaint, para. 8, 10, 15, 20, and 72).  However, despite Plaintiff's assertion that she was not exclusively discriminated against on the basis of her gender, and the fact that Plaintiff has no understanding of legal theories articulated, Defendant suggests that Plaintiff's admission in her complaint that Defendant discriminated against her on the basis of her sexual orientation, and subsequent descriptions of the actions taken by Defendants which lead her to this *legal* conclusion, form the basis for granting summary judgment on the Plaintiff's Title VII claim relating to discrimination on the basis of sex.  However, Plaintiff is not an attorney, and although she lacks knowledge and understanding of legal theories, in addition to stating in her deposition that while the treatment she received at Edward Jones was not exclusively because of her gender, she clearly recounted instances of harassment that constitute discrimination on the basis of sex.

---

[3]       "In defining the contours of an employer's duties under [Connecticut] state antidiscrimination statutes, [Connecticut courts] have looked for guidance to federal case law interpreting Title VII of the Civil Rights Act of 1964, the federal statutory counterpart to [C.G.S. §46a-60]."  Brittell v. Dep't of Correction, 247 Conn. 148, 164 (1998).

Q.    Are you saying that Mr. Mahoney's treatment of you while you were employed with Edward Jones was because of your gender?

A.    Not exclusively.

Q.    Are you saying that Mr. Mahoney did something that discriminated against you based on your gender, that you're female?

THE WITNESS:    I don't quite understand what he's saying to me.  Do you understand what he's saying to me.  Do you understand what he's saying?

MR. SPITZER:    Tell him that you don't understand.

A.    I don't understand.

(Deposition of Marian Deborah Miller at p. 298).

In Oncale v. Sundower Offshore Services, Incorporated, 523 U.S. 75 (1998), the United States Supreme Court while construing Title VII's prohibition against "discriminate[ion]...because of...sex" explicitly indicated that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." Id. at 80-81.  Defendant asserts that the fact that Mahoney was a homosexual precluded him from truly sexually harassing Plaintiff, however, his lewd behavior, gestures, simulations of masturbation, sexual comments to Plaintiff, including references to her breasts and comments of "lipstick lesbian," the sexuality of her sons, his sexual interest in her boyfriend, the constant profanity daily over the course of almost four months in a small office consisting of only Plaintiff and Mahoney, while perhaps not motivated by Mahoney's sexual desire for Plaintiff, still constitutes "severe and pervasive" harassing conduct that humiliated Plaintiff and unreasonably interfered with her work performance which is supportive of Plaintiff's claim of sexual harassment.  "[N]o case that we are aware of holds that the harasser must have been sexually interested in the victim in order for a claim of sexual harassment to be viable." See Doe v. City of Belleville, 119 F.3d at 586-88.  The harassment Plaintiff suffered, therefore, constitutes discrimination on the basis of sex.  At the very least a material factual issue exists concerning whether the harassment was "because of sex" or for some other reason, and summary

13

judgment must be denied.  See Kerzer v. Kingly Manufacturing, 156 F.3d 396, 402 (2d Cir. 1998);

Distasio v. Perkin Elmer Corporation, 157 F.3d 55, 61 (2d Cir. 1998).  See also Dortz v. City of

New York, 904 F.Supp. 127, 148 (S.D.N.Y. 1995) ("…the function of the court on a summary

judgment motion is to determine whether the proffered admissible evidence shows circumstances

that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.  It is not

the province of the summary judgment court itself to decide what inferences should be drawn.")

(Quoting Cronin v. Aetna Life Insurance Company, 46 F.3d 196, 204 (2d Cir. 1995); Chambers v.

TRM Copy Centers Corporation, 43 F.3d 29, 38 (2d Cir. 1994)).

Edward Jones also argues that it is entitled to summary judgment on plaintiff's

discrimination claims on the basis that the harassment was not sufficiently "severe or pervasive" to

amount to an actionable hostile work environment, breaking down some, but not all of the

harassment into discrete incidents, which Defendant suggests are "not extremely serious" and

dismisses as "mere offensive utterance[s]."  See Def.Memo at 7-8.  Defendant asserts Plaintiff says

Mahoney made comments about lesbians only "perhaps four times, perhaps a dozen times," and

opines that the most offensive alleged remark is that some of the lesbian clients would like her and

she should take them out to dinner, which Edward Jones deems mitigated significantly because

Mahoney never actually asked her to have sexual relationship with any of his clients.  Although

Edward Jones acknowledges Plaintiff does raise more frequently occurring conduct in claiming that

Mahoney asked questions and made comments about her boyfriend "almost on a daily basis," and

discussed "homosexual activity" and homosexuality "on a daily basis," Edward Jones characterizes

this conversation as innocuous.  Edward Jones suggests that Plaintiff is discriminatory of Mahoney

on the basis of his sexual orientation and speculates "Plaintiff's religious views thus probably

prejudiced her against homosexuals" for failing to tolerate an environment dominated by Mahoney

harassing conduct, lewd gestures in the office, including but not limited to simulating masturbation

while he was on the telephone and frequently using the word "fuck."  Mahoney aggressively

14

harassed Plaintiff regarding her sexual orientation. This harassment included, among other things, ongoing references and questions concerning her sexuality, questions about the sexuality of Plaintiff's young sons (Miller Dep. P. 124, L. 14-24, P. 125, L. 1-9 P. 197, L. 5-6; P. 210, L. 4-7), and comments and questions regarding her personal relationship with her boyfriend, such as "he's got a body like an Adonis," that he could please him better sexually than Plaintiff (Miller Dep. P. 73; P. 74, L. 1-9; P. 186, L. 20-24; P. 187, L. 1-12; P. 196, L. 24, P. 197, L. 1-2; P. 209, L. 5-8;), and comments on her body, stating she had a "nice rack." (Miller Dep., P. 199, L. 12-21) Contrary to defendant's argument, the record evidence, when viewed as a whole, establishes that plaintiff was subjected to constant severe, threatening and humiliating conduct by Mahoney, including vulgar, offensive, hostile and abusive language and conduct, over the course of many months which interfered with plaintiff's ability to perform her job. Therefore, the harassment was sufficiently severe and pervasive, and summary judgment must be denied on this issue.

To establish a hostile work environment, "the plaintiff must show that his or her workplace was permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" Distasio v. Perkin Elmer Corporation, 157 F.3d 55, 62 (2d Cir. 1998) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 22 (1993)). "Whether an environment is 'hostile' or 'abusive' depends on the totality of circumstances." Id. (quoting Harris at 23). "Courts must consider a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it unreasonably interferes with an employee's work performance." Id. "These factors must be evaluated from both a subjective and an objective viewpoint." Id. (citing Harris at 21-22). See also Torres v. Pisano, 116 F.3d 625, 631-32 (2d Cir. 1997)("The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases…Whenever the harassment is of such a quality or quantity that a reasonable employee would find the conditions of her employment altered

15

for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment.").

There is voluminous evidence of harassing behavior in this case that at the very least creates a material factual dispute concerning whether plaintiff's work environment was hostile. As set forth in detail in plaintiff's Statement of Facts *supra*, plaintiff was subjected, over the course of many months, to, *inter alia*, a barrage of vulgarity, including comments about oral sex and plaintiff's own sex life, "Every man is one drink away from being gay, and that he probably sucked better than I did anyway." (Miller Dep. P. 187, L. 5-12) offensive behavior including Mahoney simulating masturbation, abusive language directed at plaintiff including repeated swearing and use of word "fuck." (Miller Dep. P. 145, L. 16-18, P. 206, L. 1-20; P. 208, L. 21-24; P. 209, L. 1-3). In addition to the overwhelming evidence supporting an objectively hostile environment, substantial evidence supports that plaintiff subjectively perceived the work environment as hostile. Plaintiff suffered anxiety attacks, bouts of crying, needed to take medication to treat her intestinal problems, loss of hair, and depression which is attributed to the stressful conditions created by hostile work environment. See Complaint at para. 19. "The effect on the employee's psychological well-being is, of course, relevant to determining whether plaintiff actually found the environment abusive." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).

Where, as here, the evidence shows that the harassment was constant, severe, threatening, humiliating and interfering with plaintiff's ability to perform her job, the issue of whether the harassment was sufficiently severe or pervasive to constitute actionable sexual harassment presents a question of fact that must be resolved at trial. See e.g., Torres at 632-33 (reasonable woman would find her work environment abusive when supervisor, *inter alia*, repeatedly made sexual comments and referred to her in derogatory terms).

Edward Jones asserts plaintiff unreasonably failed to make timely use of Edward Jones' discrimination and harassment complaint procedures and Edward Jones acted promptly and

reasonably to correct any unlawful harassment and prevent its recurrence.  An employer is subject to liability for a hostile work environment if it "failed to provide an adequate avenue for complaints" or "knew of the harassment, or in the exercise of reasonable care should have known, yet failed to take appropriate remedial action."  <u>Dobrick v. General Dynamics Corp.</u>, 106 f.Supp.2d 386, 392 (D.Conn. 2000).

Under Title VII, an employer need not have actual knowledge of the harassment; an employer is considered to have notice of sexual harassment if the employer – or any of its agents or supervisory employees – knew or should have known of the conduct.  The question of when an official's actual or constructive knowledge will be imputed to the employer is determined by agency principles.  Pursuant to the "nondiscrimination" policy and "sexual harassment" policy, as regional leaders, Cummins and Mosca are "specifically responsible for reporting to the Associate Relations Department any information/issue on the topic of harassment or discrimination, regardless of its source."  Plaintiff fulfilled the requirements of Edward Jones' "nondiscrimination" policy and "sexual harassment" policy.  Over the course of her employment, she complained directly to Mahoney, Vasil and Commander (who reported to Cummins), Mosca and Rarick of the continuous pattern of hostile and discriminatory treatment she experienced in the work environment.   (Miller Dep. P. 207-213, P. 274, L. 24-25, P. 275, L. 1-13; P. 207, L. 22-24; P. 208. L. 17-24; P. 209, L. 17-24; P. 210, L. 1-12; P. 211; P. 212, L. 1-8; P. 230, L. 12-18).

Despite Defendant's denials that Mahoney engaged in sexually harassing conduct, Plaintiff repeatedly complained of discriminatory treatment to Edward Jones.  As communicated by Plaintiff in her correspondence to Rarick on November 9, 2001, Plaintiff had suffered harassment at the hands of Mahoney since the inception of her position on July 11, 2001.  Plaintiff worked in the close confines of an office with Mahoney, where she was subjected to his speculation regarding her sexual orientation, derogatory references to her age, religion, and gender.  Defendants goes to great lengths to deny that Plaintiff reported Mahoney's harassing conduct from the beginning, insisting

17

that it was only aware of Mahoney's harassing conduct in November, 2001, and even then choosing to characterize it as a "conflict of personalities." However, in July and August 2001, Plaintiff complained about Mahoney's harassing conduct including his comments of a sexual nature such as referring to her as a "lipstick lesbian" to Commander, who was witness to Mahoney's behavior that she acknowledged was "demanding" and "condescending," which was motivated by discrimination on the basis of her gender. Comander assured Plaintiff that she would inform Michael Cummins, the Regional Leader of Mahoney's behavior and indicated that Mahoney was already on probation. However, as a result of Plaintiff reporting Mahoney's harassing conduct to Comander, Mahoney angrily confronted Plaintiff in a threatening manner, which exacerbated the situation and caused Plaintiff to fear for her personal safety as well as her position.

Plaintiff disclosed to Rarick that she had complained repeatedly to regional leaders in the past, which included Cummins and Mosca. Pursuant to the "nondiscrimination" policy and "sexual harassment" policy, as regional leaders, these individuals are "specifically responsible for reporting to the Associate Relations Department any information/issue on the topic of harassment or discrimination, regardless of its source." However, Cummins proved ineffective in dealing with the situation. Additionally, instead of reporting or investigating Mahoney, Mosca insisted that Plaintiff ignore Mahoney and do her job. Moreover, Lynn Vasil, who admitted that Plaintiff had complained to her regarding Mahoney, acknowledged that he was "too demanding" and "overstepped his boundaries" which was motivated by discrimination on the basis of her gender and blamed Plaintiff for allowing her supervisor, Mahoney to "overstep his boundaries." As a result, regardless of the concerns raised regarding Mahoney, Edward Jones continued refusal to acknowledge and address Mahoney's continuously sexually harassing behavior, led Plaintiff to believe that Edward Jones was ineffective at dealing with the situation and its "non-discrimination" policy and "sexual harassment" policy were ineffective.

18

Defendant asserts that Plaintiff specifically requested that her complaints to Lyn Vasil not be communicated, and chose not to contact Associate Relations when advised to do so by Vasil. DefMemo at p.16. Plaintiff testified in her deposition that she was terrified of losing her employment and feared retaliation from Mahoney. However, an employer has a duty to take action to correct a hostile work environment in some circumstances *even* when, unlike here, the victimized employee requests that her complaints be kept "confidential" and that no action be taken. See Torres v. Pisano, 116 F.3d 625, 635-38 (2d Cir. 1997) (noting that "[t]here is certainly a point at which harassment becomes so severe that a reasonable employer simply cannot stand by, even if requested to so by a terrified employee."). Plaintiff was reluctant to continue complaining to management because, when she did, it only made Mahoney, who was alone in the office with Plaintiff, more hostile and abusive toward Plaintiff. Where a plaintiff's failure to report specific instances of misconduct is "attributable to the conduct of the employer or its agent," the employer may be held liable for the hostile work environment under Title VII. Dobrich v. General Dynamics Corp., 106 F.Supp.2d 386, 392 (D.Conn.2000); Distasio v. Perkin Elmer Corporation, 157 F.3d 55, 64 (2d Cir. 1998).

Edward Jones attacks Plaintiff for forcing its hand in dealing with Mahoney by labeling her "insubordinate," in spite of the fact Defendant admitted that "it was inappropriate for Mr. Mahoney to have made any comments of a sexual nature." After months of tolerating the hostile environment she was subjected to which went virtually ignored by Defendant, in fear for her safety, Plaintiff finally pleaded with Rarick via correspondence and telephone to address Mahoney's sexually harassing conduct. Additionally, counsel for Plaintiff forwarded Defendant correspondence detailing Plaintiff's position and informed of her fear to return to such a hostile environment with the continued presence of Mahoney. Despite the severity of the incidents detailed in her complaint and the fact Defendant acknowledges that Mahoney engaged in offensive behavior which Rarick assured Plaintiff would lead to the termination of Mahoney's employment, Defendant refused to

19

terminate Mahoney's position and in fact insisted that Plaintiff return to work with him in the close

confines of his office instead of transferring her to another office as she repeatedly requested after

placing her on a "as needed" basis for complaining about Mahoney, which forced her to remain

unpaid for two months.  In essence, Plaintiff would return to working under Mahoney, the man who

had sexually harassed her and had confronted Plaintiff in a threatening manner when she had

initially reported his conduct to Comander.  See Watts v. New York City Police Department, 724

F.Supp. 99, 107-108 (S.D.N.Y. 1989) ("once an employer learns of claims of discriminatory acts, it

cannot rest idly on the hopes that such acts will not be repeated…Title VII simply does not permit

an employer to 'stand by and allow an employee to be subjected to a course of []harassment…by co-

workers.'").

　　　　Edward Jones failed to provide a viable policy to prevent harassment in the workplace.

Despite Plaintiff's repeated complaints about the pervasive discriminatory treatment she

experienced, Edward Jones refused to acknowledge and investigate the treatment until Complainant

was forced to leave the office.  The evidence in this case does not, in sum, support defendant's

claim that it is entitled to summary judgment on the basis that it acted reasonably.  See Dobrich v.

General Dynamics, 106 F.Supp.2d 386, 394 (D.Conn. 2000)("The promptness and adequacy of any

employer's response is generally a question of fact for the jury."); Dortz  at 153 (whether employer

"did or did not take prompt and effective remedial action…is a question properly left for trial.").


　　　　C.　　Defendants' Motion for Summary Judgment on
　　　　　　　Plaintiff's Religion and Age Claims Must be Denied

　　　　Defendant asserts that Plaintiff's religious and age discrimination claims fail for many of the

same reasons as her sexual harassment claims, as discussed above.  Defendant contends that the fact

Mahoney made derogative comments about Jews, Jewish names and holidays, attempted to call her

20

at home on Jewish holidays, and a made disparaging remarks about Plaintiff's age do not rise to the level of severe and pervasive religious or age-based harassment.

Throughout her employment, Mahoney continuously made derogatory references to her age, and mocking her religion and devotion to it.  In September and October 2001, Plaintiff took a few days of unpaid time from work to observe her religious holidays, as a devout Jew, which earned her the scorn and contempt of Mahoney, who refused to allow her to take any further religious holidays, and threatened to fire her if she observed them.  He derogatorily referred to the Jewish holiday Rosh Hoshana as "Rushahoma."   Moreover, while she was out of the office observing her religious holidays, Mahoney frequently called her at home which interfered with Plaintiff's observance of her religious holidays.  (Miller Dep., P. 321, L. 4-11).  Mahoney often made derogatory comments about Jews, making fun of their last names, mispronouncing the names and laughing.  (Miller Dep. P. 313, L. 1-22) Any time a Jewish client called, which was approximately once a day, for four months, Mahoney would comment derogatorily about the Jewish name of the client.  (Miller Dep.. P. 315-317.)

Additionally, Mahoney told Plaintiff that she was too old to work there.  He would comment that he was younger and faster than she was.  Mahoney commented that Plaintiff was getting old and slow and asserted, "I would make a better BOA than you are.  You're too slow. You're too old."  (Miller Dep. P. 231, L. 18-24; P.232, L. 1-16; P. 234, L. 5-24; P. 235-238).

Despite the fact, Edward Jones was aware that Mahoney had difficulty relating to staff in past, which resulted in at least one BOA leaving him, and as result was assigned a coach to assist him, Edward Jones refused to discipline and terminate Mahoney once it was aware of the extent of Mahoney's discriminatory and harassing conduct, putting Plaintiff on a part-time "as needed basis," or as Defendant claims, pressuring her to return to this discriminatory environment.  In fact, Edward Jones further discriminates against Plaintiff by making assumptions about her religion, concluding that "Plaintiff's religious views thus probably prejudiced her against homosexuals." Def.Memo,

21

footnote 32 at p.19.  Despite the fact Plaintiff found Mahoney to be unprofessional and

discriminatory on the basis of her gender, age, religion, and sexual orientation, and her complaints

to Defendants were ignored, she tolerated this abusive environment in her desire to achieve success

in her profession and provide for her family.

        D.       Defendants' Motion for Summary Judgment on
                   Plaintiff's Retaliation Claims Must be Denied

Defendant argues that it is entitled to summary judgment on plaintiff's claim for retaliation

under federal and state law on the basis that plaintiff cannot establish that her evidence on the

elements of retaliation is "fatally deficient."  In order to establish a *prima facie* case of retaliation,

plaintiff must show:  (1) participation in a protected activity that is known to defendant, (2) an

employment decision or action disadvantaging plaintiff, and (3) a causal connection between the

protected activity and the adverse decision.  Richardson v. New York State Department of

Correctional Service, 180 F.3d 426, 443 (2d Cir. 1999).  A plaintiff suffers "adverse employment

action" if she "endures a materially adverse change in the terms and conditions of employment.""

Id. at 446 (quotations omitted).  "Because there are no bright-line rules as to which employment

actions meet the threshold for 'adverse' courts must make this determination on a case-by-case

basis."  Wilburn v. Fleet Financial Group, Inc., 170 F.Supp.2d 219, 237 (D.Conn. 2001)(citing

Richardson at 446).

Defendant claims that Plaintiff's refusal to submit to Mahoney's discriminatory and

harassing conduct and her complaints do not qualify as "protected activity," asserting that

Mahoney's conduct was not unlawful harassment or discrimination and even if it was, Plaintiff

passively submitted to it until she walked out.  Obviously, Defendant's characterization of

Plaintiff's action as passive submission is entirely inaccurate.  Although Defendant denies that any

discrimination or retaliation took place, its characterization of Plaintiff's termination of

employment being attributed to her failure to return to work with the man who sexually harassed her is a reflection of its unwillingness to effectively remedy the discriminatory and hostile environment Plaintiff was forced to endure in the interest of business. Plaintiff provides a detailed account of incidents throughout her employment culminating with Mahoney's harassing conduct, Defendant's refusal to effectively address and cease the conduct despite Plaintiff's repeated appeals, and her subsequent termination that clearly illustrates a pattern of discrimination and retaliation.

The evidence in this case establishes, or at the very least establishes a question of fact, that plaintiff suffered "adverse employment action" in retaliation for the complaints she made to Vasil, Commander, Cummins, Mosca, and Rarick about Mahoney's offensive and harassing conduct. As stated previously and as set forth in detail above, Edward Jones took no action in response to plaintiff's complaints and refused to acknowledge any responsibility, as characterized by Mosca's failure as regional leader to intervene, but instead her advice to plaintiff to go back to the office despite her clear distress over Mahoney's harassing conduct. Additionally, Mosca did not report the conduct or plaintiff's distress to Associate Relations as instructed in Edward Jones' nondiscrimination policy. These circumstances establish that plaintiff suffered "adverse employment action." See Richardson at 446 ("An employer subjects an employee to a materially adverse change in the terms and conditions of her employment if it "knew about but failed to take action to abate retaliatory harassment inflicted by co-workers."). In addition, the evidence shows that plaintiff suffered an adverse employment action in that she was constructively discharged. See Fitzgerald v. Henderson, 251 F.3d 345, 357 (2d Cir. 2001) (adverse employment actions include discharge from employment whether by actual termination of employment by the employer of "constructive discharge"); Wilburn at 238, n.49 (constructive discharge qualifies as adverse employment action); Downing v. West Haven Board of Ed., 162 F.Supp.2d 19, 29 (D.Conn. 2001) (same).

As stated in Wilburn,

23

[c]onstructive discharge of an employee occurs where an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit voluntarily. To find that an employee was constructively discharged, the trier of fact 'must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

Wilburn at 238 (emphasis in original). See also Colter v. Yale University, 2000 WL 559023, *3 (D.Conn., Mar. 24, 2000) ("The conditions are judged from the perspective of a reasonable person in plaintiff's position.") Evidence in support of a claim for constructive discharge must be viewed as a whole. See Chertkova v. Connecticut General Life Insurance Co., 92 F.3d 81, 90 (2d Cir. 1996), and, while certain factors standing alone may be legally insufficient to demonstrate a constructive discharge,

the effect of a number of adverse actions in the workplace is cumulative. A constructive discharge occurs if a reasonable person subjected to the same conditions as plaintiff would have felt compelled to step down.

Id. (holding that "[b]ecause a reasonable person encounters life's circumstances cumulatively and not individually, it was error [for the district court] to treat the various conditions as separate and not individually, it was error [for the district court] to treat the various conditions as separate and distinct rather than additive" in reversing summary judgment.)

Over the course of her employment, Plaintiff displayed her dedication and loyalty to her position by attending to duties beyond the parameters of her position such as dealing with the cleaning of extensive trash in the office, attending to Mahoney's personal requests which were often time-consuming and involved no relation to her professional duties, while continuously being subjected to a hostile environment, which was apparent to others including Comander, Vasil, and Karen Mugman ("Mugman"), who worked in the same office building. Although Edward Jones asserts that with the exception of the cleaning of the office, these personal duties imposed by Mahoney were within the parameters of her position as long as they did not interfere with her professional duties, the fact is Mahoney constantly interfered with Plaintiff's training and pressured

24

Plaintiff to give priority to his personal chores ahead of becoming fully knowledgeable and trained in her position, often pressuring her to stay beyond her normal working hours without compensating her, as it would come out of his private income. To that end, he pressured her to be deceitful and obtain answers involved in her training from others, instead of spending the time to learn. Additionally, although Edward Jones facetiously comments that Plaintiff never complained regarding cleaning the office, the fact is Mahoney threatened her with the termination of her position if she failed to pick up the trash that he threw at her and clean the office, which often required heavy industrial cleaning due to Mahoney's slovenly manner. (Miller Dep. P. 125, L. 12-24; P. 126, L.1). Mahoney's behavior to stem from contempt for her gender, which was confirmed by his unwarranted condescending and contemptuous behavior toward her, referring to her as a "lowlife" and her position as "menial," and often handling her private belongings, including her purse.

Plaintiff proved to be an invaluable employee who performed the duties of her position under the most difficult of conditions, repair relations and restore customer confidence. On November 9, 2001, after being faced with yet another incident involving an irate customer due to Mahoney's incompetence, which he blamed her for and violently berated her for, Plaintiff was reduced to tears and in fear for her physical safety, she left the office and contacted Rarick. (Miller Dep. P. 170, L. 17-20). Although Edward Jones refers to Plaintiff as "insubordinate" using her use of her cell phone to criticize her performance and undermine her, at no time was Plaintiff informed that there was a problem with her performance, and the fact remains that Edward Jones asserts that Plaintiff was to return to work with Mahoney despite its vague allegations of her substandard performance. However, Plaintiff was understandably reluctant to place herself in the vulnerable position of returning to the two-person office consisting only of the man who had repeatedly discriminated against her and threatened her. As a result, Plaintiff was retaliated against and her position was ultimately terminated for complaining against Mahoney, initially by Edward

25

Jones' failure to address her complaints and insistence that she ignore him, and subsequently by reducing her position to an "as needed" basis, while leaving her with two months without pay.

This evidence at the very least creates an issue of material fact concerning whether plaintiff was constructively discharged and, thus, whether plaintiff suffered adverse employment action. See, e.g. Van Steenburgh v. Rival Company, 171 F.3d 1155, 1160 (8th Cir. 1999) (evidence was sufficient to establish constructive discharge where employer failed to remedy harassment despite repeated complaints indicating that plaintiff had a "lack of recourse against the harassment within [the company's] organization."); Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 574-75 (8th Cir. 1997 ("reasonable jury could find that the continuing harassment and management's indifference rendered [plaintiff's] working conditions intolerable and forced her to quit" even where management offered plaintiff other positions at exit interview because management "made no suggestion that [it] would investigate her complaints or try to ameliorate the situation or consider disciplinary action."). Plaintiff's options, to continue to work for Michael Mahoney in an increasingly hostile and retaliatory environment or to be constructively discharged constitute "adverse employment action," as set forth above.

Contrary to Edward Jones' arguments, the evidence shows that Plaintiff engaged in protected activity and suffered adverse employment action. Therefore, Defendant is not entitled to summary judgment on plaintiff's retaliation claim.

     E.     **Defendants' Motion for Summary Judgment on**
                **Plaintiff's Aiding and Abetting Claim Must be Denied**

In Count Seven of Plaintiff's Complaint, Plaintiff states a claim for violation of Conn. Gen. Stat. §46a-60(a)(5) against Defendant Edward Jones. Conn. Gen. Stat. §46a-60(a)(1) makes it unlawful for an employer, by himself or his agent, to discriminate against an individual in compensation or in the terms, conditions, or privileges of employment based on ...gender." Conn. Gen. Stat. §46a-60(a)(5) provides in relevant part, that it is a discriminatory practice "[for] any

26

person…to aid, abet, incite, compel…the doing of any act declared to be a discriminatory employment practice…" Defendant Edward Jones asserts that Plaintiff fails to sufficiently allege this claim as a matter of law.

In a recent decision, following an exhaustive analysis, the Connecticut Supreme Court held that Section 46a-60(a)(1) does not impose liability on individual municipal employees. Perodeau v. Hartford, 259 Conn. 729, 744 (2002). Defendant asserts that as individual employees conduct can never constitute unlawful employment practice, Edward Jones can not have aided or abetted anyone. This is an expansive reading of Perodeau that frustrates the intent of Section 46a-60(a)(5) and renders it void when viewed according to Defendant's interpretation. In her Complaint, Plaintiff provides a detailed account which clearly illustrates that the discrimination by Edward Jones by subjecting her to a hostile environment, its failure to address the sexually harassing conduct, and its retaliation against Plaintiff for her complaints regarding Defendant Mahoney's sexually harassing conduct which continued for at least for four months aided, abetted, and incited Defendant Mahoney's sexually harassing conduct. Additionally, as asserted by The Honorable Alan Nevas, U.S.D.J. in Murphy v. Burgess & Norwalk Economic Opportunity Now, Inc., "[i]t would produce an illogical result if the statute were read to impose personal liability on supervisory employees who aid and abet harassment but allow supervisory employees who actually engage in the prohibited acts to escape liability." 1997 WL 529610 (D.Conn.) at p. 6 (citing Tomka v. Seiler Corp., 66 F.3d 1295 (2d Cir.1995) (holding that an employee who participates in the conduct giving rise to a discrimination claim may be personally liable under New York's virtually identical aiding and abetting section.) Defendant Edward Jones's egregious conduct and Plaintiff's opposition of it, sufficiently alleges facts that would support a cause of action for a violation of Conn. Gen. Stat. §46a-60(a)(5).

F.    Defendants' Motion for Summary Judgment on

27

Plaintiff's Emotional Distress Claims Must be Denied

1.    "Extreme and Outrageous Conduct"

a.   Intentional Infliction of Emotional Distress

In order to maintain an intentional infliction of emotional distress claim in Connecticut,

Plaintiff must prove that defendant's actions were "extreme and outrageous." See Peyton v. Ellis,

200 Conn. 243, 253 (1986). In its analysis, the Peyton court notes: "The rule which seems to have

emerged is that there is liability for conduct exceeding all bounds usually tolerated by decent

society, of a nature which is especially calculated to cause, and does cause, mental distress of a very

serious kind." (emphasis omitted). Peyton, supra, 254, n.5, quoting W. Prosser & W. Keeton, Torts

(5th Ed.) Section 12, p. 60; see also DeLaurentis v. New Haven, 220 Conn. 225, 267 (1991).

"Whether the defendant's conduct and the plaintiff's resulting distress are sufficient satisfy the

requirement that it be extreme and outrageous is initially a question for the court to determine.

Only where reasonable minds disagree does it become an issue for the jury." (internal quotations

omitted). Appleton v. Board of Education of the Town of Stonington et al., 254 Conn. 205, 210

(2000). "There is no bright line rule to determine what constitutes extreme and outrageous conduct

sufficient to maintain an action. The court looks to the specific facts and circumstances of each

case in making its decision." (citations omitted; internal quotation marks omitted). Rosenberg v.

Meriden Housing Authority, Superior Court, Judicial District of New Haven at New Haven, Docket

No. 377376 (October 29, 1999).

"Mere insults, indignities, or annoyances that are not extreme or outrageous will not

suffice... Such conduct may, however, give rise to a cause of action where the defendant is aware

of the peculiar sensitivities of the plaintiff." Brown v. Ellis, 40 Conn.Supp. 165, 167. "The

extreme and outrageous character of the conduct may arise from the actor's knowledge that the

other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition

or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor

28