UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARIAN DEBORAH MILLER,

    Plaintiff,

vs.

EDWARD D. JONES & CO., L.P.,
MICHAEL MAHONEY, MICHAEL
CUMMINS, BARBARA MOSCA, and
STEVEN RARICK,

    Defendants.

CIV NO.
3:03CV 0193 (MRK)

July 16, 2004

**CONSOLIDATED REPLY TO PLAINTIFF'S OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT FILED BY DEFENDANTS EDWARD D. JONES & CO., L.P., MICHAEL CUMMINS, BARBARA MOSCA, AND STEVEN RARICK**

I.   **Facts**

In her Local Rule 56(a)2 Statement, Plaintiff admits most of the facts in Edward Jones' Local Rule 56(a)1 Statement without reservation.[1] She also admits many of the remaining facts, but adds some facts not contradictory to or inconsistent with them.[2] Several of Plaintiff's few denials are of clearly inconsequential background factual details,[3] or are not true denials, but merely addition of facts not contradictory to or inconsistent with the facts stated.[4] This leaves only four of the 153 paragraphs of facts in Edward Jones' Local Rule 56(a)1 Statement as to which denials in Plaintiff's Local Rule 56(a)2 Statement raise issues requiring any discussion.[5]

**ORAL ARGUMENT REQUESTED**

---

[1] Jones Stmt. ¶¶ 1-4, 6, 7, 9, 12-16, 19-27, 30, 33-44, 47-81, 83-89, 92-135, 137-151.
[2] Jones Stmt. ¶¶ 17, 18, 28, 29, 45, 46, 82, 90, 136, 152, 153.
[3] Jones Stmt. ¶¶ 8, 10, 11.
[4] Jones Stmt. ¶¶ 18, 28, 29.
[5] Jones Stmt. ¶¶ 5, 31, 32, 91. Paragraph 5 is addressed in the reply on negligent hiring and retention. Paragraph 31 and 32 merely challenge the interpretation of the undisputed evidence, as discussed in II.A.1. Paragraph 91 is addressed in the Clarification of Local Rule 56(A)1 Statements.

Moreover, significant portions of the "Statement of Facts" section of Plaintiff's Oppositions consist of legal conclusions[6] and/or statements drawn directly from Plaintiff's Complaint without citation of any evidence.[7] Such assertions must be ignored for summary judgment. Plaintiff cannot "rest upon the mere allegations" of her complaint, but "must set forth specific facts" that would be admissible in evidence. Fed. R. Civ. P. 56(e).

Further, Plaintiff significantly exaggerates and distorts the record evidence. For example, she uses terms such as "continuously," "often," "constant," and "frequently," where the evidence reflects only a few isolated instances.[8] A repeated distortion of the evidence is Plaintiff's claim that Mahoney often simulated masturbation while on the telephone, referenced at least three times in Plaintiff's Opposition (Pltf. Opp. at 5, 14, and 16). The record evidence cited (Miller Depo. P.89 L.22-24) says no such thing, but merely refers generically to Mahoney making "lewd gestures" towards Edward Jones while waiting to speak with its St. Louis home office by telephone. Another significant distortion is Plaintiff's statement that after Cummins spoke to Mahoney about getting along with Plaintiff, "Mahoney *angrily* confronted" her (Pltf. Opp. at 7, ¶ 2; 18, ¶ 1). The record evidence cited (Miller Depo. P.97 L.21-23) is silent on the emotional tone of the conversation, which in substance is neutral and not inherently angry or threatening, simply requesting Plaintiff to be open with Mahoney about her concerns. The cited evidence also does not support the facts in the next two sentences of her Opposition – that she told Mahoney "she found it difficult to communicate with him because of his unprofessional

---

[6] See, e.g., Pltf. Opp. at 4, ¶ 3; Pltf. Opp. at 9, ¶ 4, sentence 1; Pltf. Opp. at 10, ¶ 2. All references to "Pltf. Opp." are to Plaintiff's Memorandum Of Law In Opposition To Edward Jones' Motion For Summary Judgment; all paragraph numbers refer to paragraphs appearing on the cited page, whether or not they begin on that page. Most of the referenced Pltf. Opp. passages are repeated verbatim in Plaintiff's Oppositions to the other Defendants' motions, and citations to such repetitious statements are omitted here.

[7] See, e.g., Pltf. Opp. at 6, ¶ 2 (*compare* Complaint ¶ 10); Pltf. Opp. at 7, ¶ 1(*compare* Complaint ¶ 12); Pltf. Opp. at 7, sentences 2 and 3 (*compare* Complaint ¶ 13); Pltf. Opp. at 7, ¶ 3, last sentence (*compare* Complaint ¶ 14); Pltf. Opp. at 8, ¶¶ 2-5 (*compare* Complaint ¶¶ 19-21, 24); Pltf. Opp. at 9, ¶ 3 (*compare* Complaint ¶ 31); Pltf. Opp. at 9, ¶ 4, sentences 2-4 (*compare* Complaint ¶32); Pltf. Opp. at 10, ¶ 2 (*compare* Complaint ¶ 33).

[8] See, e.g., Pltf. Opp. at 6, ¶ 1 (statement she was **often** left in fear he might physically strike her supported by record evidence of **only one incident** described as causing such fear -- the confrontation with Mahoney on the last day she worked;); Pltf. Opp. at 9, ¶ 4, sentences 2-4 (*compare* Jones Stmt. ¶¶ 43-47, referring to **two** age-related remarks and a few comments relating to Jewish holidays and to Jewish names, not to "religious **beliefs**").

2

attitude and mood swings," and that his threatening conduct, etc. made her reluctant to approach him directly – "facts" for which Plaintiff cites absolutely no evidence. Furthermore, Plaintiff admitted that in addition to having this conversation with Plaintiff, Mahoney responded to his conversation with Cummins by bringing Plaintiff flowers to apologize (Pltf. Resp. to Cummins Stmt. ¶ 12). These distortions are highly significant to evaluation of the severity and outrageousness of Mahoney's alleged conduct and Plaintiff's claimed fear of retaliation, as Plaintiff relies heavily on them.

The most significant distortion and exaggeration is that Plaintiff simply ignores the record as she constantly chants her mantra: that she frequently complained about a discriminatory work environment, and Defendants knew of such environment but callously failed to take any action to address it. *See, e.g.*, Pltf. Opp. at 4, ¶¶ 1, 3 (despite notice of hostile and abusive work environment and severe emotional distress to Plaintiff, management failed to correct or even investigate, but ignored, tolerated or condoned); at 5, ¶ 1 (Cummins and Rarick were aware of Mahoney's hostility, through her previous complaints, but refused to effectively deal with situation); at 7, ¶ 1 (Plaintiff contacted Commander regarding "unprofessional and harassing conduct"); at 8 ¶ 5 (Plaintiff reported harassing conduct to Mosca); at 9, ¶ 2 (Commander, Cummins, Mosca, and Rarick were aware of Mahoney's hostility, but refused to effectively deal with situation); at 10, ¶ 2 (Edward Jones ignored or condoned Mahoney's intolerant attitude toward women and verbal abuse; Cummins, Mosca and Rarick failed to investigate and effectively end harassment); at 17, ¶¶ 2-3 (over course of employment, Plaintiff complained directly to Mahoney, Vasil, Commander, Mosca, and Rarick of continuous pattern of hostile and discriminatory treatment; repeatedly complained of discriminatory treatment to Edward Jones); at 18, ¶¶1-2 (Plaintiff complained to Commander about harassing conduct, complained repeatedly to regional leaders, including Cummins and Mosca, but they proved ineffective and Edward Jones continued to refuse to acknowledge and address continuously sexually harassing behavior); at 20, ¶2 (despite repeated complaints about pervasive

3

discriminatory treatment, Edward Jones refused to acknowledge and investigate until Plaintiff was forced to leave office); at 23, ¶ 2 (Edward Jones took no action in response to her complaints and refused to knowledge any responsibility); at 27, ¶ 2 (failure to address sexually harassing conduct); at 29, ¶ 2 (Plaintiff complained to Commander about harassing conduct); at 30, ¶¶2-4 (Plaintiff complained repeatedly to regional leaders, including Cummins and Mosca, but they proved ineffective; Edward Jones continued to refuse to acknowledge and address continuously sexually harassing behavior; hostile environment virtually ignored by Defendants); at 31, ¶ 2 (numerous complaints); at 32, ¶ 1 (failure to effectively address harassing conduct for months; refusal to address complaints); at 36, ¶ 2 (same); at 39, ¶ 2 (aware of Mahoney's egregious and continuous conduct for over four months); 40, ¶1 (no action in response to her complaints and refusal to knowledge any responsibility).

These allegations of constant complaints of discriminatory harassment falling on deaf ears, repeated theme-and-variation style, might be impressive were they supported by the factual record, but they are not.

***Only two*** of the above-referenced statements in Plaintiff's Opposition refer to any supporting evidence (Pltf. Opp. at 5, ¶ 1; 17, ¶ 2). The evidence cited for these statements supports only: 1) Plaintiff's reporting of ***unspecified "problems"*** to various Edward Jones employees (Miler Depo. P.274, L.24-25, P.275, L.1-13); 2) more detailed complaints to Rarick only ***after she walked out*** November 12 (Miller Depo. P.207, L.22-24; P.208. L.17-24; P.209, L.17-24; P.210, L.1-12; P.211; P.212, L.1-8;); and 3) one complaint about not getting to take off two Jewish holidays (Miller Depo. P.230 L.12-18).

Plaintiff's reliance on so many conclusory statements unsupported by any evidence is understandable, since so much evidence belies the central "facts" upon which she relies. Examination of the record evidence discloses that Plaintiff has admitted that her complaints to ***Commander and Vasil*** prior to walking out (since Commander and Vasil are both just BOAs in another branch office, Plaintiff presumably seeks to impute knowledge of these comments to

4

their IR, Defendant Cummins) were focused on matters that could reasonably be viewed only as interpersonal friction or "personality conflict," as opposed to discriminatory harassment. Plaintiff admitted that: 1) she complained to Commander about Mahoney being "very demanding"; 2) Commander had no knowledge that a previous employee's conflicts with Mahoney involved conduct of sexual nature or inappropriate language; 3) Plaintiff never said anything to Commander about Mahoney "doing anything or saying anything that was inappropriate or a violation of Edward Jones policies"; 4) she never complained to Commander about Mahoney's language or demeanor; 5) she never said anything to Commander indicating Mahoney was making offensive statements referring to sex, religion, or age, using language of sexual nature, or making any inappropriate comments or statements; 6) she told Vasil vaguely that she found Mahoney "to be a bit odd"; 7) she told Vasil Mahoney sent her out to get breakfast and lunch, had her make his coffee and do personal work for him; 8) she mentioned to both Vasil and Commander that Mahoney pranced around the room in her coat and scarf, mildly describing it only as "odd behavior"; 9) she had vaguely told another BOA Mahoney was "very difficult"; and 10) she told Vasil and Commander Mahoney had asked her whether either of her sons were gay (Pltf. responses to Jones Stmt.¶¶ 61-66, 68, 73, 75, 77).

Similarly, Plaintiff admitted her complaints to **Cummins** were merely that things were "difficult" and that Mahoney: 1) asked her to do things not part of her job description; 2) was very "demanding" and "condescending"; 3) made her work overtime; 4) asked her "for a number of personal favors"; 5) made a couple of unspecified wisecracks; 6) caused her to feel she was not in a "professional atmosphere"; and 7) was "not behaving himself" (Pltf. responses to Cummins Stmt. ¶¶ 11, 13, 14).

Plaintiff also admitted she only complained to **Mosca** on two occasions, telling Mosca only that: 1) Mahoney "badger[ed]" her, called her unspecified names, and blamed her for a situation that had upset a client; 2) she was having a "lot of trouble" with Mahoney; and 3) Mahoney was "very difficult to work for" (referring to him raising his voice and being "abrasive")

5

(Pltf responses to Mosca Stmt. ¶¶ 8-10). Plaintiff admitted that in talking to Mosca she never referred to sexual discrimination or other discrimination issues (Pltf responses to Mosca Stmt. ¶ 13).

Plaintiff has also admitted facts establishing that Edward Jones employees did not passively ignore her complaints, vague as they were, but attempted to help her -- in a manner commensurate with the nature of her complaints. She admitted that: 1) Vasil encouraged her not to let Mahoney get the better of her, not to take her work home with her, and not to do extra work for him; 2) Vasil told her she was not supposed to be getting Mahoney's breakfast and lunch, cleaning the office, making his coffee and doing personal work for him; 3) Vasil offered to discuss Plaintiff's complaints with Cummins (but Plaintiff asked Vasil not to); 4) Commander reassured Plaintiff that if anyone would get fired it would be Mahoney, not her; 5) Vasil and Commander told her to contact the Associate Relations Department in St. Louis, as required under Edward Jones' policy for reporting harassment and discrimination complaints (but Plaintiff chose not to do so); 6) when Plaintiff finally called Associate Relations, John Sullivan (a "very nice guy") encouraged her to fax a letter to Rarick immediately; and 7) Rarick promptly and extensively investigated, culminating in a warning to Mahoney (Pltf. responses to Jones Stmt. ¶¶ 67, 68, 70, 71, 78, 79, 81, 83, 84-135).

Plaintiff has also admitted a number of facts establishing that she repeatedly failed to take advantage of opportunities to obtain assistance from Edward Jones employees. She admitted: 1) Commander discussed with her the fact Mahoney was gay (but Plaintiff apparently did not respond that this fact and his related behavior was highly offensive to her and was causing her to suffer severe emotional distress); 2) on two occasions Commander observed Plaintiff getting lunch for Mahoney, but Plaintiff did not complain to Commander about this at the time; 3) Plaintiff told Commander Mahoney was "very demanding," but was very vague about the nature of his demands; 4) when Vasil offered to have Cummins talk to Mahoney, Plaintiff declined; 5) on a number of occasions, Vasil made comments to Plaintiff about Mahoney's

6

sexual preference (but again Plaintiff apparently did not bring up all the alleged harassment and emotional distress stemming from his sexual preference and related behavior); 6) when Vasil and Commander told Plaintiff to contact the Associate Relations Department in St. Louis, she chose not to do so; 7) when Plaintiff finally wrote a detailed letter to Rarick complaining about Mahoney's conduct, she made no reference to sex discrimination, sexual harassment, sexual orientation, religious discrimination, or age discrimination; 8) when Cummins specifically asked her how things were going, Plaintiff made some vague complaints, but never referred to sex discrimination, sexual harassment, sexual orientation, religious discrimination, or age discrimination; and 9) Plaintiff had occasional telephone contact with Mosca, but they merely exchanged pleasantries and Plaintiff never told Mosca about any problems with Mahoney. (Pltf responses to Jones Stmt. ¶¶ 53, 57, 61, 70, 72, 79, 90, Cummins Stmt. ¶¶ 12, 14, Mosca Stmt. ¶ 12).

Clearly, this review of the evidence establishes that, contrary to Plaintiff's repeated conclusory assertions, which she does not support with evidence, a reasonable jury could *only* conclude that: 1) Plaintiff did *not* make "repeated complaints about pervasive *discriminatory* treatment," or the like (as opposed to complaints about slightly unpleasant, but not discriminatory or unlawful treatment); 2) Plaintiff did *not* act reasonably to take advantage of numerous available opportunities to pursue relief from the alleged discriminatory harassment; 3) Plaintiff did *not* perceive her work environment as discriminatorily hostile or abusive, or Mahoney's conduct as extreme and outrageous (the only reasonable inference from the extent and nature of her communications with Edward Jones employees); and 4) Defendants did *not* callously ignore her complaints, such as they were, but responded reasonably under the circumstances. Additionally, most of the complaints upon which Plaintiff relies were made to Commander and Vasil, fellow BOA's with no supervisory authority, and Plaintiff never raised any allegations of unlawful conduct with Rarick until November, 2001, after she had walked out.

7

## II.  Argument

### A.  Sexual Harassment and Sex, Religious, and Age Discrimination Claims

#### 1.  Plaintiff admits she was not subjected to sex discrimination.

This argument was directed to allegations of conduct having no reference to gender, sexuality, or sexual orientation, other than Plaintiff's conclusory statements that the conduct was motivated by gender discrimination.  Exploration of these allegations led counsel to ask the straightforward question: "you've said Mr. Mahoney and/or Edward Jones discriminated against you based on your gender, on your sex, right?" (Miller Depo. P.298 L.20-23).  Plaintiff's equally straightforward negative response was clarified in a follow-up question to which she responded that her claim was of discrimination based on her sexual orientation (Miller Depo. P.298 L.25-P.299 L.1).  This admission was further confirmed in another follow-up question asked three times (reread by the reporter twice) asking whether she was not saying she was discriminated against based on her sex, but rather on her sexual orientation, to which she responded: "Mr. Mahoney discriminated against me for my sexual orientation" (Miller Depo. P.299 L.2-16).  Finally, in yet another follow-up question, Plaintiff confirmed that she was saying Mahoney discriminated against her because she was heterosexual and he was homosexual (Miller Depo. P.299 L.17-22).

Plaintiff now seeks to avoid the inescapable consequences of this admission not by presenting evidence of gender discrimination, but by arguing: 1) the admission should be disregarded because she "has no understanding of legal theories"; 2) she testified she was not *exclusively* discriminated against on the basis of her gender; 3) "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex"; and 4) "she clearly recounted instances of harassment that constitute discrimination on the basis of sex" (Pltf. Opp. at 12; Pltf. Response to Jones Stmt. ¶¶ 31, 32).

Plaintiff's first point must be rejected because the questioning did not involve sophisticated legal theories, but the most basic question asked of every discrimination

8

complainant: "what is the nature of the discrimination you claim you suffered?" Further, by the time her deposition is taken, a discrimination plaintiff should sufficiently understand the legal theories underlying her claim to respond intelligently to such questions. Finally, Plaintiff's statement that "I don't quite understand what he's saying to me" was immediately followed by a rephrasing of the question, to which she had no difficulty responding with a simple, unequivocal "No" (Miller Depo. P.299 L.20-24), a response repeatedly reconfirmed in layman's terms in clear follow-up questions, as discussed above.

Plaintiff's second point must be rejected because the cited testimony **preceded** the admission at issue. Under questioning, Plaintiff changed from the equivocal "not exclusively" with respect to gender discrimination, to the unequivocal admission that her claim was based on sexual orientation discrimination, not gender discrimination.

Plaintiff's third point must be rejected because, while an accurate statement of the law, it is of no assistance to Plaintiff here due to the complete lack of evidence of gender discrimination. In the cited case, Oncale v. Sundower Offshore Services. Inc., 523 US. 75 (1998), the Supreme Court said that "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Immediately following the language Plaintiff quoted from this case, the Court explained that absent evidence of sexual desire, discrimination could be established by harassment "in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace" or by "comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." There is no such evidence here, which is why Plaintiff's fourth point must also be rejected. There is absolutely no evidence Mahoney's alleged conduct such as insisting Plaintiff attend to his personal tasks, blaming Plaintiff for problems not of her own making, etc. was motivated by general hostility to women, and no evidence he treated men in the workplace differently. See also further discussion of "because of sex" at III.A.2.b., below. Plaintiff's

9

unsubstantiated claim in her response to Jones Stmt. ¶ 32 that these incidents were examples of gender discrimination is belied by the context of the cited testimony: these incidents were described in response to questions about how Mahoney discriminated against Plaintiff based on *sexual orientation*.

### 2. Plaintiff was not subjected to sexual harassment.

#### a) *Plaintiff was not subjected to a hostile work environment.*

Plaintiff's response to Edward Jones' argument on this point essentially reiterates the evidence discussed by Edward Jones, adding allegations that Mahoney simulated masturbation while on the telephone and frequently used the word "fuck" (Pltf. Opp. at 14, ¶ 2). As noted above, the "simulated masturbation" allegation is unsupported by the evidence. The word "fuck" may be offensive to some men and women, but despite its literal sexual meaning it is an everyday gender-neutral expletive in the vocabulary of many others.[9] Plaintiff has presented no evidence that this word was used in a discriminatory fashion, or with a crudely sexual meaning, rather than as a gender-neutral expletive.

Plaintiff disputes Edward Jones' characterization of Mahoney's alleged conduct as merely "isolated acts" and "offensive utterances" that are not extremely serious, and as conduct that would be "quite innocuous" and "routine chitchat" but for Mahoney's sexual orientation. However, she offers no reason it should not be so characterized. She criticizes Edward Jones for breaking down the alleged harassment into "discrete incidents," stating that a hostile environment should be evaluated based on "the totality of circumstances." Although courts have expressed this "totality" approach, it remains true that the whole is no greater than the sum of its parts, and therefore examination of "discrete incidents" is not inappropriate. Incidents not reflecting unlawful discrimination simply have no place in the "totality." This is particularly true in

---

[9] See *Wachner v. Aramark Educ. Serv., Inc.*, 2004 WL 1379566 (D.Or. 2004) (granting defendant's motion for summary judgment on sexual harassment, court says use of word "fuck" "had no obvious or even subtle connection to gender or sexual acts, but instead conveyed anger . . . [This] conduct may have been unpleasant and not conducive to a positive working environment [,but] . . . does not constitute sexual harassment").

a case such as this one where the plaintiff attempts to make the whole appear much greater than the sum of its parts by means of exaggeration and repetition. Plaintiff repeats adjectives such as "aggressively," "constant," "severe," "threatening"," "humiliating," "vulgar," "offensive," "hostile," "abusive," "voluminous," and "overwhelming," as if calling it so makes it so (Pltf. Opp. at 14-16).

Plaintiff concedes that proof of sexual harassment has a subjective component (Pltf. Opp. at 15, ¶2). However, her only reference to her subjective perception of the work environment fails to cite any admissible evidence, relying solely on the Complaint (Pltf. Opp. at 16, ¶2, citing Complaint¶ 19). Significantly, in her 56(a)2 Statement, she unequivocally admitted the evidence cited by Edward Jones as demonstrating that she actively participated in -- and initiated -- discussions of a sexual and personal nature with Mahoney, including crude particulars of her sex life (Pltf. Response to Jones Stmt., ¶¶124, 126).

### b) *Plaintiff does not claim that she was harassed because of her sex.*

Essentially, Plaintiff's argument on this point (Pltf. Opp. at 13, ¶ 2) is to ignore it and simply claim there is a material factual issue as to whether the harassment was "because of sex." Plaintiff correctly points out that sexual attraction or desire is not a necessary requirement to establish sexual harassment. However, she leaps from this directly to the conclusion that "the harassment Plaintiff suffered, therefore, constitutes discrimination on the basis of sex" (Pltf. Opp. at 13, ¶ 2), thus ignoring "[t]he critical issue [of] . . . whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Oncale*, 523 U.S. at 80 (1998). Ignoring Edward Jones' argument that the fact that alleged behavior touched on matters of sexuality does not establish it was a form of sex discrimination, particularly in the absence of issues of sexual attraction, Plaintiff simply reiterates those aspects of Mahoney's alleged conduct involving sexuality. Finally, Plaintiff does not address Edward Jones' argument that her admission that she claims discrimination based on sexual orientation rather than gender is contrary to the requirement that harassment involve

11

"disadvantageous terms or conditions . . . to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80.

### 3. The *Faragher/Ellerth* affirmative defense

#### a) *No tangible employment action*

Plaintiff admits she was not eligible for, and therefore not denied, any bonuses, promotions or pay increases (Plaintiff's response to Jones Stmt. ¶ 153). Plaintiff discusses constructive discharge (Pltf. Opp. at 23, ¶ 2- 26, ¶2), but nothing she says would bar the affirmative defense under the rule established by the Supreme Court in the decision it issued after Edward Jones filed its motion,[10] even if she could establish constructive discharge.

#### b) *Failure to make timely use of complaint procedures*

Without providing any reason not to apply the *Faragher/Ellerth* affirmative defense (applicable to **supervisory** harassment), Plaintiff tries an end run around this critical issue by applying the incorrect legal standard -- the **coworker** harassment "knew or should have known" standard (Pltf. Opp. at 17, ¶2). Plaintiff thus dodges her failure to follow the complaint procedures, contending that complaints to Mahoney, Vasil, Commander, and Mosca sufficed because they had a responsibility to report her complaints. Under the inapplicable "knew or should have known" standard, this might allow her to contend their knowledge of these complaints must be imputed to Edward Jones. However, under the applicable *Faragher/Ellerth* standard the focus is not on Edward Jones' knowledge, but on Plaintiff's conduct -- whether she unreasonably failed to take advantage of corrective opportunities. Her failure to comply with Edward Jones' procedures until she finally complained to Rarick establishes such unreasonable

---

[10] In *Pennsylvania State Police v. Suders*, 124 S.Ct. 2342 (2004), decided June 14, the Supreme Court held that a constructive discharge is not a tangible employment action that would preclude an employer from asserting the *Faragher/Ellerth* affirmative defense, unless "the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation." Plaintiff cites no such official action.

failure. Moreover, the content of the complaints to Mahoney, Vasil, Commander, and Mosca to which she refers is insufficient to establish liability under either standard.

Plaintiff apparently concedes she did not make timely use of the established complaint procedure, but contends this failure was not unreasonable because: 1) Edward Jones' "refusal to acknowledge and address Mahoney's continuously sexually harassing behavior" led her to believe Edward Jones and its policies were "ineffective" (Pltf. Opp. at 18, ¶ 2); and 2) she "was terrified of losing her employment and feared retaliation" (Pltf. Opp. at 19, ¶ 1). The Second Circuit applies a strict standard to such assertions. Normally failure to utilize a complaint procedure establishes the second element of the defense. Avoidance of this result requires "a *credible* fear that [a] complaint would not be taken seriously or that [the plaintiff] would suffer some adverse employment action as a result of filing a complaint."[11] "A credible fear" requires not just "the employee's subjective belief," but evidence "the employer has ignored or resisted similar complaints" or "taken adverse actions" in response to them.[12]

Plaintiff's evidence fails under this standard. She cannot say Edward Jones "ignored or resisted *similar* complaints," because her complaints were completely different. Her limited complaints did not involve sexual harassment or sexual orientation discrimination, but only lawful if unpleasant conditions created by a demanding supervisor. Plaintiff has no evidence of adverse action against any other employee in response to harassment or discrimination complaints. She says that in response to a complaint she made about him, "Mahoney angrily confronted Plaintiff in a threatening manner, which . . . caused Plaintiff to fear for her personal safety as well as her position" (Pltf. Opp. at 18, ¶ 1). But, as noted in section I above, the evidence Plaintiff cites does not indicate anything angry or threatening about this exchange. She says she testified "she was terrified of losing her employment and feared retaliation from

---

[11] *Caridad v. Metro-North Commuter Railroad*, 191 F.3d 283, 295 (2nd Cir. 1999) (emphasis added).
[12] *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246 (2nd Cir. 2001):

13

Mahoney," but citation to the record is curiously absent (Pltf. Opp. at 19, ¶ 1). Moreover, the record establishes several reasons fear of retaliation would have been extremely unreasonable. First, Plaintiff was aware of the nonretaliation provisions of the Edward Jones policies, but simply chose not to believe they meant what they said (Miller Depo. P.140 L.10 – P.141 L.9; P.142 L.17-P.143 L.11). Second, when Plaintiff expressed a concern about her job, Commander told Plaintiff: "You can't get fired. If anyone is going to get fired, it will be him" (Jones Stmt. 78, admitted by Plaintiff). In addition, Plaintiff was aware that another employee who had complained to Associate Relations had not been fired (Miller Depo. P.130 L.16 – P.131 L.1-24 – P.132 L.1-6).

Contrary to Plaintiff's assertion, Plaintiff simply had no credible fear that her complaint, if made, would not be taken seriously or would result in some adverse employment action. Plaintiff says she never reported her complaints to the Edward Jones' human resources department "because when you report to Human Relations to any place [any Employer], you lose your employment." (Miller Depo. P.130 L.4-22). Plaintiff said that at one of her prior employers, Smith Barney, if anyone made a complaint "they would just let you go." (Miller Depo. P.135 L.15-23). So, Miller explained that she did not complain to Edward Jones because she just assumed that if she complained she would be discharged. (Miller Depo. P.135 L.15-23; P.132 L8-24; P.133 L.1-24; P. 134 L1-24; P.135 L.1-24). Thus, Plaintiff's excuse for not reporting her complaints to Edward Jones was her absurd belief that all employers, including Jones, automatically discharge any employee who complains, even though Edward Jones' written policy prohibited retaliation.

### c) *Edward Jones acted promptly and reasonably to correct any unlawful harassment and prevent its recurrence.*

Plaintiff contends Edward Jones failed to act promptly and reasonably because it: 1) failed to provide a "viable" harassment policy (Pltf. Opp. at 20, ¶ 2); 2) failed to "correct or even investigate the harassment," (Pltf. Opp. at 4, ¶ 1); and 3) "refused to acknowledge and

14

investigate" until she walked out (Pltf. Opp. at 20, ¶ 2). These are but three different ways of making the same argument, each completely ignoring the facts concerning Plaintiff's complaints and Edward Jones' response -- facts Plaintiff has admitted. It was not Edward Jones' policy, investigation, or corrective action that was deficient, but Plaintiff's own conduct. The policy was not effective only to the extent Plaintiff failed to properly utilize it. Certainly, "Title VII simply does not permit an employer to 'stand by and allow an employee to be subjected to a course of harassment'" (Pltf. Opp. at 20, ¶ 1). But Plaintiff admits all the facts establishing that once she complained through proper channels and raised possible unlawful harassment, Rarick thoroughly investigated, culminating in a warning to Mahoney (Jones Stmt. ¶¶ 84-153). Clearly, there was a proper investigation and corrective action; it did not occur earlier only because Plaintiff did not properly complain earlier. As explained in the preceding section, the problem was not Jones' harassment policy. Rather, the problem was that Plaintiff unreasonably assumed she would be discharged if she complained so she never reported her complaints to Jones until after she walked out in November.

### 4. Plaintiff was not subjected to religious or age discrimination.

Essentially, Plaintiff argues that the objectionable conduct occurred frequently (Pltf. Opp. at 21, ¶2). She provides no reason to consider it severe. Two joking references to age and humorous mispronouncing of Jewish names[13] is mild conduct simply not rising to the level of a hostile work environment. It was the least of Plaintiff's concerns when she griped about Mahoney to her fellow employees. Further, Plaintiff ignores the dispositive *Faragher/Ellerth* defense, except to incorrectly state Edward Jones refused to discipline Mahoney (it is undisputed he was given a stern warning), or terminate him, a remedy to which she was not entitled.

---

[13] *E.g.,* calling Weinberg "Weinbergwitz." (Miller Depo. at 316).